No. 21-70010

---

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

**BRITTANY MARLOWE HOLBERG,**

**Petitioner-Appellant**

v.

**BOBBY LUMPKIN, Director, Texas Department of Criminal Justice, Correctional Institutions Division,**

**Respondent-Appellee**

---

**On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
USDC No. 2:15-CV-285**

---

**BRIEF FOR PETITIONER-APPELLANT
BRITTANY MARLOWE HOLBERG**

---

**David F. Abernethy
Anton Stewart
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia PA 19103-6996
Telephone (215) 988-2502
david.abernethy@faegredrinker.com**

**Shawn Nolan
Federal Community Defender Office for the Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone (215) 928-0520
Shawn_Nolan@fd.org**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

Petitioner-Appellant

Brittany Marlowe Holberg, TDCJ ID Number 999258

Counsel for Petitioner-Appellant in the District Court

Alan J. Lazarus
Faegre Drinker Biddle & Reath LLP

Philip Alan Wischkaemper
Law Office of Philip Wischkaemper

Paul Edward Mansur

Appellate Counsel for Petitioner-Appellant

David F. Abernethy
Anton Stewart
Faegre Drinker Biddle & Reath LLP

Paul Edward Mansur

Shawn Nolan
Federal Community Defender Office, Eastern District of Pennsylvania

Respondent-Appellee

Bobby Lumpkin, Director
Texas Department of Criminal Justice
Correctional Institutions Division

<u>Counsel for Respondent-Appellee in the District Court</u>

Travis Golden Bragg
Office of the Texas Attorney General
Criminal Appeals Division

Edward Larry Marshall
Office of the Texas Attorney General
Financial Litigation & Charitable Trusts Division

<u>Appellate Counsel for Respondent-Appellee</u>

Ryan Baasch
Office of the Texas Attorney General
Solicitor General Division

Travis Golden Bragg
Office of the Texas Attorney General
Criminal Appeals Division

Edward Larry Marshall
Office of the Texas Attorney General
Financial Litigation & Charitable Trusts Division

*/s/ David F. Abernethy*
DAVID F. ABERNETHY
Counsel for Appellant-Petitioner
Brittany Marlowe Holberg

## STATEMENT CONCERNING ORAL ARGUMENT

Both the stakes in this case and the issues presented in this appeal warrant oral argument. Both issues present important constitutional concerns: whether due process required the State to disclose that the prosecution's most important witness was working as a paid police informant, and whether defense counsel provided ineffective assistance by failing to investigate and present extensive mitigation evidence that was critical to the choice between life and death. Those concerns can only be addressed in this appeal through a careful exploration of the voluminous record and the applicable law. This Court has determined, by granting a certificate of appealability, that these are significant questions worthy of consideration on the merits. Oral argument will significantly aid that decisional process.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT CONCERNING ORAL ARGUMENT ................................................ iii

TABLE OF AUTHORITIES ................................................................................ vi

JURISDICTIONAL STATEMENT ........................................................................ 1

ISSUES PRESENTED FOR REVIEW .................................................................... 2

STATEMENT OF THE CASE ............................................................................... 3

    A.    The Homicide and the Guilt Phase of Trial ........................................ 5

    B.    The Sentencing Phase of Trial ........................................................ 12

    C.    Holberg's Direct Appeal ................................................................. 17

    D.    The State Habeas Proceeding .......................................................... 17

        1.    Kirkpatrick's Undisclosed Work as an Informant ................... 17

        2.    Unpresented Mitigation Evidence ......................................... 18

        3.    The State Court Rulings on the Ineffectiveness Claim ............ 24

SUMMARY OF ARGUMENT .............................................................................. 30

STANDARD OF REVIEW .................................................................................. 31

ARGUMENT ................................................................................................... 31

I.    The State Violated Holberg's Due Process Rights by Failing to Disclose that a Critical Prosecution Witness Was a Paid Informant for Law Enforcement ......................................................................... 31

    A.    The Evidence Was Favorable to Holberg. ......................................... 33

    B.    The Evidence Was Suppressed. ....................................................... 35

    C.    The Evidence Was Material for Both Phases of Trial. ....................... 35

        1.    Kirkpatrick Was a Critical Witness; Impeaching Her Was Vital. ................................................................................... 36

        2.    The Evidence Does Not Support a Conclusion That Impeaching Kirkpatrick Would Have Damaged Holberg. ...... 38

        3.    The Undisclosed Evidence Would Have Discredited the State's Investigation. ............................................................ 41

# TABLE OF CONTENTS
## (continued)

Page

D.    AEDPA Poses No Barrier to Relief. ....................................42

II.    Trial Counsel Were Ineffective in Failing to Conduct an Adequate Mitigation Investigation and Provide Critical Information to Their Mental Health Expert...................................................................44

A.    Trial Counsel Performed Deficiently. .................................47

1.    Counsel Unreasonably Disavowed Reliance on Mitigation. ..................................................................48

2.    Counsel's Professed Strategies Were Based on Inadequate Investigation. ............................................49

3.    Counsel's Professed Strategies Were *Post Hoc* Rationalizations. .........................................................55

4.    Counsel's Failures Undermined the Substance and Strength of Dr. Patel's Testimony. ...........................61

B.    Counsel's Deficient Performance Prejudiced Holberg. ....................65

1.    The Unpresented Mitigation Was Powerful. ...........................66

2.    The Unpresented Evidence Was Uniquely Mitigating Here. ...............................................................67

3.    The Unpresented Evidence Would Have Refuted the State's Arguments. ....................................................69

4.    The Sentencing Verdict Was Close. ........................................70

C.    AEDPA Poses No Barrier to Relief. .................................70

CONCLUSION ................................................................................75

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH RULE 32 AND FIFTH CIRCUIT RULE 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andrus v. Texas*,
   140 S. Ct. 1875 (2020)................................................................................47, 48

*Banks v. Dretke*,
   540 U.S. 668 (2004).....................................................................passim

*Brady v. Maryland*,
   373 U.S. 83 (1963).......................................................................passim

*Brumfield v. Cain*,
   576 U.S. 305 (2015)................................................................................71, 72

*Cone v. Bell*,
   556 U.S. 449 (2009)........................................................................................33

*Delaware v. Van Arsdall*,
   475 U.S. 673 (1986)........................................................................................34

*Dennis v. Sec'y, Pa. Dep't of Corr.*,
   834 F.3d 263 (3d Cir. 2016) ..........................................................................38

*Giglio v. United States*,
   405 U.S. 150 (1972)........................................................................................42

*Harrington v. Richter*,
   562 U.S. 86 (2011)..........................................................................................56

*Holberg v. Lumpkin*,
   No. 21-70010, 2023 WL 2474213 (5th Cir. March 13, 2023) ......................1, 34

*Kyles v. Whitley*,
   514 U.S. 419 (1995).....................................................................passim

*Lewis v. Dretke*,
   355 F.3d 364 (5th Cir. 2003) ....................................................................55, 66

*Lindsay v. King*,
   769 F.2d 1034 (5th Cir. 1985) .......................................................................41

*Lockett v. Anderson,*
230 F.3d 695 (5th Cir. 2000) ................................................................54, 55, 67

*Massiah v. United States,*
377 U.S. 201 (1964)................................................................................42

*Miller v. Dretke,*
420 F.3d 356 (5th Cir. 2005) ........................................................47, 51

*Panetti v. Quarterman,*
551 U.S. 930 (2007)................................................................43, 71, 72

*Porter v. McCollum,*
558 U.S. 30 (2009)..................................................................passim

*Rompilla v. Beard,*
545 U.S. 374 (2005)................................................................passim

*Strickland v. Washington,*
466 U.S. 668 (1984)................................................................passim

*United States v. Abel,*
469 U.S. 45 (1984)..................................................................34

*United States v. Bagley,*
473 U.S. 667 (1985)................................................................32

*United States v. Brown,*
650 F.3d 581 (5th Cir. 2011) ............................................43

*United States v. Cervantes-Pacheco,*
826 F.2d 310 (5th Cir. 1987) ............................................33

*United States v. Delvalle,*
444 F. App'x 336 (11th Cir. 2011) ....................................70

*United States v. Ottersburg,*
76 F.3d 137 (7th Cir. 1996) ..............................................70

*Virgil v. Dretke,*
446 F.3d 598 (5th Cir. 2006) ............................................31

*Walbey v. Quartman,*
  309 F. App'x 795 (5th Cir. 2009) ................................................................passim

*Wiggins v. Smith,*
  539 U.S. 510 (2003) ........................................................................................passim

*Williams v. Taylor,*
  529 U.S. 362 (2000) ........................................................................................passim

**STATE CASES**

*G. & H. Equip. Co., Inc. v. Alexander,*
  533 S.W.2d 872 (Tex. Civ. App. 1976) ................................................................34

*Holberg v. State,*
  38 S.W.3d 137 (TCCA 2000) .............................................................17, 36, 37

**FEDERAL STATUTES**

28 U.S.C. § 1291 ......................................................................................................1

28 U.S.C. § 2241 ......................................................................................................1

28 U.S.C. § 2254 ......................................................................................................1

28 U.S.C. § 2254(d) ................................................................................42, 71, 72

**STATE STATUTES**

TEX. CODE CRIM. PROC. ANN., ARTICLE 37.071(2)(b) ......................................37, 48

TEX. CODE CRIM. PROC. ANN., ARTICLE 37.071(2)(c) ...........................................37

TEX. CODE CRIM. PROC. ANN., ARTICLE 37.071(2)(e)(1) ..................................37, 48

TEX. CODE CRIM. PROC. ANN., ARTICLE 37.071(2)(g) ...........................................37

TEX. PENAL CODE § 19.03(a)(2) ..............................................................................37

**OTHER AUTHORITIES**

MCCORMICK ON EVIDENCE § 39 (2023) ..................................................................34

37 TEX. JUR. 3D Evidence § 801 (3d ed. 2023) ........................................................34

2 WHARTON'S CRIMINAL EVIDENCE § 9:12 (15th ed. 2023) ....................................34

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to decide the petition for writ of habeas corpus filed by Appellant Brittany Marlowe Holberg ("Holberg"). 28 U.S.C. §§ 2241, 2254. Holberg appeals here from the final judgment denying that petition. (Appellant's Record Excerpts, Tabs 4 and 6.)

Holberg's timely motion to alter or amend the judgment was denied on November 15, 2021. (Record Excerpts, Tab 5.) Holberg timely filed her notice of appeal on December 14, 2021. (Record Excerpts, Tab 2.)

On March 13, 2023, this Court granted a certificate of appealability on two issues. *Holberg v. Lumpkin*, No. 21-70010, 2023 WL 2474213 (5th Cir. March 13, 2023) (per curiam). This Court has jurisdiction to review the District Court's conclusions with respect to those issues, as embodied in its final judgment and memorandum opinion and order. 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    The State suppressed evidence that its most critical witness, Vickie Kirkpatrick, worked as a paid informant for law enforcement. With that information Holberg could have impeached Kirkpatrick and refuted the State's contention that she was a disinterested witness who only wanted to "do the right thing" and be "truthful." Is Holberg entitled to relief under *Brady v. Maryland,* 373 U.S. 83 (1963), *Banks v. Dretke,* 540 U.S. 668 (2004), and other cases?

2.    Trial counsel failed to investigate and present compelling mitigation evidence, including evidence that Holberg was born addicted to drugs, that her parents gave her drugs and alcohol in early childhood, that they physically abused her and neglected her basic needs, that she was subjected to repeated sexual violence during childhood and adolescence, that she suffered from major depression and cognitive impairments, and that her resulting drug addiction induced psychosis and delirium. All of this information is recognized as mitigating under decisions of the Supreme Court and this Court. Is Holberg entitled to relief under *Strickland v. Washington*, 466 U.S. 668, 691 (1984), *Wiggins v. Smith*, 539 U.S. 510, 522 (2003), and other cases?

## STATEMENT OF THE CASE

Brittany Holberg was convicted of capital murder and sentenced to death in the 251st District Court of Randall County, Texas, for the killing of A.B. Towery, Sr. ROA.803. Her conviction and sentence were affirmed on appeal and habeas relief was denied in state and federal court.

But District Judge Kacsmaryk, who denied relief below, attached an Appendix to his opinion encouraging Texas clemency officials to "review Holberg's case and afford her the grace and dignity that have been absent from her life to date." ROA.110966. He explained that the "circumstances of Brittany Marlowe Holberg's childhood and adolescence," in which she suffered "repeated sexual victimization" and her "family exposed her to rampant abuse of prescription medication and illicit drugs," provided "stark evidence that Holberg's family and her community allowed her to 'slip through the cracks.'" ROA.110964-110966.

The jurors who sentenced Holberg to death did not see that "stark evidence." The State told them she had "a good childhood" in which "nothing particularly unusual" happened, and that "everything [was] handed to her on a silver platter." ROA.8069:9, 9946:5-9. Despite her "All American upbringing," the State said, she killed Towery "for a fix," because "she'd do anything to get drugs," would gladly "do it all over again," and even had "fun" doing it. ROA.8069:5-13, 8620:17-8625:8. Holberg, the State insisted, showed "[n]o remorse." ROA.8625:6-8.

3

Her counsel responded that she was a "wonderful warm human being until she got hooked on crack cocaine." ROA.9533:5-9. They did not present the "stark evidence" of unrelenting sexual victimization, of her birth as an inconsolable infant addicted to drugs, of early childhood beatings, neglect, and molestation, or of her early and involuntary use of drugs and alcohol. The life Brittany Holberg actually lived, and the gravely injured soul she became, were never put before the jurors who chose death over life.

Trial counsel neither learned nor told that story. Having neglected to conduct a mitigation investigation before trial began, they presented a superficial portrait of Holberg as someone who "could return to her pre-drug self." ROA.1142. Rather than looking into her early childhood and developing and presenting the extensive evidence of trauma from those years, and the psychiatric and cognitive damage it caused, they focused on Holberg's life "most immediately before" the homicide. ROA.1112. They told the jury her drug abuse in later years was the problem, but that Holberg "probabl[y]" could not get drugs in prison, ROA.9963:20-25, and therefore "deserves a life sentence," ROA.9977:1-5.

Meanwhile the State was presenting a very different picture, based on gruesome testimony from a jailhouse informant, Vickie Kirkpatrick. She claimed that Holberg admitted killing Towery in the course of robbery, said she enjoyed killing him, reveled in the "fountain of blood" she saw, would kill again in the

same circumstances, and recounted it all without remorse. ROA.8621:17-8625:8.

Unbeknownst to the jury and Holberg's counsel, Kirkpatrick was a police

informant who had been paid thousands of dollars, ROA.106754:2-106755:4,

106759:1-7, who was placed in Holberg's cell after a felony burglary arrest,

ROA.29884, and who conveyed these explosive allegations to her law enforcement

handlers only two days later, ROA.29886 – handlers who, the very same day, got a

criminal charge against her dismissed and helped her obtain release on bond,

ROA.29756, 92731, 106754:25-106755:20.

### A.    The Homicide and the Guilt Phase of Trial

On November 13, 1996, Holberg was 23 years old. After a childhood and

adolescence marked by repeated sexual abuse and trauma, she had fallen deeply

into drug addiction and was working as a prostitute in Amarillo. ROA.8922:25-

8942:24.

Two years earlier she had been found "lying in the corner of an intersection"

in Amarillo after overdosing, and was hospitalized with psychosis, paranoia, and

severe delirium. ROA.75675-75676, 77496-77497. After her discharge, she

became homeless. ROA.75679.

A year later a group of men gang-raped her. ROA.77700-77706, 77711-

77712, 77727. Traumatized and injured, she went to the hospital where she told

doctors that her "soul [wa]s dead" and she wanted to kill herself. ROA.77710.

Although she managed to complete a substance abuse program, she soon relapsed. She returned to sex work and her cocaine addiction worsened. ROA.85416-85417.

On November 13, 1996, after ten sleepless days using crack cocaine, Holberg was involved in a minor traffic accident. She fled the scene and sought refuge in Towery's apartment. ROA.8989-8993, 9001. There she and Towery got into a heated argument that escalated into a violent struggle that left Towery dead with numerous stab wounds and a lamp base stuck in his throat, and Holberg cut and bruised, bleeding from the head where Towery had torn out clumps of her hair. ROA.9001-9038. Holberg fled, was captured in Tennessee, and admitted to killing Towery, in self-defense. ROA.9042-9053.

Holberg's case was assigned to Judge Patrick Pirtle. Catherine Dodson and Candace Norris were assigned to defend her, assisted by investigators Jim Patterson and Kathy Garrison. District Attorney James Farren led the prosecution team, assisted by Robert Love and Dave Blount. ROA.921-922, ¶¶3-5.

The State alleged that Holberg, desperate to feed her addiction, tricked her way into Towery's apartment to steal money and drugs, killed him, and delighted in the bloody spectacle. ROA.9938:11-25. The defense contended Towery was Holberg's occasional prostitution client and that he invited her in but then flew into a rage and attacked her after she smoked crack in his apartment. Under the

6

influence of drugs and fearing for her life she "flipped out" and killed Towery during the frenzied struggle. ROA.9030-9031.

The prosecution's star witness was Vickie Kirkpatrick, who was arrested for felony burglary and placed in a cell with Holberg and several other women in May 1997. Two days after arriving in that cell, where she met Holberg in person and spoke to her for the first time, ROA.8619:3-13, Kirkpatrick gave a statement to police alleging that Holberg made admissions about Towery's killing, ROA.29886, to which Kirkpatrick later testified at trial.

Led by the prosecutor, Kirkpatrick testified that Holberg told her on the day of the killing Towery gave Holberg money, which she used to buy drugs, but Holberg then went back to his apartment for more money. According to Kirkpatrick, Holberg said Towery refused to give her more money, Holberg tried to take it, a struggle ensued, and Holberg started to stab Towery. ROA.8621:14-8622:19. Kirkpatrick claimed Holberg said seeing his blood was "amazing" and "pretty," like a "fountain." ROA.8622:22-8623:8. Kirkpatrick also claimed that Holberg described Towery on the ground, making "gurgling noises . . . like pain noises," ROA.8623:18-21, and then said she "stuck a lamp thing down his throat because she got tired of hearing him make the noises," ROA.8620:24-8621:3.

Kirkpatrick insisted that Holberg said killing Towery was "fun" and "amazing," ROA.8623:17, and that "if she had to do it all over again, … she

would," because "she'd do anything to get drugs or drug money." ROA.8624:14-23. Kirkpatrick added that Holberg showed "[n]o remorse." ROA.8625:3.

Kirkpatrick was the sole source of this account. The State presented her to Holberg's jury as a disinterested individual who just "wanted to do the right thing," and be as "truthful . . . and complete as . . . [she] could." ROA.8618:17-8619:2. But at the time of her arrest (and Holberg's supposed admissions) Kirkpatrick was a paid informant who had been given thousands of dollars to make drug buys for Amarillo police. ROA.106754:2-106755:4, 106759:1-7. In the months leading up to her felony burglary arrest she had almost daily contact with Corporal Stallings and Sergeant Williams from the Amarillo police, who paid her $100 for each drug buy. ROA.106754:2-106755:4. They knew she was a daily cocaine user, ROA.29911, likely using her informant payments to buy drugs, ROA.106755:1-12, and frequently high when she met with them, ROA.106753:8-14.

On May 13, 1997, Stallings arrested Kirkpatrick for felony burglary and she was placed in the cell with Holberg. ROA.29849, 29884. Two days later Stallings transported Kirkpatrick from the jail, and within an hour she gave her statement to Amarillo police detailing the explosive admissions Holberg allegedly made. ROA.110804-110805, 29884, 92731. That same day Stallings secured dismissal of a criminal trespass charge against Kirkpatrick and helped her get released on bond. ROA.29756, 92731, 106755:25-106756:20.

The felony burglary charge was still pending against Kirkpatrick when she testified against Holberg. Before she testified, Kirkpatrick wrote to the judge in her case, touting her informant work as a reason the judge should give her probation. ROA.30232-30233. In that letter she claimed this was her "first felony," ROA.30232, which was false, as the DA proved at her plea hearing, ROA.106727:3-106728:8.

The State did not disclose Kirkpatrick's work as a paid informant until after Holberg was sentenced to death. At Kirkpatrick's later plea hearing in the burglary case, Stallings testified "no one until today knew that Ms. Kirkpatrick had been an assistant to the Amarillo Police Department," other than the police she worked with. ROA.106759:11-106760:5.

Holberg denied Kirkpatrick's account, and in fact denied any conversation with her about the killing. ROA.9009-9042, 9055:23-9056:4. Holberg testified that Towery initiated the struggle by screaming at her and hitting her in the head. ROA.9009-9010. She was "terrified," "afraid," and unable to breathe. ROA.9023, 9026-9027. At one point Towery had hold of her hair and shirt and she shoved the lamp base towards him to get him away from her. ROA.9034-9035. After the struggle she was wounded in the head, torso, and hands. ROA.9038-9039, 9050-9052.

On cross-examination the prosecutor relied on Kirkpatrick's account to challenge Holberg's credibility about using the lamp, ROA.9137:2-13, 9140:16-25, 9141:1-3, and to undercut her denial that she would "do anything to get drugs or drug money," ROA.8624:23, 9149:5-9151:9.

Holberg supported her testimony about self-defense by relating times when she had been battered and traumatized. She testified a male babysitter molested her when she was four or five years old, ROA.8888:20-8889:3, and that her parents abused alcohol and drugs and gave her access to both as a child, ROA.8892:3-8893:24. She told the jury that when she was 12 her Aunt Karen was murdered, after which the family "fell apart." ROA.8891:18-8892:3. As a teenager she was assaulted by two men in an alley near her home. ROA.8894:14-8897:25.

Holberg dropped out of high school and married at age 17. ROA.8900:2-8901:12. It was an abusive marriage, during which Holberg became addicted to painkillers, which ultimately led to her cocaine addiction. ROA.8910:2-8916:2, 8932:5-17, 9065:12-18. While living in Oklahoma she was the victim of another assault. ROA.8906:2-8908:19. While still a teenager she began to work as a dancer in strip clubs and then as a prostitute. ROA.8934:14-8936:25.

To further challenge Holberg's credibility the prosecutor contended her sex work was proof she was "trained and experienced in deception," ROA.9076:18-20, because "there's an element that goes on with this prostitution in that you are not

enjoying this so much but you must give at least some appearance that you are."

ROA.9061:5-15. The prosecutor repeatedly emphasized this so-called "element of

deceit or deception" in her sex work. ROA.9061:21-9062:20, 9078:12-14.

From the outset the prosecution emphasized the account of the homicide

Kirkpatrick attributed to Holberg. In his opening the prosecutor twice mentioned

Kirkpatrick by name, and referred to her version of Holberg's alleged admissions

five times, citing her testimony that Holberg used the lamp to stop Towery from

making gagging noises, reveled in the "fountain of blood," and showed no

remorse. ROA.8077:10-8078:16, 8082:20-8084:6. He ended his opening by

haunting the jury with the most vivid and violent image from Kirkpatrick's

testimony:

> And finally, finally, the lamp, the lamp to stop the
> gagging noises. . . . You will not hear the gagging noises
> during this trial. We won't be able to reproduce them for
> you.
>
> But I suspect that you, like those of us who worked
> on this case, will hear the gagging noises, not in this
> courtroom, but in your thoughts, your sleep and in your
> dreams maybe for the rest of your lives.

ROA.8084:5-15.

The prosecutor continued to rely on Kirkpatrick's testimony in closing,

citing her claims that Holberg admitted killing Towery "for drugs," and "for a fix,"

ROA.9288:1-10, "shove[d] the lamp down his throat" to stop the gagging noises, ROA.9288:16-18, and showed no remorse at all, *see* ROA.9288:19-9289:1.

When the defense pointed out that Kirkpatrick's account of a "fountain" of blood was inconsistent with the physical evidence, ROA.9319:17-24, the prosecutor doubled down on Kirkpatrick's credibility. "Ms. Kirkpatrick is telling the truth," he insisted in rebuttal, arguing that Holberg "really did talk to Ms. Kirkpatrick and she really did tell her these things." ROA.9339:9-22. He even turned to the State's favor the fact that the physical evidence refuted the "fountain" of blood, arguing this just showed Holberg was full of "[j]ailhouse puffery" and a "liar[]." ROA.9339:23-25.

On March 13, 1997, the jury convicted Holberg of capital murder based on a robbery/burglary aggravator. ROA.9353:10-14.

### B.    The Sentencing Phase of Trial

The State began its presentation by re-offering the evidence from the guilt phase. ROA.9378:1-3. It then presented prior bad acts evidence through four witnesses.

Katrina Dixon testified that while they were in jail together Holberg asked her "to shut Vickie [Kirkpatrick] up," ROA.9395:5-9, and also testified that to her "understanding" Holberg paid several men to beat up another inmate, ROA.9395:10-9396:24. Mary Burnett and Corena Norrell testified that years

earlier Holberg told them she killed a prostitution client named E.R. Williams by hitting him in the head with a cane. ROA.9424:9-19, 9435:3-22, 9475:20-9476:17. Probation Officer Richard Bernal testified about forms Holberg filled out indicating she had a good childhood, had once broken her husband's nose, and had cut someone with a knife. ROA.9458:17-25, 9468:10-13.

The State presented a psychiatrist, Dr. Richard Coons, who testified to an opinion that Holberg presented a danger of future violence, based on a lengthy hypothetical that included Holberg's alleged account of the crime as supplied by Kirkpatrick. Dr. Coons testified Holberg would probably "commit criminal acts of violence in the future," ROA.9495:5-9511:4, based in part on "the gratuitous lamp down the throat," ROA.9512:4, to stop the "gagging sound," ROA.9505:3-13. Coons said "the lamp was unnecessary" and showed Holberg's "violence and overkill." ROA.9518:11-24.

Holberg's counsel offered a four-sentence opening statement, telling the jurors that Holberg was a "wonderful warm human being until she got hooked on crack cocaine," that their answer to the first question about future dangerousness should be "no," and that as a result "we will not proceed to question No. 2," the question relating to mitigating facts. ROA.9533:5-15.

Holberg's stepfather, John Schwartz, testified about Holberg's upbringing, describing her as an "outgoing, energetic, intelligent," and "healthy" girl before

she became addicted to drugs. ROA.9535:13-23, 9543:11-16. Holberg was an "honor roll" student and, he claimed, was "accepted – I was very proud – by Duke University because of her SAT scores." ROA.9538:24-9539:2. She also did "a lot of volunteer work." ROA.9539:5-21. Schwartz reported that Holberg's behavior changed significantly in high school when she became "boy crazy." ROA.9539:22-24.

Schwartz echoed some of what Holberg had told the jury: her Aunt Karen had been murdered, Holberg was attacked in an alley when she was 14, ROA.9547:3-6, and she was later assaulted in Oklahoma, ROA.9536:2-4, 9541:19-23. But he also contradicted Holberg, testifying she did not tell him at age five that a babysitter molested her. ROA.9570:1-18. Schwartz described his and Holberg's mother's use of alcohol, marijuana, and valium in the home, but claimed Holberg did not use those substances there. ROA.9536:23-9538:14. In essence, Schwartz denied that Holberg suffered abuse or trauma in the family home.

Two lay witnesses provided brief testimony about the alcohol and marijuana abuse by Holberg's parents, her Aunt Karen's murder, and Holberg's later struggles with addiction. ROA.9592:15-25, 9598:1-17, 9628:1-9629:10, 9635:1-17. Two former school counselors testified that Holberg was an outgoing, good child. ROA.9763:23-9764:3, 9791:1-6.

Dr. Dhiren Patel, a psychiatrist, testified for the defense that Holberg suffered from drug dependency, Post-Traumatic Stress Disorder ("PTSD"), and Battered Woman Syndrome ("BWS"), with drug dependency having the greatest impact on her behavior and the offense. ROA.9679:13-9680:7, 9718:4-9719:7. He opined she had a low probability of future violence in prison because, to his knowledge, cocaine and heroin were not available there. ROA.9668:7-9670:18. He read from the death certificate of E.R. Williams, which reported his cause of death as pancreatic cancer. ROA.9686:16-9688:11. On cross he admitted Holberg was his primary source of information and that he had not talked to her parents or friends, though he had reviewed certain records. ROA.9666:1-9668:6, 9703:3-9705:13. He also admitted some information from Holberg may have been untrue and that this could affect the accuracy of his conclusions. ROA.9705:11-14.

A jail minister testified that while awaiting trial Holberg expressed remorse and regret "time and again." ROA.9776:19-22. An inmate who shared a jail cell with Holberg and Kirkpatrick testified she never heard the admissions Kirkpatrick described and that Holberg frequently awoke in cold sweats from nightmares. ROA.9865:1-9866:24. A defense investigator for the Texas Department of Criminal Justice ("TDCJ") testified that drug cases were rare in prison and that he never had a case involving crack cocaine in prison. ROA.9835:1-8. Finally, defense counsel inexplicably called two jail officers to testify that Holberg had

been involved in altercations while incarcerated. ROA.9886:8-9887:2, 9891:2-25, 9897:3-24.

In rebuttal, the State called a TDCJ investigator who testified that weapons, violence and drugs, including cocaine and heroin, were prevalent in Texas prisons. ROA.9907:7-9908:13, 9920:17-9921-4.

In closing, the prosecutor asked "where is the mitigating evidence?" He insisted Holberg "had a good childhood" and "had everything handed to her on a silver platter." ROA.9946:5-9. He argued her parents only used "some marijuana," which "a lot of folks" do. ROA.9946:18-9947:2. He claimed Holberg had "a good relationship with her mother," and "had everything she ever wanted except more attention and love from her parents," and that "her real problems with drugs began later, not at home." ROA.9946:5-9947:24, 9981:13-25. He insisted "[s]he chose the drugs, she chose the prostitution, she chose to live a life of deception, manipulation and violence." ROA.9948:4-6.

The prosecutor also emphasized Dr. Coons's reliance on Kirkpatrick's testimony: "[Holberg] chose to hang around and cram a lamp down his throat, five inches into his mouth and throat. That scares him and that scares me. That bothers him about whether she's going to be a future danger." ROA.9990:3-13.

The defense closing disputed Kirkpatrick's account of the crime and the supposed "fountain" of blood. ROA.9958:1-9960:22. Defense counsel also said to

16

the jury, "I told you in a very brief opening statement I didn't believe you would deliberate on the issue of the mitigating evidence," but then changed course and said "I want to talk to you about the issue of mitigating evidence." ROA.9965:2-12. Counsel then briefly discussed Holberg's parents' "partying," the trauma of Aunt Karen's death, Holberg's leaving home as a minor, her later drug addiction, and her remorse. ROA.9969:1-9973:14.

The jury deliberated for 11 hours before concluding that Holberg presented a future danger of violence and that mitigating circumstances warranting life imprisonment were not present. ROA.9993:1-9994:25.

### C.    Holberg's Direct Appeal

The Texas Court of Criminal Appeals ("TCCA") affirmed. ROA.807. It identified Kirkpatrick as "a key prosecution witness" and adopted crucial parts of her testimony as the facts of the case. ROA.809-811; *Holberg v. State*, 38 S.W.3d 137, 139 (TCCA 2000). As the District Court later observed, the TCCA's view of the evidence was "exactly how prosecution witness Vickie Kirkpatrick described Holberg's account of her fatal encounter with Towery." ROA.110706.

### D.    The State Habeas Proceeding

### 1.    Kirkpatrick's Undisclosed Work as an Informant

Holberg petitioned the state court for habeas relief in July 2000. She alleged the State suppressed impeachment evidence about Kirkpatrick including her work as a police informant. Because it not been disclosed Holberg requested an

17

evidentiary hearing "to determine the extent of the State's misconduct."
ROA.1688, 1905.

The court refused and rejected Holberg's *Brady* claim without discussing
Kirkpatrick's work as an informant. ROA.97956-97957, 97963-97964. The court
reasoned that the prosecutor's open file policy fulfilled the State's duty of
disclosure, and that a *Brady* claim cannot be premised on evidence that is
inadmissible or already known to the defense, ROA.97964, though neither was true
as to Kirkpatrick's informant work.

### 2.    Unpresented Mitigation Evidence

Holberg also alleged that trial counsel provided ineffective assistance by
failing to investigate and present mitigating evidence. ROA.48406, 84940.

Holberg proffered extensive evidence – never collected by trial counsel –
that her mother, Pam Schwartz, abused alcohol and drugs during her pregnancy,
that Holberg was born drug-addicted, and that she suffered health problems and
cognitive impairments as a result. ROA.84951, 84956. Holberg's father, Jimmy
Brogdon, whom counsel never contacted, would have testified that throughout her
pregnancy Pam "drank alcohol, injected heroin, and took everything else she could
get her hands on." ROA.85672. Other family members, also never contacted,
would have confirmed Pam's heavy substance abuse during the pregnancy.
ROA.85785-85786, 85695.

Brogdon was "terrified that Pam's constant drug and alcohol use while she was pregnant would cause some sort of serious birth defect." ROA.85673. As an infant Holberg "threw 'fits' where her arms and legs shook violently like a body going through withdrawal," and was "excessively sensitive to touch and could not be soothed or calmed throughout this time." ROA.85720. It "seemed like it hurt to touch her," Brogdon recalled. ROA.85673, ¶13. For the first months of her life Holberg was "an addicted infant" going through "detoxification and drug withdrawal." ROA.85720, 85756, ¶12. Holberg would later develop chronic asthma, cognitive impairments, and her own addictions. ROA.85722-85723, 85798-85790.

Her parents' extreme substance abuse continued into Holberg's childhood. There were "needles stuck in between towels in their bathroom," ROA.85779, ¶11, and "cake pan lids full of pot and pills just lying around," ROA.85695, ¶12. The family home was a drug den for Holberg's parents and their friends. ROA.85688, ¶19. They gave Holberg alcohol in early childhood, ROA.47591, and got Holberg and her cousin high on marijuana, ROA.85688, ¶19. When Jimmy Brogdon was imprisoned on heroin dealing charges, ROA.47219, Pam took up with John Schwartz, marrying him when Holberg was four. ROA.49192. Their relationship also centered on drug abuse; they injected heroin and methamphetamines, used

cocaine, and cooked methamphetamine in the bathtub. ROA.85770, ¶7, 85695, ¶12.

The state post-conviction record showed that counsel failed to collect evidence of extensive childhood abuse and neglect in the home. ROA.84952-84953. When Holberg was an infant her mother "[o]ften . . . would get impatient and shake Brittany real hard." ROA.85673, ¶13. Holberg's uncle "could not believe the way they neglected" her; he bought her diapers and food because her parents spent their money on drugs. ROA.85696, ¶14. When Holberg was a toddler her mother would "smack" and "hit Brittany much too hard." ROA.85786, ¶16. She "yell[ed] and scream[ed]" and "spanked Brittany all the time." ROA.85779, ¶11.

Holberg also witnessed violence, as when her father "slapped her [mother] around," and "she would fight . . . back," ROA.85674, ¶16, and when he "[b]roke three toes trying to kick down the door" and "finally used the butt of the shotgun to beat down the door" to the bathroom where her mother hid, ROA.85672, ¶9. Holberg's mother "tried to punch" her stepfather and "her fist went through the wall and made a big hole." ROA.85771, ¶12; *see also* ROA.49305, 49338, 49344-49346, 49354, 49265, 49272.

Counsel likewise failed to collect available evidence of extensive sexual abuse of Holberg, and her parents' indifference to this trauma. ROA.84951.

Hospital records described Holberg's sexual assault by a male babysitter when she was five years old, and recorded that when Holberg reported the abuse her mother said Holberg was "exaggerating" and "shouldn't talk like that," then left Holberg in the molester's care again. ROA.48927, 49000.

Witnesses also could have testified that Andy Grimes, who was having an affair with Pam, sexually abused Holberg from age 12 or 13 to age 15. ROA.85697, ¶19, 85764-85765, ¶7, 85774, ¶22. Holberg's stepfather, John Schwartz, was no more interested in protecting her from sexual victimization than her mother. He would tell Holberg that she had a "nice ass" and asked intrusive questions about her sexuality. ROA.85766, ¶9, 85702-85703, ¶7.

As a result of her prenatal drug addiction and traumatic childhood, Holberg suffered "wide-reaching" and "significant brain dysfunction" that impaired executive functioning, including her ability to plan and self-inhibit, her memory, her emotional regulation, and her intellect, resulting in "her inability to do simple mathematics." ROA.85801, 85808-85810. John Schwartz's testimony about Holberg's SAT scores and acceptance to Duke University was false. Holberg did not attain the required score of 500 on the verbal or math portions of the SAT to even qualify for Duke's summer program. ROA.78004. In fact her verbal score of 250 and math score of 260 placed her in the seventh and second percentiles nationally. ROA.78009-78010.

The jury never heard about Holberg's "pattern and severity of brain dysfunction." ROA.85808-85810. They never learned that Holberg does not "consistently describe information and/or events . . . not because she would not relay information consistently and accurately, but — because of brain dysfunction — she could not relay information consistently and accurately." ROA.85798, ¶24.

Because they did not investigate Holberg's family history, her counsel were also unaware that "Brittany's family has an extensive history of severe, intractable mood disorders with psychotic features and other mental diseases on both her paternal and maternal side," along with "an extensive legacy of intra-familial violence and abuse" and "chronic and extreme chemical dependency." ROA.85709-85711. In elementary school Holberg's mother and uncle were sexually molested by a family member, which explained why her mother treated Holberg's sexual victimization as normal — in their family it was. ROA.85713. Holberg's mother suffered from psychiatric illness and normalized bizarre sexual behavior throughout Holberg's life. ROA.85713-85715. Her numerous marriages coincided with numerous affairs including with her brother-in-law, the man who molested Holberg beginning at age 12 or 13, Holberg's high school friends, and Holberg's husband. ROA.85697, 85702, 85714, 85719, 85764-85765.

Holberg's adolescence and early adult years mirrored her mother's decline into severe depression, drug addiction, and extreme sexual behavior, as

22

documented in medical records. ROA.85726-85729. In the 16 months preceding the homicide, Holberg's depression and addiction intensified to the point that she was hospitalized with "psychotic symptoms including visual hallucinations and tactile delusions," and later "severe delirium" from extended intravenous injection of cocaine. ROA.77492-77496, 77700-77706, 85827-85728. During the latter hospitalization she would "recoil and scream out" when touched, ROA.85728, an extreme reaction that recalled her drug addiction as an infant (and that presaged the homicide the following year). During that same time period she was gang-raped. ROA.77700-77702, 77711-77712, 77727.

Hospital records also documented that Holberg's husband physically "attacked her on at least two different occasions," causing injuries requiring stitches, and on another occasion he "molested her and sodomized her." ROA.47589; *see also* ROA.104182:17-10483:18. When she confided this to her stepfather he said "she should stay with . . . [her husband] and that a husband could not rape a wife." ROA.47589.

If counsel had investigated these facts and shared them with Dr. Patel he could have testified about Holberg's "brain dysfunction," her lifelong history of "highly significant mental health issues and factors," ROA.85754, including chronic major depression and PTSD, ROA.85757-85758, and her family history

contributing to impairments and traumas, ROA.85755-85759. Dr. Patel stated in a

post-conviction affidavit that, based on information not supplied before trial,

> Brittany has brain damage that seriously impairs her
> judgment in certain situations. She also has a mood
> disorder that was probably inherited from both parents.
> On top of these significant mental illnesses, Brittany
> meets the criteria for PTSD, as a result of multiple
> exposures to traumatically terrifying and life-threatening
> experiences.

ROA.85761, ¶21. Dr. Patel's post-conviction findings were confirmed by

psychiatric and neuropsychological testing. ROA.85758-85761.

Armed with complete and accurate information, Dr. Patel would have

testified that "Brittany's underlying mental illness is at the core of her history of

addictive disease." ROA.85755. She "suffers from chronic major depression" that

she was "greatly predisposed to inheriting." ROA.85757. "This genetic

programming was compounded by extreme neglect and abuse during her early

childhood developmental period." ROA.85757. "Eventually, Brittany's life became

organized around shutting off the intense mental and emotional pain of her life

through the use of extreme levels of substance use," which "required medical

interventions and resulted in psychotic symptoms." ROA.85758.

### 3.    The State Court Rulings on the Ineffectiveness Claim

The state court denied Holberg's requests to depose trial counsel and the

prosecution team. *See, e.g.,* ROA.909, 917, 10807:17-10811:11, 10725:7-13. It

denied an evidentiary hearing on issues relating to ineffective assistance, other than

permitting testimony by the defense counsel and investigators about what they did

and why, pursuant to an order from the TCCA. ROA.1054, 1078, 10675:13-

10685:13, 10818:5-10820:12. At that limited hearing the court sustained objections

to questions about trial counsel's compliance with professional standards for

investigating mitigation. ROA.11609:1-11610:10, 11613:7-11614:1, 11620:18-

11622:6, 44324:1-44325:22. It also excluded the affidavits Holberg proffered. *See,*

*e.g.,* ROA.1145-1149, ¶¶1-25, 10935:11-10937:19, 11699:16-11702:13. It rejected

Holberg's efforts to call other witnesses. ROA.1073-1078, ¶¶7-12, 10680:8-9,

10685:4-5, 10819:5-10820:11.

    The state court ultimately rejected the ineffectiveness claim, ROA.1063-

1151, adopting the State's proposed findings in full and refusing to consider

evidence contesting the State's arguments. For example, the parties disputed

whether trial counsel gave Dr. Patel a Northwest Texas Hospital record

demonstrating that Holberg had suffered from cocaine-induced psychosis,

delirium, and hypersensitivity, the same conditions that manifested during her

struggle with Towery. ROA.12650:5-12651:16, 11940:1-11951:23, 11954:15-

11956:19, 16496, 16511, 44311:6-44312:25, 44441:13-44451:1. No record showed

that counsel sent it to Patel, ROA.1114, 1122, 9666:1-9668:6, and it was not

mentioned at trial or included in his recitation of the records he considered,

ROA.9666:1-23. In a post-conviction affidavit Dr. Patel denied he ever saw it.

ROA.17467-17469, 17475-17476. Two attorneys, Long and Wischkaemper, said

in affidavits that they showed the record to Norris, and she told them she too had

never seen it – and if she had it would have changed the defense strategy.

ROA.17353, 21147.

But at the hearing Norris testified she knew about the record and gave it to

Dr. Patel, denying the conversation to which Long and Wischkaemper attested.

ROA.44314-44316, 44441:13-44451:1. The state court denied Holberg's request to

offer testimony from Dr. Patel, Long, and Wischkaemper, ROA.1945-1946,

12655:6-24, 12693:22-12695:13, 44446:1-44448:25, and found, based solely on

defense counsel's oral testimony, that she gave Dr. Patel all the records,

ROA.1114.

With respect to the ineffectiveness claim generally, the state court found that

Dodson and Norris were appointed in February and March 1997, ROA.1101, and

soon after that Dodson recorded interviews with Holberg's mother, stepfather, and

grandfather. Her mother claimed Holberg had a "normal childhood" until her Aunt

Karen was killed. Her stepfather also described "a fairly normal childhood."

ROA.58168:2-23, 58170:5-58171:10. Both said Holberg's problems began in

adolescence "either as a result of going 'boy crazy' or the emotional impact of her

Aunt Karen's murder, or both." ROA.1107. They admitted their own drug and

alcohol abuse but claimed that "Holberg's serious drug problems began to develop in California," after she left home. ROA.1107-1108, 1141.

These initial characterizations of Holberg's childhood became the foundation of defense counsel's plan "to humanize Holberg and show that she could return to her pre-drug self without drugs." ROA.1141-1142. Counsel acknowledged this strategy was "absolutely" in place before investigators began working on the case, and did not change during the course of trial, ROA.104049:2-104050:27, even though that is when most of the mitigation investigation occurred.

This pre-determined strategy purportedly was based on counsel's view of local juries. The state court found that trial counsel correctly surmised that Randall County juries "were tough on punishment," "did not like drug-related crimes or murder," and "felt that brain damage made one defective . . . and . . . would not 'save' someone they saw as defective." ROA.1097-1098. The jury also purportedly would not be swayed by evidence of sexual molestation or a sexualized childhood and would react harshly to prostitutes. ROA.57755:1-2, 58649:5-14. Counsel believed "the jurors would care more about what had been going on in Holberg's life and the family household most immediately before Towery's killing." ROA.1112. Their plan was to show Holberg as a "juror's sister, daughter, or friend," and to portray her crime "as an aberration for a girl who was basically and intrinsically good. " ROA.1098.

In July 1997, counsel hired Dr. Patel and arranged his evaluation. ROA.1114-1115. After sending him records counsel "relied on his expertise . . . to instruct us what would be relevant" to mitigation. ROA.104191:18-10492:5. Dr. Patel diagnosed Holberg with PTSD, BWS, and drug-induced psychosis, and did not recommend further testing. ROA.1114-1115, 1127. His findings were incorporated into a defense presenting the homicide as an aberration caused by drugs. ROA.1127. Counsel's focus was on Holberg's "drug abuse and addiction" because these were "the overwhelming factors that contributed to Towery's killing." ROA.1112-1113.

The state court itemized the investigation it found pertinent to mitigation. Except for three discrete tasks, Garrison began investigating in December 1997, less than two months before trial began. ROA.1090-1091. Even then, the witnesses she interviewed were guilt phase witnesses who might also provide mitigation evidence: Shawna Williams, who had information about Holberg's relationship with Towery, ROA.11814:4-25; Gary Warren, a drug friend who could attest to Holberg's addiction, ROA.1144-1145, 46413; and Marty Vanaman, another elderly prostitution client of Holberg who said she tried to get off drugs, ROA.11818:2-12.

Other than the three family interviews in early 1997, and meetings with Holberg herself, no social history witnesses were contacted until January 1998, the

month voir dire began. At that point the defense interviewed John Schwartz, but this interview occurred "almost a year after" and was "materially similar" to counsel's earlier interview. ROA.1130. The few remaining witnesses interviewed in January were primarily relevant to the guilt phase; they were pertinent to mitigation only concerning Holberg's "recent drug use," her "non-violent character," and her relationship with Towery. ROA.1092-1093, 1145, 11836:1-2, 45414-45416, 45449, 58341:4-9.

In short, the state court's findings reflect that the defense investigation focused on the guilt phase until after trial began in late January 1998. ROA.1095-1097. Most of the "attempt[s] to follow up with investigatory leads" concerning mitigation occurred in March 1998, after the guilty verdict. ROA.1131, 1133.

The state court found all this reasonable. The court found it reasonable not to interview Holberg's father and other family members who had been "out of the picture for years," because "the jurors would care more about what had been going on in Holberg's life and the family household most immediately before Towery's killing." ROA.1112, 1136. The court also found counsel's limited investigation of sexual victimization reasonable because Holberg denied incidences of childhood abuse, other than the molestation when she was five – even though counsel recognized it is often difficult to elicit information from abuse victims. ROA.1109, 1134-1135. The court also found reasonable counsel's decision not to interview

witnesses who might reveal unhelpful information if they testified. ROA.1137-1141. The court ultimately concluded that counsel was not deficient.

The state court also found no prejudice, explaining that the "uninvestigated and unpresented evidence, even taken at face value, is not so remarkable that it would have offset the brutality and depravity of her crime," and asserting that the jury already heard "the majority of the evidence." ROA.1150, 52835.

The TCCA adopted the lower court's findings in full. ROA.1153.

## SUMMARY OF ARGUMENT

The State suppressed important impeachment evidence about Kirkpatrick – her paid work as a police informant – that would have undercut her credibility and refuted the State's claim that she was a disinterested witness. *Brady*, *Banks*, and other Supreme Court decisions required the State to disclose that evidence. Kirkpatrick was critical to the State's case on both guilt and sentence. There is a reasonable probability the outcome would have been different as to both had this evidence been disclosed. The state court's adjudication of this claim was contrary to and unreasonably applied clearly established federal law.

Trial counsel failed adequately to investigate Holberg's background and unreasonably disavowed mitigation at the penalty phase, leaving the jury with the false impression that Holberg "had a good childhood." Counsel later claimed jurors would not have cared about mitigation from Holberg's early childhood, or about

her sexual victimization or cognitive impairments, but that is contrary to Supreme Court law. These in fact were *post hoc* rationalizations for a belated and incomplete investigation. The evidence counsel failed to collect and present was powerfully mitigating under federal law, especially in the unique circumstances of this case. It is reasonably probable that if the jurors heard it at least one would have voted for life instead of death. The state court's rulings refusing evidentiary development and denying relief were contrary to and unreasonably applied *Strickland* and its progeny, and its factual determinations were objectively unreasonable.

## STANDARD OF REVIEW

In reviewing the denial of a writ of habeas corpus this Court reviews "the federal district court's factual findings for clear error and its conclusions of law de novo." *Virgil v. Dretke*, 446 F.3d 598, 604-05 (5th Cir. 2006).

## ARGUMENT

### I.   THE STATE VIOLATED HOLBERG'S DUE PROCESS RIGHTS BY FAILING TO DISCLOSE THAT A CRITICAL PROSECUTION WITNESS WAS A PAID INFORMANT FOR LAW ENFORCEMENT.

The State's failure to disclose Kirkpatrick's informant work violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Banks v. Dretke*, 540 U.S. 668 (2004), and other cases. It prejudiced Holberg at both phases of trial by depriving her of vital impeachment about the State's most important witness. Had this evidence been

31

disclosed defense counsel could have impeached her with the bias that attaches to a paid informant for the State, and also could have shown that her highly paid informant work coincided with her cooperation against Holberg, that her law enforcement handlers funded her drug habit and facilitated her cooperation against Holberg, that she tried to use her informant work to get leniency in her own felony case, and that she lied to the court in that effort. *See* pages 8-9, above.

Under *Brady*, failure to disclose "evidence favorable to an accused . . . material either to guilt or to punishment" violates due process, "irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "[I]mpeachment evidence . . . falls within the *Brady* rule," because "if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley,* 473 U.S. 667, 676 (1985). *Brady* requires disclosure even if the evidence is known only to law enforcement and not prosecutors. *Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995).

In *Banks*, the Court held that *Brady* required disclosure that a key prosecution witness was a paid informant because of the obvious questions of bias created by that relationship:

> This Court has long recognized the "serious questions of credibility" informers pose. . . . We have therefore allowed defendants "broad latitude to probe [informants'] credibility by cross-examination" and have counseled submission of the credibility issue to the jury "with careful instructions."

540 U.S. at 701-02 (citations omitted). The Court recognized that "'jurors suspect [informants'] motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable . . . .'" *Id.* (citation omitted). The Court also pointed out that jury instructions, including in the Fifth Circuit, urge special caution in assessing the credibility of informants. *Banks,* 540 U.S. at 702. *See also United States v. Cervantes-Pacheco,* 826 F.2d 310, 316 (5th Cir. 1987).

Holberg is entitled to relief because the information about Kirkpatrick's informant status was advantageous to Holberg, it was suppressed by the State, and the violation prejudiced Holberg. *Banks,* 540 U.S. at 691.

## A.     The Evidence Was Favorable to Holberg.

In *Kyles*, the Supreme Court recognized that impeachment evidence need only have "some value" for disclosure to be required. 514 U.S. at 450. The Court rejected the argument that evidence is not favorable because the jury might not credit it, because this "confuses the weight of the evidence with its favorable tendency." *Id.* at 451. *See also Cone v. Bell,* 556 U.S. 449, 471 n.16 (2009) (*Brady* applies where "a jury would have been free to infer" that the evidence supported defendant).

Applying this low bar, it is "beyond genuine debate [that] the suppressed evidence relevant here, [Kirkpatrick]'s paid informant status, qualifies as evidence

advantageous to [Holberg]." *Banks,* 540 U.S. at 691. Had it been disclosed, the

defense could have cross-examined her about her motives and bias, about the fact

that her statement incriminating Holberg coincided with her informant work and

was facilitated by the same officers who paid her thousands of dollars, and about

the fact that she tried to use her informant work to get leniency for herself while

lying about her own criminal record. *See* pages 8-9, above. This was classic

impeachment material.

Employment of a witness by one side in litigation – or any relationship that

may suggest bias – may be used to impeach. *See, e.g., United States v. Abel,* 469

U.S. 45, 50-52 (1984); *G. & H. Equip. Co., Inc. v. Alexander,* 533 S.W.2d 872, 875

(Tex. Civ. App. 1976). *See generally* 37 TEX. JUR. 3D Evidence § 801 (3d ed.

2023); MCCORMICK ON EVIDENCE § 39 (2023); 2 WHARTON'S CRIMINAL EVIDENCE

§ 9:12 (15th ed. 2023). Indeed, the ability to impeach prosecution witnesses based

on bias or interest has a constitutional dimension. *See Delaware v. Van Arsdall,*

475 U.S. 673, 678-79 (1986) ("exposure of a witness' motivation in testifying is a

proper and important function of the constitutionally protected right of cross-

examination") (internal quotations omitted).

And even if "Kirkpatrick was a paid informant 'in unrelated matters,' but not

in Holberg's case," as Judge Duncan's dissent from this Court's grant of the COA

suggests, *Holberg*, 2023 WL 2474213, at *5, that would not matter under *Brady*.

Kirkpatrick's relationship with law enforcement at the time of her cooperation against Holberg was highly impeaching. She was an informant when placed in Holberg's cell, she quickly provided police with a statement incriminating Holberg, and she sought and received benefits from her police handlers at the same time, including dismissal of a criminal charge and release on bond. *See* pages 8-9, above. These circumstances strongly suggest Kirkpatrick's cooperation against Holberg was part and parcel of her informant work. To the extent this question is critical to the resolution of this appeal and remains unresolved this Court should remand to the District Court to hear evidence and determine the issue.

### B.    The Evidence Was Suppressed.

There is no dispute on this point. Stallings testified Kirkpatrick's work as a paid informant was known to law enforcement but not disclosed to others. ROA.106759:11-106760:5. The District Court assumed that the information was suppressed, ROA.110804, and nothing in the record suggests otherwise.

### C.    The Evidence Was Material for Both Phases of Trial.

*Banks* teaches that informant work renders a witness's testimony suspect and may be used to impeach. But the impeachment value of Kirkpatrick's work went far beyond the informant's typical interest in helping the side that pays her.

Her law enforcement handlers knew she was a cocaine addict likely using informant income to feed her drug habit. They did not just pay her cash for

informant work, they secured dismissal of a criminal charge and helped her get a

bond right after she incriminated Holberg. Kirkpatrick tried to leverage her

informant work to get probation on her burglary charges while falsely denying she

had prior felony convictions. *See* pages 8-9, above.  This would have been

powerful impeachment of someone the State presented as only wanting to "do the

right thing" and be "truthful." ROA.8618:17-8619:2.

### 1. Kirkpatrick Was a Critical Witness; Impeaching Her Was Vital.

The appellate court that reviewed Holberg's case recognized Kirkpatrick

was "a key prosecution witness." *Holberg*, 38 S.W.3d at 139. She provided critical

evidence the State relied on both to support a conviction for capital murder and to

establish the basis for a death sentence.

"The likely damage" of withholding impeachment evidence "is best

understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444. The

State's extensive use of Kirkpatrick's testimony at trial is detailed above. *See* pages

10-12, 16, above. Holberg's prosecutor told the jury "I am telling you she really

did talk to Ms. Kirkpatrick and she really did tell her these things." ROA.9339:20-

22. Holberg's own counsel called Kirkpatrick's testimony "absolutely damning."

ROA.80019.

Kirkpatrick put into Holberg's mouth an alleged confession to robbing

Towery, which supported the conviction for capital murder. *See Holberg,* 38

S.W.3d at 138-39; TEX. PENAL CODE § 19.03(a)(2). Her testimony was the only

direct evidence of this; consistent with her statement to police, Holberg denied she

robbed Towery and testified she killed him in self-defense. ROA.9001. Jury

questions during guilt-phase deliberations confirm this importance of this issue.

ROA.9350:13-24 (jury questions regarding robbery and burglary aggravators). As

the Court said of similar facts in *Banks*, "[t]he stress placed by the prosecution on

this part of [the informant's] testimony, uncorroborated by any other witness . . .

belie[d] the State's suggestion that '[his] testimony was adequately corroborated'"

with other proof. *Banks,* 540 U.S. at 672.

    In the penalty phase the State had to prove future dangerousness beyond a

reasonable doubt. ROA.106642; *Holberg,* 38 S.W.3d at 139; TEX. CODE CRIM.

PROC. ART. 37.071(2)(b), (c). It used Kirkpatrick's testimony to do so, including

her claims that Holberg admitted to gratuitous cruelty and willingness to kill again

and showed no remorse. ROA. 8620:24-8621:3, 8623:18-21, 8624:14-23.

Kirkpatrick portrayed Holberg as a soulless monster who reveled in killing, also

vitally important to the State since all jurors had to agree that mitigating

circumstances justifying a life sentence were absent, in order to sentence Holberg

to death. ROA.106644-106645; TEX. CODE of CRIM. PROC. ART. 37.071(2)(e)(1),

(g).

There was no corroboration of Holberg's alleged admissions, so Kirkpatrick's credibility was critical. She claimed Holberg, who was facing the death penalty and who met Kirkpatrick for the first time in jail, ROA.8619:3-13, nonetheless made damaging admissions to Kirkpatrick about the killing within two days, ROA.29884. Kirkpatrick testified Holberg made these statements while "[e]verybody was up talking," and said she (Kirkpatrick) then went to sleep while the other women in the cell might have continued talking, ROA.8625:17-24, yet none of the others testified they heard these alleged admissions. *See* ROA.9864:22-9866:24. Other women who saw Holberg in jail testified she was remorseful and upset about the killing. ROA.9776:19-22, 9866:16-24, 9888:2-11.

The suppressed information "would have empowered defense counsel to effectively impeach one of the . . . [State's] strongest witnesses and mitigated the devastating effect of her testimony." *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 296 (3d Cir. 2016) (en banc). Had the jurors assessed Kirkpatrick's story in light of the undisclosed facts they likely would have rejected her testimony, as juries often do with paid informants. *See Banks,* 540 U.S. at 701.

### 2. The Evidence Does Not Support a Conclusion That Impeaching Kirkpatrick Would Have Damaged Holberg.

The District Court concluded the suppression did not prejudice Holberg because impeachment of Kirkpatrick based on her informant work could have resulted in the State calling law enforcement officers to bolster her credibility with

testimony that she was a reliable informant who provided "truthful information to solve other crimes." ROA.110805.

*Banks* teaches otherwise. Paid informants are paid because they provide information helpful to law enforcement. If general reliability as an informant made impeaching information immaterial the State rarely if ever would be obligated to disclose. The central holding of *Banks* is that informant testimony is inherently suspect, so *Brady* requires disclosure. *Banks,* 540 U.S. at 701-02.

And the record here refutes the notion that prosecutors would have bolstered Kirkpatrick's credibility with evidence she was a reliable informant. In the first place, the record does not show she *was* a reliable informant. Her handler, Corporal Stallings, testified she was helpful in drug cases and he paid her "for a case if it was a good warrant," ROA.106754:8-17, but he did not testify to her overall reliability. The state court made no finding on this point. ROA.36447-36470. Kirkpatrick provided accurate information about drug buys in some cases, ROA.106754:8-106755:9, but that does not suggest she was credible about a jailhouse conversation for which no corroborating evidence exists, especially since some of her account was contradicted by other testimony, ROA.9776:19-22, 9866:16-24, 9888:2-11.

Furthermore, there is no competent evidence the prosecution in fact would have bolstered Kirkpatrick with testimony about her reliability. The District Court

cited an affidavit by defense counsel speculating that prosecutors might use Kirkpatrick's informant work to bolster her credibility. ROA.80017-80020, 110805. But that affidavit does not address the informant work, and more importantly, it does not show that *defense* counsel had any knowledge at all about what the *prosecution* would have done if Kirkpatrick had been impeached with evidence about that work. Neither the state court nor the District Court pointed to any testimony by a prosecutor or law enforcement officer that such impeachment would have been answered with testimony that Kirkpatrick was a credible informant.

In fact, in the immediate aftermath of Holberg's trial the State did not vouch for Kirkpatrick's credibility but savaged it. Robert Love, who prosecuted both Holberg and Kirkpatrick, argued in Kirkpatrick's burglary case, barely a month after Holberg was sentenced to death, that "Ms. Kirkpatrick has lied throughout her entire testimony, and in fact, was caught in a lie before she got up on the witness stand today until I pointed it out to her and her attorney that she had had a previous felony conviction." ROA.106764:5-9. At the same hearing Stallings contradicted Kirkpatrick's testimony that she only was involved in one burglary, testifying she admitted to more than 30. ROA.106704:1-23, 106750:2-21.

If Kirkpatrick's informant work had been disclosed, and officers had been called at Holberg's trial to bolster Kirkpatrick's credibility based on that work, the

defense could have shown the jury that she was a drug addict who used her

informant income to buy drugs, a liar who falsely denied prior felonies to plead for

probation, and an interested witness who touted her informant work to seek

leniency for herself. *See* pages 8-9, above. Holberg is only required to show a

"reasonable probability" that the outcome in her case would have been different

had this impeachment evidence been provided – one "sufficient to undermine

confidence in the outcome." Given the Supreme Court's admonition about

informant testimony, *Banks,* 540 U.S. at 702, the other impeaching facts that could

have been uncovered and presented, and the importance of Kirkpatrick's testimony

in Holberg's case, there is far more than a "reasonable probability" here. The

record refutes the assertion that the state court "reasonably could have concluded"

that the evidence was not "material in a way that undermines confidence in the

verdict." ROA.110805.

### 3.    The Undisclosed Evidence Would Have Discredited the State's Investigation.

Suppressed evidence is material where its disclosure would have cast doubt

on "the thoroughness and even the good faith of the [State's] investigation." *Kyles*,

514 U.S. at 445; *accord Lindsay v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

The State's disclosures at Kirkpatrick's sentencing, detailed above, would

have called into serious question the good faith of the State's case against Holberg.

Defense counsel could have used these suspect circumstances to question the

reliability of the State's investigation and to investigate and develop claims under *Massiah v. United States*, 377 U.S. 201, 206 (1964), and *Giglio v. United States*, 405 U.S. 150 (1972). Their suppression undermined Holberg's defense.

### D.    AEDPA Poses No Barrier to Relief.

The state court decision was contrary to and unreasonably applied clearly established federal law. 28 U.S.C. § 2254(d).

The state court never specifically addressed the Kirkpatrick informant issue but did assert three bases to deny the *Brady* claim. ROA.97964. First, the court reasoned that "if a prosecutor opens his files for examination by defense counsel, he fulfills his duty to disclose exculpatory evidence." ROA.97964. This is contrary to and unreasonably applies *Banks*, which found a *Brady* violation despite an "open file" policy, because impeachment evidence about the informant was not in the file. *Banks*, 540 U.S. at 692. An open file policy does not defeat a *Brady* claim but rather demonstrates that defense counsel reasonably could rely on the State's promise to disclose favorable evidence. *Id*. at 692-94.

The state court also unreasonably applied *Kyles*, which established a prosecutor's "duty to learn" favorable information known to the police. 514 U.S. at 437. There was no finding that any of the suppressed information here was in the prosecutor's file or otherwise disclosed to Holberg. Indeed, Stallings's testimony

makes clear the informant work was not disclosed. An "open file" policy did nothing to cure this violation.

Second, the state court reasoned that "the State cannot suppress information that the applicant actually possesses." ROA.97964. But its decision does not suggest Holberg had any information about Kirkpatrick's informant work, and the State established in the burglary case that only the police knew about it. ROA.106759:1-106760:21.

Third, the state court ruled that "the allegedly suppressed evidence must also be admissible." ROA.97964. This unreasonably applied *Banks,* which precludes any rule of admissibility controlling disclosure of informant status. 540 U.S. at 701-03. This Circuit has squarely held that "suppressed evidence need not be admissible to be material under *Brady.*" *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011). And authorities cited above, *see* pages 34-35, establish that evidence of Kirkpatrick's informant work would have been admissible to impeach her.

Fourth, the state court unreasonably applied clearly established law because the facts relating to Kirkpatrick's informant work are not materially distinguishable from the facts in *Banks. See, e.g., Panetti v. Quarterman,* 551 U.S. 930, 953 (2007); *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). Any distinction based on which cases Kirkpatrick was paid for is meaningless. The paid employment

establishes the basis for impeachment, and here it was simultaneous to and

intertwined with Kirkpatrick's cooperation against Holberg.

Finally, the state court unreasonably found that "the State did not refer to

Kirkpatrick's testimony in its closing argument at the penalty phase." ROA.52860.

The State's sentencing argument relied on facts Kirkpatrick claimed she got from

Holberg, including that she robbed and burglarized Towery. ROA.9938:16-22. It

also relied on Dr. Coons' opinion about future dangerousness, supported by

Kirkpatrick's testimony about the lamp. ROA.9944:8-25, 9989:20-9990:13.

Beyond the argument itself, the prosecution's quest for a death sentence was

clearly aided by the explosive testimony from Kirkpatrick that Holberg enjoyed

killing Towery and recounted the experience with no remorse.

## II.    TRIAL COUNSEL WERE INEFFECTIVE IN FAILING TO CONDUCT AN ADEQUATE MITIGATION INVESTIGATION AND PROVIDE CRITICAL INFORMATION TO THEIR MENTAL HEALTH EXPERT.

For the first months of her life, Brittany Holberg was addicted to the drugs

her mother abused during pregnancy. When healthy babies would be bonding with

their caregivers, her limbs shook convulsively, and she screamed in pain when

touched.

She learned to walk in a veritable drug den where her parents abused her by

giving her drugs and alcohol, shaking her violently, hitting her, and neglecting her

most basic needs. Her mother modeled shockingly inappropriate sexual behavior

during Holberg's childhood, and "[a]lmost every man in Holberg's life," in the

District Court's words, "treated her as a sexual object," as she was subjected to

"repeated sexual victimization." ROA.110964-110965.

Holberg's personal and family history left her with chronic major depression

and cognitive impairments that undermined her ability to regulate emotions, to

remember and describe her experiences, and even to do simple math. It led to her

own drug addiction and sexual degradation as a teenager and young woman,

culminating in heavy cocaine use that induced delirium and psychosis and

ultimately ended in this homicide.

The jury required to choose between life or death for Holberg did not know

this. Defense counsel told the jury that "we will not proceed to" address mitigation

and presented Holberg as a "wonderful warm human being until she got hooked on

crack cocaine." ROA.9533:5-15. The prosecution emphasized the absence of

mitigation evidence, arguing that, despite having "everything handed to her on a

silver platter" at home, ROA.9946:5-9, Holberg "chose the drugs, she chose the

prostitution, she chose to live a life of deception, manipulation and violence,"

ROA.9948:4-7.

The jury was not left in the dark because mitigating evidence was

unavailable, but rather because Holberg's trial counsel failed to collect and present

it. Counsel claimed they limited their mitigation investigation because a jury would

care more about mitigation from the time of the crime than from early childhood, would not be swayed by evidence of sexual victimization, and would see someone with brain damage as "defective" and unworthy of being saved. But under Supreme Court law these professed strategic choices were unreasonable, as were the decisions by the state courts that sanctioned those purported choices. Counsel's strategic decisions – even if they were such, and not *post hoc* rationalizations for inadequate representation – were not informed by adequate investigation, but rather by unfounded preconceptions. Counsel failed to complete a social history of Holberg, a core duty of capital defense lawyers, and failed to interview key witnesses including her father, ex-husband, and ex-boyfriend.

While counsel claimed they limited their investigation as a strategy based on their views of juries, the state court record provides a better explanation. The defense team did not begin its mitigation investigation in earnest until trial was already underway. Counsel did not leave themselves time to complete a thorough investigation or to follow up on the leads their belated efforts revealed.

Holberg's life story provided a compelling explanation of how, despite her desire to escape a life defined by victimization, she came to commit this homicide. The jurors who deliberated for 11 hours before sentencing her to die knew only a tiny part of this story. They did not know that Holberg did not "choose" a life of drugs, sexual degradation, and violence, but rather was born into and shaped by

that life. If the jurors had known the truth there is a reasonable probability at least one of them would have "afford[ed] her the grace and dignity that have been absent from her life to date," ROA.110966, and opted for a life sentence.

## A.    Trial Counsel Performed Deficiently.

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020) (citation omitted). This Court "focus[es] on whether the information [counsel] possessed would have led a reasonable attorney to investigate further," *Miller v. Dretke*, 420 F.3d 356, 363 (5th Cir. 2005), or whether counsel "ignored pertinent avenues for investigation of which [they] should have been aware," *Porter v. McCollum*, 558 U.S. 30, 40 (2009).

Capital defense counsel must "'conduct a thorough investigation of the defendant's background.'" *Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 396 (2000)). At least by 1989, this required counsel to investigate their client's "*family and social history*." *Wiggins*, 539 U.S. at 524 (emphasis by the Court) (citing 1989 ABA Guidelines). Here counsel made

unreasonable decisions not to investigate mitigation, failed to complete a family and social history, and ignored pertinent avenues for investigation.

### 1.    Counsel Unreasonably Disavowed Reliance on Mitigation.

Texas law provides only two avenues for a defendant convicted of capital murder to avoid a death sentence: raise reasonable doubt as to whether she presents a danger of future violence, or establish mitigating facts that warrant a life sentence. TEX. CODE CRIM. PROC. ANN., ART. 37.071, § 2(b), (e)(1). In their opening statement Holberg's counsel abandoned the second issue at the start, telling the jury: "I think you will see that the answer to Question No. 1 should be 'no.' And we will not proceed to Question No. 2." ROA.9533:13-15. Simply put, defense counsel told the jurors at the outset that Holberg had no mitigation case.

Focusing only on future danger was not "a reasonable decision that ma[de] particular investigations unnecessary" as to mitigation. *Strickland*, 466 U.S. at 691. The Supreme Court recognized "[t]here is no squaring that conduct," that is, relinquishing one "of only two procedural pathways for opposing the State's pursuit of the death penalty," "with objectively reasonable judgment." *Andrus*, 140 S. Ct. at 1885. And in *Walbey v. Quartman*, 309 F. App'x 795, 801 (5th Cir. 2009), this Court ruled "the decision not to investigate potentially mitigating evidence was based on an erroneous legal conclusion" because counsel decided "to focus on future dangerousness when Texas law dictates that the facts of Walbey's crime

48

themselves are sufficient to prove this aggravating factor." Counsel here provided ineffective assistance for the same reason.

The District Court found Holberg's counsel reasonable in deciding to focus on future dangerousness and downplay mitigating evidence they feared would show Holberg was irredeemable or unfixable. ROA.110932. But contrary to counsel's approach, and the state and federal courts' rulings, there is nothing contradictory in contesting both special issues, particularly since the crime itself was sufficient to show future dangerousness. *Walbey,* 309 F. App'x at 801. Here, as in *Walbey*, counsel faced a "virtually impossible battle" on the issue of future dangerousness. *Id.* Reasonable professional judgment did not justify their decision to disavow mitigation, and their decision to limit their mitigation investigation was "all the more unreasonable." *Id.*

### 2.    Counsel's Professed Strategies Were Based on Inadequate Investigation.

Counsel's strategy at sentencing was to show that Holberg was a "wonderful warm human being until she got hooked on crack cocaine." ROA.9533:5-9. Counsel "absolutely" adopted this mitigation strategy before their investigators were even retained, and it did not change during the course of trial. ROA.104049:2-104050:24. This pre-determined strategy was shaped by presumptions about jurors, not by a thorough investigation, and it led to counsel's failure to collect readily available and vitally important mitigation evidence.

Counsel claimed they thought "the more remote the history of the client is, the less concerned the jury is with it," ROA.11914:3-14, and "the jurors would care more about what had been going on in Holberg's life and the family household most immediately before Towery's killing," ROA.1112. That was their explanation for not contacting Holberg's father and other paternal relatives who could have shed light on her genetic history, birth, and early childhood. ROA.11914:5-24.

This was unreasonable under clearly established federal law. Counsel were required to investigate Holberg's "*family and social history*," *Wiggins*, 539 U.S. at 524, which necessarily included "mistreatment, abuse, and neglect during . . . early childhood," *Williams*, 529 U.S. at 370. *See also Wiggins*, 539 U.S. at 534-35 (finding "powerful" mitigation in the "severe privation and abuse in the first six years of his life"). Counsel could not compile Holberg's family and early childhood history without interviewing Holberg's father and other relatives, particularly given that they interviewed Holberg's mother only once and "didn't trust her," ROA.12554:1-23, and she then testified against her daughter in the guilt phase, ROA.8644:23-8661:21.

Counsel were aware of red flags that called for further investigation. Shortly after being appointed, counsel interviewed Holberg's paternal grandfather — the only paternal relative they contacted — who reported that "when Brittany was born

50

. . . both [her parents] were really messed up with drugs." ROA.11681:21-25.

Counsel also knew that when Holberg was young her father was incarcerated on

drug charges, ROA.1107, and her mother gave birth to a stillborn child,

ROA.11124:16-19. This information "would have led a reasonable attorney to

investigate further." *Miller*, 420 F.3d at 363.

Had counsel done so they "would have found a range of mitigation . . . that

no other source had opened up." *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). As

detailed above, paternal relatives would have attested to Holberg's mother's heavy

drug use during pregnancy, Holberg's drug addiction at birth, the physical abuse,

neglect, the forced drug and alcohol use during childhood, and the extensive family

history of psychiatric illness. This in turn would have prompted testing confirming

cognitive impairments and psychological disorders. *See* pages 18-24, above.

Counsel claimed to believe jurors would not be swayed by evidence of

Holberg's sexual victimization, ROA.11242:4-12, 110927-110928, even though

Supreme Court precedent has long recognized the mitigating power of such

evidence, *see Wiggins*, 539 U.S. at 535. Holberg reported to Dr. Patel "fondling

[that] lasted three years," "by her [step]father's best friend," beginning when she

was 12. ROA.11928:20-11929:17. Counsel were aware of this but viewed it as a

"sexual relationship," ROA.12078:1-12079:2, 104109:4-104110:24, and did not

51

meaningfully investigate it, ROA.11929, 104110:10-24, 12633:7-18, or elicit testimony about it from Dr. Patel.

Had they followed up, they would have found multiple witnesses who could have testified that Andy Grimes, Schwartz's close friend who periodically lived with the family, had an affair with Pam and sexually abused Holberg for years beginning when she was 12 or 13, an age at which she could not consent to sexual contact. ROA.85697, 85764-85766, 85774. What happened to Holberg was a repeated crime of sexual violence but the jury heard only that Holberg went "boy crazy," ROA.9539:22-24.

During the guilt phase the jury heard from Holberg herself that she was sexually molested by a babysitter at age four or five. ROA.8888:20-8889:9. But counsel did nothing to substantiate her testimony and in fact elicited contradictory testimony from Schwartz, who denied Holberg told him about the abuse. ROA.9570:1-18. Effective counsel would have presented medical records which documented the assault and recounted that, when Holberg reported it, her mother scolded her and left her in the molester's care again. ROA.48927, 49000.

Counsel could have presented additional powerful evidence of Holberg's sexual victimization, including rapes she endured in her marriage and a brutal gang rape that left her suicidal the year before her fatal struggle with Towery. ROA.47589, 77700-77712, 77727, 85883, 85774, 85829-85830. Instead, counsel

failed to corroborate Holberg's account of abuse, leaving her open to the

prosecutor's attack that she was merely a "party girl," ROA.8081:12-23, 8602:5-6,

15-16, 9272:23-9273:5, 9506:24-9507:3, who was "trained and experienced in

deception" as a prostitute, ROA.9076. Counsel also failed to collect and present

evidence of Schwartz's sexually predatory behavior toward Holberg, ROA.85766,

85702-85703, and of Pam's extraordinary sexual behavior, including having sex

with Holberg's teenaged friends, ROA.85697, 85702, 85714, 85719, 85764-85765.

Counsel similarly dismissed the issue of cognitive impairment, claiming it

could be more aggravating than mitigating, ROA.12038:10-25, and believing a

jury would see it as making Holberg "defective" and unworthy of being saved,

ROA.1097-1098, 11253:6-11254:7. At sentencing, counsel presented testimony

that Holberg was highly intelligent and was accepted to Duke University based on

SAT scores, ROA.9538:17-9539:2, but in fact her scores were so low she was

ineligible to attend even a summer program at Duke, and her math score placed her

in the bottom two percent nationally, ROA.78004, 78009-78010. It is unclear

whether counsel even knew this, but it is clear they failed to obtain

neuropsychological testing despite indicators of brain damage. ROA.12527:2-19.

Counsel likewise were unaware of the other facts described above, including

Holberg's *in utero* drug exposure and early childhood trauma that led to cognitive

impairments.  This information would have prompted effective counsel to get

testing done, and testing now has demonstrated substantial impairments. ROA.85758-85759. And contrary to counsel's view, the Supreme Court has long recognized the mitigating power of such evidence. *See Porter*, 558 U.S. at 41; *Rompilla*, 545 U.S. at 391; *Wiggins*, 539 U.S. at 535.

Counsel's professed views about how jurors would reject mitigating evidence were misguided for a more fundamental reason: they limited their *investigation* based on how information might be received if *presented at trial*. This turns the duty to investigate on its head. "[T]he record will not support the . . . conclusion that counsel could have made an informed strategic choice not to present mitigation evidence" where the "information and the opportunity to weigh this evidence was never before counsel." *Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000). Counsel cannot make "a strategic choice either to avoid devastating cross-examination or to prevent the jury from hearing" damaging evidence if counsel has not collected the evidence in the first place. *Id.*

Counsel had no knowledge of Holberg's extensive family history of mental illness; her *in utero* drug exposure and drug-addicted infancy; the physical abuse, forced drug use, and neglect that characterized her early childhood; or her cognitive impairments. Counsel had only a vague and unsubstantiated understanding of Holberg's extensive sexual victimization. Under these circumstances "the assertion of a 'strategic decision' must be rejected because no

54

informed decision was made." *Id.*; *accord Lewis v. Dretke*, 355 F.3d 364, 367 (5th Cir. 2003).

The state court also unreasonably endorsed counsel's claim that they decided not to interview witnesses, including Holberg's ex-boyfriend Loren Knight, her maternal grandparents, and her ex-husband Ward Holberg, because they might reveal damaging information if they testified. ROA.1137-1141, 104235:4-25, 104239:2-25, 12638:10-12639:25. These witnesses could have alerted counsel to excessive drug abuse and bizarre and incestuous sexual behavior by Holberg's parents, and to Holberg's chronic depression and suicidality. ROA.85701-85703; *see also* ROA.85143. These were fruitful areas for further investigation whether or not these witnesses testified. Simply put, counsel performed deficiently because their professed strategies did not justify their limited investigation.

### 3.    Counsel's Professed Strategies Were *Post Hoc* Rationalizations.

The evidentiary hearing in state court was limited to a presentation of trial counsel's self-serving explanations for their actions and omissions. But even on this record it is clear their claimed strategy choices were *post hoc* rationalizations, asserted to defend a belated and inadequate mitigation investigation.

The record refutes counsel's insistence, and the state and federal courts' findings, that they strategically avoided evidence of Holberg's childhood exposure to drug abuse, history of sexual trauma, and teenage descent into drug addiction

and sex work. Counsel actually presented *some* evidence of this at trial. Indeed, they told the jury they would present the same types of evidence they later claimed would be harmful. *See, e.g.,* ROA.1097-98, 1127, 57756:9-22, 58649:5-14, 8085:17-8088:10. And then they did – to a limited extent.

But the evidence they presented was so incomplete and uncorroborated that the State turned the evidence to its own advantage. The ineffectual mitigation case the jury heard was the product of counsel's belated and limited investigation, and their professed strategies were rationalizations for a failure to present a coherent mitigation case. *See Harrington v. Richter*, 562 U.S. 86, 109 (2011) ("courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions").

At the guilt phase, counsel introduced Holberg's childhood trauma and family substance abuse in their opening statement, explaining to the jury that "there were incidences in her young childhood when she was attacked criminally," and "by the time she was 13, she was already consuming alcohol and marijuana that was freely available to her in her own home." ROA.8085:22-25. Due to these circumstances, they said, Holberg's life later "took a downward spiral" into prostitution and beatings at the hands of "various tricks, various pimps." ROA.8087:21-8088:10. Counsel returned to these issues when questioning Holberg, *see* ROA.8889:2-8897:25, 8906:2-8907:20, 8912:6-8916:18, and in their

guilt-phase closing, in which they contended that Holberg's testimony about her "background, her upbringing," showed she had "been battered." ROA.9307:3-9308:2.

The guilt-phase evidence was incorporated at penalty phase, ROA.9377:3-9378:11, where counsel presented three other witnesses, including Schwartz, who was counsel's first witness and "main gun," ROA.11865:2-4, 11740:14-25. He briefly addressed his and Pam's drug abuse during Holberg's childhood, Aunt Karen's murder, and Holberg's struggles with addiction. ROA.9536:2-25, 9541:2-25, 9590:2-9592:25, 9628:2-9629:23. But this testimony was superficial and did not address the childhood abuse and trauma that Holberg suffered at home or the addictions and psychiatric disorders that ravaged her extended family. Indeed, it undercut Holberg's account of early drug use, because Schwartz claimed Holberg did not use the illegal substances found in the house. ROA.9536:5-9538:23. And it belittled Holberg's sexual trauma, because Schwartz denied that Holberg told him at age five about being molested, ROA.9570:1-21, and explained her later problems as her becoming "boy crazy," ROA.9539:22-24.

In like fashion, defense counsel in *Wiggins* told the jury in opening statement that the defendant "had a difficult life," but failed to support the assertion with readily available evidence. 539 U.S. at 515. The Supreme Court recognized that the strategy later advanced by counsel was "a *post hoc*

rationalization" of their failure to complete a thorough mitigation investigation. *Id*. at 526-27. So too here.

Readily available records and witnesses would have provided what the District Court ultimately described as "stark evidence" of Holberg's "repeated sexual victimization," and the fact that Holberg's "family exposed her to rampant abuse of prescription medication and illicit drugs." ROA.110964-110966. *See, e.g.,* ROA.47589-91 (hospital records documenting husband's physical and sexual abuse); 77700-77712, 77727 (hospital records of sexual assault and rape and trauma symptoms); 85883 (police report of rape by drug dealer); 85829-85830 (police report of assault in alley); *see also* ROA.49562, 49710, 85773-85774, 77796-77797.

Available evidence would have corroborated Holberg's account and greatly expanded on it. She obviously could not testify about the physical abuse, neglect, and forced drug use in the earliest years of her life, but other witnesses could have, if counsel had contacted them. *See* ROA.85673-85674, 85688, 85696, 85779, 85787. Yet despite introducing to the jury the issues of "incidences in her young childhood when she was attacked criminally," and "alcohol and marijuana freely available to her in her own home," ROA.8085:17-25, counsel failed to investigate and substantiate just how deep those problems ran. Instead they left the field to the prosecutors to ridicule the mitigation case and argue Holberg had a "good

childhood" and freely "chose" a life of violence, drugs, and prostitution.
ROA.9948:4-7, 9981:3-24.

Nor did counsel grasp when Holberg's drug addiction began or how severe
and debilitating it became. Counsel told the jury Holberg first became addicted to
pills during her marriage and to cocaine during her divorce. ROA.9972:5-18. In
fact, Holberg's addiction began *in utero* and continued in the first months of her
life. ROA.85672, 85720, 85756. The fact that her drug addiction was involuntary
in origin would have strengthened immeasurably counsel's argument about
Holberg's inability "to make choices," ROA.9973:3-10, but counsel were unaware
of it.

Similarly, counsel argued in closing that Holberg's drug use was the primary
cause of the homicide. ROA.9963:4-10. But counsel failed to present medical
records showing that, a year before the homicide, Holberg was found lying in the
street after overdosing on cocaine, manifested "psychotic symptoms including
visual hallucinations and tactile delusions," and later experienced "severe
delirium" that caused her to "recoil and scream out" when touched. ROA.85727-
85728; *see also, e.g.*, ROA.47578, 47595-47596, 77710-77712, 85879-85880,
85888-85889. This evidence would have provided a much stronger basis for the
argument that Holberg's addiction undermined her volition, and would have helped

the jury understand the intensity of Holberg's reaction in the violent struggle with Towery.

The state court record makes clear why counsel failed to present a thorough mitigation case. They simply waited too long. While counsel conducted initial interviews of Holberg's mother, stepfather and paternal grandfather soon after appointment and before investigators were retained, the defense interviewed no other mitigation witnesses until January 1998, the same month voir dire began. ROA.1090-1091, 11113:7-20, 11125:3-20. Nearly the entire mitigation investigation, such as it was, occurred during trial in February and March 1998. ROA.1095-1097, 1131, 1133.

By that point, even when witnesses disclosed pertinent evidence it was too late to follow up effectively. For example, the defense team first interviewed Holberg's friend Holly Ruffin in February 1998. Ruffin revealed that Holberg "was all hung up about being molested by someone in her family when she was very young," and Holberg believed this was "why she went bad," but there was no time to develop the information. ROA.12674:4-13. When the defense next spoke to Schwartz, five days before the punishment phase began, there was no follow-up about Ruffin's information. ROA.11865:5-11866:25.

Counsel's interviews of other family members likewise failed to explore Holberg's sexual victimization. ROA.1266-1267. And when counsel later learned

of more allegations of sexual abuse, from Corena Norrell, it was too late to substantiate them, as counsel later admitted. ROA.12674:4-13. Similarly, as stories of Pam Schwartz's drug and alcohol abuse emerged the "thought occurred to [counsel]" that Holberg could have been impacted *in utero*, but counsel did nothing to further explore the issue. ROA.11681:4-11682:24.

Counsel's mitigation investigation must be "diligent." *Wiggins*, 539 U.S. at 523 (internal quotation omitted). That duty is not met where counsel does not "prepare for [sentencing] until a week before the trial," *Williams*, 529 U.S. at 395; *see Walbey*, 309 F. App'x at 801. In waiting until the eve of trial to begin the bulk of their mitigation investigation, Holberg's counsel painted themselves into a corner. Their subsequent claims of strategy to explain the limited mitigation investigation were unsupportable *post hoc* rationalizations.

### 4.    Counsel's Failures Undermined the Substance and Strength of Dr. Patel's Testimony.

Counsel believed Dr. Patel was their most important sentencing-phase witness, ROA.11741:3-19, 11905:8-21, and the "star witness . . . for family background," ROA.11892:3-21. But he did not testify about Holberg's family background beyond euphemistic references to an "abusive situation" and a "dysfunctional family." ROA.9680:1-9681:23. He tentatively concluded that Holberg's "chemical dependency, PTSD, or being a battered woman in her past" "*may* be a reasonable explanation" for the crime. ROA.9680:1-9681:23 (emphasis

added). But he admitted Holberg was his primary source of information, that some of her information may have been untrue, and that this could undermine his conclusions. ROA.9666:1-9668:25, 9703:1-9705:25. Due to trial counsel's inadequate investigation of Holberg's background, Dr. Patel's testimony was narrow and inadequately substantiated.

During the state habeas proceedings, Dr. Patel received "several categories of materials" he did not have at trial: "medical and psychiatric records of Brittany and her family; affidavits from family members and others concerning Brittany's life and background; educational records; legal records (e.g., domestic, criminal, etc.); the results of testing for neurological impairment; and the results of assessment for traumatic and mood disorders." ROA.85754. This new information revealed "highly significant mental health issues," including "an extensive [family] history of psychosis and major mood disorders," and Holberg's exposure "to chronic and severe child abuse and neglect, including *in utero* exposure to dangerous neurotoxins, narcotics and alcohol," which had a "significant adverse consequences on her development." ROA.85754-85755.

Had this information been provided before trial, Dr. Patel "would have requested diagnostic tests to determine the presence, severity, and effect of brain dysfunction," ROA.85754, and "to assess the level and degree of traumatization [she] experienced," ROA.85759-85760. Those tests affirmatively showed

cognitive impairments that "substantially compromise[d] Brittany's ability to function in situations that require the complex and critical thought processes that are mediated by the frontal cortex of the brain," ROA.85758-85759, and "indicate[d] that Brittany meets the criteria for PTSD." ROA.85760.

With this information Dr. Patel's testimony would have been markedly stronger than what the jury heard. He could have explained that Holberg experienced "extreme neglect and abuse during her early childhood developmental period" and suffered from chronic major depression, PTSD, and brain damage largely attributable to her upbringing and *in utero* exposure to drugs. Holberg abused drugs to "shut[] off the intense mental and emotional pain" that characterized her life, and her addictions became so severe that they induced psychosis, including at the time of the crime. ROA.85757-85761. Unlike his uncorroborated and tentative testimony at trial, *see* ROA.9680:1-9681:23, 9685:7-20, Dr. Patel could have detailed specific traumas and mental health crises that Holberg experienced, and substantiated his testimony with voluminous records and accounts from family members. *See* ROA.85760-85761. He also could have explained that trauma and "brain impairments prevented [Holberg] from making coherent, consistent or factually reliable statements . . . concerning the circumstances of the offense," ROA.85762, countering the State's narrative that she was a manipulative liar.

This case mirrors *Rompilla*, 545 U.S. at 392, in which three mental health experts failed to find significant mitigation at the time of trial. Post-conviction experts, unlike their pre-trial counterparts, were provided thorough background information and promptly recognized "plenty of red flags pointing up a need to test further." *Id.* (internal quotation marks omitted). That testing found "organic brain damage . . . significantly impairing several of [Rompilla's] cognitive functions," and showed the impairments "relate[d] back to his childhood." *Id.* Counsel's deficient performance here prevented Holberg's jury from hearing similar testimony.

Despite failing to provide Dr. Patel with necessary information, counsel relied on him to guide their investigation. ROA.12172:1-25, 12563:23-12564:25. The state court found "[t]he trial team . . . relied on Dr. Patel's expertise to identify any particular medical record provided to him that was relevant to mitigation." ROA.1127. In Norris's words, "I handed him all the documents and relied on his expertise . . . to instruct us what would be relevant." ROA.104191:24-104192:5. This too was unreasonable.

Counsel is obligated to "reach an independent conclusion about the viability of a mitigation defense, instead [of] delegating that task to an expert." *Walbey*, 309 F. App'x at 801. Holberg's pre-offense medical records were replete with information that effective counsel would have recognized as mitigating, and would

have investigated further. A medical record from the year before the homicide reported that, after being gang raped days earlier, Holberg was having nightmares, flashbacks, and constant suicidal thoughts: "I just don't want to live feeling like this, every time I open my eyes I relive that rape." ROA.77700-77712, 77727. Other medical records recounted Holberg's molestation by a babysitter and her mother's harsh response to it, ROA.48927, 49000; showed that Holberg "began her use of alcohol at about the age of seven or eight" after "[h]er father would give it to her as a small child," ROA.47591; and documented that she was hyper-sensitive to "any touch" when suffering drug-induced psychosis, ROA.77496.

Any counsel independently considering a mitigation defense would recognize the importance of such records. In relying on Dr. Patel "to instruct us what would be relevant," ROA.104192:2-5, counsel was deficient.

### B.    Counsel's Deficient Performance Prejudiced Holberg.

In considering prejudice the Court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. Prejudice is established where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Holberg was prejudiced for four reasons. First, the Supreme Court has recognized the inherent power of the types of mitigating evidence adduced in the habeas proceeding here. Second, that evidence was especially mitigating in the unique circumstances of this case. Third, the unpresented mitigating evidence would have refuted key arguments in favor of a death sentence. Fourth, the sentencing decision was a close one. Had the evidence been presented there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### 1.    The Unpresented Mitigation Was Powerful.

"The mitigating evidence counsel failed to discover and present in this case is powerful." *Id.* at 534. The Supreme Court has recognized the mitigating power of all the types of evidence that were available but not presented here. *Porter*, 558 U.S. at 41-43 (childhood physical abuse and cognitive deficits); *Rompilla*, 545 U.S. at 390-93 (*in utero* alcohol exposure, parental alcoholism, physical abuse, neglect, mental health problems, alcoholism); *Wiggins*, 539 U.S. at 534-35 (maternal alcoholism, early childhood neglect and privation, physical and sexual abuse, diminished mental capacity); *Williams*, 529 U.S. at 395-96 (childhood neglect, physical abuse, substance abuse, mental health problems).

This Court has as well. *Walbey*, 309 F. App'x at 803 (ingestion of drugs and alcohol before age five, parental alcoholism, physical and mental abuse); *Lewis*,

355 F.3d at 368-69 (parental drug addiction, domestic violence, physical and sexual abuse); *Lockett*, 230 F.3d at 709, 713-17 (brain damage and psychiatric illness). The evidence Holberg's counsel failed to collect and present mirrors the evidence that supported findings of prejudice in these cases.

### 2.    The Unpresented Evidence Was Uniquely Mitigating Here.

The unpresented evidence would have been powerful in any case, but particularly so here. Holberg had just been convicted of killing an older man during a violent struggle in his home. Yet the jury heard no evidence of the early childhood physical abuse that Holberg endured, or the domestic violence she witnessed throughout childhood. Instead the jury was given a "benign conception of [her] upbringing." *Rompilla*, 545 U.S. at 391. Effective counsel would have used the evidence of violence in her home to show how her childhood trauma manifested during, and helped to explain, the offense.

Holberg and other witnesses testified that she knew Towery as an occasional prostitution client. ROA.8630:3-17, 8649:4-23, 8989-8990. But at trial her history of sexual victimization was unsubstantiated, minimized, and woefully incomplete. Had counsel substantiated the sexual assaults and rapes she endured throughout her life, leading up to the night of the homicide, it would have helped explain her rage and terror during the violent struggle with Towery.

The unpresented mental health evidence was uniquely mitigating as well. Witnesses and medical records would have shown that Holberg's exaggerated fear of even gentle touches dated, literally, to her birth as a drug-addicted baby, ROA.85672, 85720, 85756, and as a young woman was the product of "psychotic symptoms including visual hallucinations and tactile delusions," brought on by extended cocaine use like that preceding this offense, ROA.85728. Effective counsel would have used this evidence, including hospital records recounting how she would "recoil and scream out" at "any touch," ROA.85728, to explain her fearful and violent reaction to Towery.

In the guilt phase, the jury rejected Holberg's account of the homicide. Effective counsel would have presented mitigating evidence to explain that Holberg's traumatic experiences and cognitive impairments made it impossible for her to remember and report these experiences accurately, and thus "prevented her from making coherent, consistent or factually reliable statements . . . concerning the circumstances of the offense." ROA.85762. Effective counsel likewise would have shown that Holberg's sex work was a manifestation of her extreme trauma and suffering and not, as the prosecution contended, a choice through which she became "trained and experienced in deception." ROA.9076. Available evidence would have shown that Holberg's unreliable reporting stemmed from trauma and impairment and not from "manipulation" and "deception." ROA.9948:4-7.

### 3.    The Unpresented Evidence Would Have Refuted the State's Arguments.

By disavowing the issue of mitigation in their opening statement, and by failing to present the extensive evidence detailed here, defense counsel opened up their client to devastating arguments by the State.

The prosecutor mocked the lack of mitigating evidence, ROA.9946:4-9950:21, told the jury Holberg had "a good childhood," ROA.9981:13-20, and insisted Holberg "had everything handed to her on a silver platter." ROA.9946:8-9. He minimized drug use in the home with a claim that her parents only used "some marijuana," which "a lot of folks" do. ROA.9946:21-22. He told the jury – without fear of contradiction, because the contrary proof was never presented – that Holberg had "a good relationship with her mother," "had everything she ever wanted except more attention and love from her parents," ROA.9981:3-25, 9946:10-11, and that "her real problems with drugs began later, not at home." ROA.9946:18-9947:25, 9981:3-25. He used all this to support an argument that Holberg "chose the drugs, she chose the prostitution, she chose to live a life of deception, manipulation and violence." ROA.9948:4-6.

Effective counsel could have refuted every one of these arguments. Holberg did not "cho[o]se drugs"; her genetic predisposition, addiction *in utero* and in infancy, and compelled drug use as a young child emphatically refuted that argument. She did not "cho[o]se the prostitution"; her extensive history of being

sexually victimized by older men, and her parents' outrageous sexual behavior, was its genesis. "[H]er real problems" did not begin after she left home; her cognitive impairments dated to birth, and she was abused and neglected from an early age. The only things "handed to her on a silver platter" were drugs, alcohol and grossly inappropriate sexual behavior, all beginning in early childhood. The unpresented mitigation evidence "would have destroyed the benign conception of [Holberg's] upbringing and mental capacity." *Rompilla*, 545 U.S. at 391.

### 4.    The Sentencing Verdict Was Close.

Even without hearing the overwhelming mitigation evidence detailed here, the jury deliberated 11 hours on sentence. The State's aggravating evidence clearly was not overwhelming; even a portion of the unpresented mitigation evidence could have tipped the scales in favor of life. *See, e.g., United States v. Delvalle*, 444 F. App'x 336, 342 (11th Cir. 2011) (deliberations that "lasted over six hours" supported finding reasonable probability of a different result); *United States v. Ottersburg*, 76 F.3d 137, 140 (7th Cir. 1996) (nine hours of "deliberations makes clear that this case was not an easy one"). Had counsel performed effectively there is a reasonable probability that at least one juror would have chosen life.

### C.    AEDPA Poses No Barrier to Relief.

The state court ruling on deficient performance was contrary to and unreasonably applied clearly established law as set forth above.

The state court unreasonably applied *Strickland*, *Williams*, *Wiggins*, *Rompilla*, and *Porter*, by endorsing counsel's decision to limit their investigation based on preconceptions about jurors, while counsel remained unaware, because of their limited inquiry, of evidence the Supreme Court recognizes as mitigating.

The state court likewise unreasonably applied *Strickland* and its progeny by failing to recognize counsel's deficiency in openly abandoning the issue of mitigation before the jury; by upholding counsel's decision not to complete a family and social history; by sanctioning counsel's decision to delegate to a mental health expert the responsibility for identifying mitigating evidence in Holberg's records; and by upholding counsel's decision not to interview witnesses, purportedly because they feared the witnesses might provide damaging testimony if called at trial.

The state court's factual determinations were unreasonable in light of the substantial evidence the state court refused to consider. Section 2254(d) is satisfied where, as here, "the evidence in the state-court record provided substantial grounds" in support of a claim and "none of the countervailing evidence could be said to foreclose" it. *Brumfield v. Cain*, 576 U.S. 305, 319-21 (2015). In these circumstances, there is ample "cause to believe [a petitioner] might prove such a claim in a full evidentiary hearing," and the state "court's failure to do so resulted in an unreasonable determination of the facts." *Id*. at 321-22; *see also Panetti*, 551

U.S. at 954 (section 2254(d) deference does not apply where "the factfinding procedures upon which the [state] court relied were not adequate for reaching reasonably correct results or, at a minimum, resulted in a process that appeared to be seriously inadequate for the ascertainment of the truth") (internal quotation omitted).

The TCCA here ordered a limited evidentiary hearing to consider the testimony of only four witnesses, the trial defense team, ROA.1054, 1078, all of whom were closely aligned with the State. But the state court refused to hear evidence that directly contradicted their self-serving testimony about their actions and decisions. *See, e.g.*, ROA.1945-1946, 12655:1-24, 12693:7-12695:17, 44446:1-44448:23. This included evidence, discussed above at pages 25-26, that refuted counsel's self-serving testimony that they provided critical medical records to Dr. Patel. The state court ignored contrary testimony from witnesses who swore that counsel admitted she did not do so, and from Dr. Patel himself that he never saw the records. Because this one-sided process was "seriously inadequate for the ascertainment of the truth," *Panetti,* 551 U.S. at 954 (citation omitted), the state court's findings unreasonably applied federal law and "resulted in an unreasonable determination of the facts," *Brumfield,* 576 U.S. at 322.

The state court's prejudice analysis likewise was contrary to and unreasonably applied clearly established federal law. The state court adopted the

reasoning that (1) the "uninvestigated and unpresented mitigation was not so remarkable that it would have offset the brutality and depravity of her crime," and (2) the jury had already heard "the majority of the evidence." ROA.1150, 1153, 52835. The former standard substantially heightens the "reasonable probability" threshold, and is more onerous even than outcome-determinative standards rejected as inconsistent with *Strickland*. *Williams*, 529 U.S. at 397. The state court's requirement that mitigating evidence "offset the brutality and depravity of her crime" is indistinguishable from an argument this Court recognized as "a non-starter." *Walbey*, 309 F. App'x at 804.

The state court's analysis likewise was "unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams,* 529 U.S. at 397-98. Rather than cumulating the trial and post-conviction mitigation as the Supreme Court requires, *see Porter*, 558 U.S. at 41, and *Wiggins*, 539 U.S. at 534, the state court subtracted one from the other, reasoning that prejudice cannot occur if the "majority" of mitigating evidence was presented at trial, ROA.52835. The characterization of the unpresented evidence as less weighty than what the jury heard was also a quintessential example of a state court "unreasonably discount[ing] the mitigation evidence adduced" in post-conviction proceedings. *Porter*, 558 U.S. at 42.

Finally, as this Court recognized, clearly established federal law "stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Walbey*, 309 F. App'x at 802. The state court unreasonably applied these bedrock principles in finding no prejudice here.

## CONCLUSION

For the reasons set forth above this Court should reverse the judgment of the District Court and remand with instructions to grant the writ, or in the alternative remand for further proceedings as discussed above.

Dated: July 7, 2023                    Respectfully submitted,

*/s/ David F. Abernethy*
David F. Abernethy
Anton Stewart
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia PA 19103-6996
Telephone (215) 988-2502
Fax (215) 988-2757
david.abernethy@faegredrinker.com

Shawn Nolan
Federal Community Defender Office for the
Eastern District of Pennsylvania
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
Telephone (215) 928-0520
Shawn_Nolan@fd.org

# CERTIFICATE OF SERVICE

I certify that on July 7, 2023, a copy of this document was filed electronically with the Clerk for the Court of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


Dated:  July 7, 2023                     */s/ David F. Abernethy*
                                          David F. Abernethy

## CERTIFICATE OF COMPLIANCE WITH RULE 32 AND FIFTH CIRCUIT RULE 25

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 15,836 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). That word count is within the 16,000-word limit approved by this Court's Order of May 16, 2023.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman in at least 14-point font.  I further certify that (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

Dated: July 7, 2023          */s/ David F. Abernethy*
                             David F. Abernethy