No. 21-70010

---

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

## BRITTANY MARLOWE HOLBERG,

**Petitioner-Appellant**

**v.**

## ERIC GUERRERO, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

**Respondent-Appellee**

---

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division
USDC No. 2:15-CV-285

---

## BRIEF FOR PETITIONER-APPELLANT
## BRITTANY MARLOWE HOLBERG – EN BANC REVIEW

---

David F. Abernethy
PA Bar No. 36666
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia PA 19103-6996
Telephone (215) 988-2502
Fax (215) 988-2757
david.abernethy@faegredrinker.com

**D. Alexander Harrell**
**TX Bar No. 24055624**
**FAEGRE DRINKER BIDDLE & REATH LLP**
**2323 Ross Avenue, Suite 1700**
**Dallas TX 75201**
**Telephone (469) 357-2500**
**Fax (469) 327-0860**
**alex.harrell@faegredrinker.com**

**Sonali Shahi**
**PA Bar No. 319898**
**FEDERAL COMMUNITY DEFENDER OFFICE FOR THE EASTERN**
**DISTRICT OF PENNSYLVANIA**
**Capital Habeas Unit**
**601 Walnut Street, Suite 545 West**
**Philadelphia PA 19106**
**Telephone (215) 928-0520**
**sonali_shahi@fd.org**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

1.      Brittany Marlowe Holberg, TDCJ ID Number 999258, Patrick O'Daniel Unit, 2305 Ransome Road, Gatesville TX 76528, Petitioner and Appellant.

2.      Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division, P.O. Box 99, Huntsville TX 77342, Respondent and Appellee.

3.      Counsel for Holberg: Faegre Drinker Biddle & Reath LLP (David F. Abernethy, Alex Harrell); Federal Community Defender Office for the Eastern District of Pennsylvania (Sonali Shahi).

4.      Counsel for the Director: Attorney General of Texas and Office of the Solicitor General (Ken Paxton, Brent Webster, Aaron L. Nielson, William F. Cole, Travis G. Bragg, Cameron M. Fraser, Mohmed I. Patel).

/s/ David F. Abernethy
DAVID F. ABERNETHY
Counsel for Appellant-Petitioner
Brittany Marlowe Holberg

## STATEMENT CONCERNING ORAL ARGUMENT

The Court ordered oral argument in connection with rehearing en banc. Dkt.

307-2. Appellant believes oral argument will assist the Court in addressing the

issues raised by this appeal in the context of a voluminous record.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................... i

STATEMENT CONCERNING ORAL ARGUMENT ........................................... ii

TABLE OF CONTENTS .................................................................................... iii

TABLE OF AUTHORITIES ................................................................................ v

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED FOR REVIEW ................................................................ 2

STATEMENT OF THE CASE ............................................................................. 3

   I.   THE EVIDENCE PRESENTED – AND NOT PRESENTED – AT HOLBERG'S TRIAL ................................................................................. 6

      A.   Holberg's Account of the Confrontation .................................................. 6

      B.   The Prosecution Theory; Testimony by Paid Informant Vickie Kirkpatrick ............................................................................................. 7

      C.   Use of Kirkpatrick's Testimony in the Guilt Phase ................................ 9

      D.   Use of Kirkpatrick's Testimony in the Penalty Phase .......................... 10

      E.   The Undisclosed Impeachment Evidence .............................................. 11

      F.   The Defense Presentation on Sentence .................................................. 13

      G.   The Mitigation Defense Counsel Did Not Investigate or Present ......... 15

   II.   STATE AND FEDERAL HABEAS PROCEEDINGS ................................ 20

SUMMARY OF ARGUMENT ........................................................................... 24

STANDARD OF REVIEW ................................................................................ 26

ARGUMENT ..................................................................................................... 26

   I.   HOLBERG IS ENTITLED TO RELIEF UNDER *BRADY* AND ITS PROGENY. ............................................................................................... 26

      A.   Holberg Exhausted This Claim in State Court. ..................................... 26

      B.   *Brady* Required Disclosure of the Kirkpatrick Evidence. ..................... 27

      C.   The State Court Ruling Is Contrary to and Unreasonably Applies Clearly Established Law. ...................................................................... 31

      D.   AEDPA Deference Does Not Apply to Materiality Because the State Court's Decision Did Not Rest on a Finding the Evidence Was Not Material. .............................................................................. 33

E. The Evidence Was Suppressed, Favorable and Material. ......................35

    1. Materiality on Guilt.......................................................................35

    2. Materiality on Sentence................................................................43

F. Even if AEDPA Deference Applied to Materiality, Holberg Would Be Entitled to Relief......................................................................44

II. HOLBERG IS ENTITLED TO RELIEF UNDER *STRICKLAND* AND ITS PROGENY.....................................................................................45

    A. Trial Counsel Performed Deficiently. ....................................................48

        1. Counsel unreasonably disavowed reliance on mitigation.............48

        2. Counsel's professed strategies were based on inadequate investigation. ................................................................................50

        3. Counsel's professed strategies were *post hoc* rationalizations. ..............................................................................56

        4. Counsel's failures undermined the substance and strength of Dr. Patel's testimony.................................................................63

    B. Counsel's Deficient Performance Prejudiced Holberg..........................68

        1. The unpresented mitigation was powerful. ..................................69

        2. The unpresented evidence was uniquely mitigating here. .............71

        3. The unpresented evidence would have refuted the State's arguments. ...................................................................................72

        4. The sentencing verdict was close..................................................73

        5. Counsel's failures justify relief. ...................................................74

CONCLUSION ..................................................................................................75

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andrew v. White*,
604 U.S. 86 (2025)............................................................26, 28, 29, 74

*Andrus v. Texas*,
590 U.S. 806 (2020)........................................................................49, 56

*Atkins v. Hooper*,
979 F.3d 1035 (5th Cir. 2020) ..............................................................34

*Brady v. Maryland*,
373 U.S. 83 (1963).................................................................passim

*Brady, Banks v. Dretke*,
540 U.S. 668 (2004)..................................................................passim

*Brumfield v. Cain*,
576 U.S. 305 (2015)........................................................33, 62, 63

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*,
933 F.2d 1285 (5th Cir. 1991) ...............................................................26

*Delaware v. Van Arsdall*,
475 U.S. 673 (1986)...............................................................................28

*Dennes v. Davis*,
797 F. App'x 835 (5th Cir. 2020) ........................................30, 31, 35

*Duncan v. Henry*,
513 U.S. 364 (1995) (per curiam)..........................................................27

*Floyd v. Vannoy*,
894 F.3d 143 (5th Cir. 2018) ...............................................35, 36

*Glossip v. Oklahoma*,
604 U.S. 226 (2025)...............................................................................38

*Graham v. Johnson*,
94 F.3d 958 (5th Cir. 1996) ..................................................................26

*Harrington v. Richter*,
562 U.S. 86 (2011).......................................................33, 57, 62

*Holberg v. Davis*,
No. 2:15-CV-285-Z, 2021 WL 3603347 (N.D. Tex. Aug. 13, 2021) ...............22

*Kyles v. Whitley*,
514 U.S. 419 (1995)..................................................................passim

*Lewis v. Dretke*,
355 F.3d 364 (5th Cir. 2003) .............................................55, 70

*Lockett v. Anderson*,
230 F.3d 695 (5th Cir. 2000) .............................................55, 70

*Lucio v. Lumpkin*,
   987 F.3d 451 (5th Cir. 2021) (en banc) ......................................27, 33
*Maxwell v. Roe*,
   628 F.3d 486 (9th Cir. 2010) ...........................................................30
*Miller v. Dretke*,
   420 F.3d 356 (5th Cir. 2005) ...........................................................51
*Panetti v. Quarterman*,
   551 U.S. 930 (2007)........................................................29, 62, 63
*Porter v. McCollum*,
   558 U.S. 30 (2009)..................................................................passim
*Reeder v. Vannoy*,
   978 F.3d 272 (5th Cir. 2020) ...........................................................26
*Robinson v. Mills*,
   592 F.3d 730 (6th Cir. 2010) ...........................................................30
*Rompilla v. Beard*,
   545 U.S. 374 (2005)................................................................passim
*Sofar v. Dretke*,
   368 F.3d 441 (5th Cir. 2004), *amended on reh'g in part,* 391 F.3d 703
   (5th Cir. 2004)...............................................................................27
*Squyres v. Heico Cos., LLC*,
   782 F.3d 224 (5th Cir. 2015) ...........................................................26
*Strickland v. Washington*,
   466 U.S. 668 (1984)................................................................passim
*Strickler v. Greene*,
   527 U.S. 263 (1999)................................................................21, 31
*Taylor v. Cain*,
   545 F.3d 327 (5th Cir. 2008) ...........................................................27
*United States v. Abel*,
   469 U.S. 45 (1984).........................................................................28
*United States v. Bagley*,
   473 U.S. 667 (1985)........................................................27, 29, 44
*United States v. Brown*,
   650 F.3d 581 (5th Cir. 2011) ...........................................................32
*United States v. Delvalle*,
   444 F. App'x 336 (11th Cir. 2011) ...................................................73
*United States v. Ottersburg*,
   76 F.3d 137 (7th Cir. 1996) .............................................................73
*Vasquez v. Hillery*,
   474 U.S. 254 (1986)........................................................................27

*Virgil v. Dretke*,
446 F.3d 598 (5th Cir. 2006) ...........................................................26
*Walbey v. Quartman*,
309 F. App'x 795 (5th Cir. 2009) (per curiam) .........................passim
*White v. Woodall*,
572 U.S. 415, 427 (2014).................................................................29
*Wiggins v. Smith*,
539 U.S. 510 (2003)...................................................................passim
*Williams v. Taylor*,
529 U.S. 362 (2000)...................................................................passim
*Williams v. Thaler*,
684 F.3d 597 (5th Cir. 2012) ...........................................................33
*Wilson v. Sellers*,
584 U.S. 122 (2018)....................................................................33, 34

**STATE CASES**

*Ex Parte Adams*,
768 S.W.2d 281 (Tex. Crim. App. 1989) .........................................21
*Ex Parte Holberg*,
No. WR-68,994-01, 2008 WL 152725 (Tex. Crim. App. Jan. 16, 2008)
(per curiam).....................................................................................21
*Ex Parte Holberg*,
No. WR-68,994-01-03, 2014 WL 5389907 (Tex. Crim. App. 2014) (per
curiam) ......................................................................................22, 34
*G. & H. Equip. Co. v. Alexander*,
533 S.W.2d 872 (Tex. Civ. App. 1976)...........................................28
*Gordon v. State*,
633 S.W.2d 872 (Tex. Crim. App. 1982) .........................................42
*Holberg v. State*,
38 S.W.3d 137 (Tex. Crim. App. 2000) ..........................2, 8, 20, 37
*Holberg v. State*,
425 S.W.3d 282 (Tex. Crim. App. 2014) .........................................40
*Hurd v. State*,
725 S.W.2d 249 (Tex. Crim. App. 1987) (en banc) ........................28
*McCarthy v. State*,
65 S.W.3d 47 (Tex. Crim. App. 2001) .............................................36
*Robertson v. State*,
871 S.W.2d 701 (Tex. Crim. App. 1993) .....................................8, 36

*Saxton v. State*,
    804 S.W.2d 910 (Tex. Crim. App. 1991) (en banc) ....................................7, 36

**FEDERAL STATUTES**

28 U.S.C. § 1291 ...............................................................................................1
28 U.S.C. § 2241 ...............................................................................................1
28 U.S.C. § 2254(d) ...................................................................................passim
28 U.S.C. § 2254(d)(2)......................................................................................32
AEDPA ...................................................................................................passim

**STATE STATUTES**

TEX. CODE CRIM. PROC. ANN., ARTICLE 37.071, § 2(b).....................................43
TEX. CODE CRIM. PROC. ANN., Article 37.071, § 2(b), (e)(1)................................49
TEX. PENAL CODE, Chapter 5, § 21.02(b) ............................................................52
TEX. PENAL CODE § 19.03(a)(2) (1996) ................................................................8

**OTHER AUTHORITIES**

S. Kassin and K. Neumann, *On the Power of Confession Evidence: An
    Experimental Test of the Fundamental Difference Phenomenon*.......................37
37 TEX. JUR. 3D .............................................................................................28

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction to decide Holberg's petition for a writ of habeas corpus under 28 U.S.C. § 2241.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it was taken from a final judgment of the District Court that disposed of all issues. ROA.110967.  Holberg filed a timely motion to alter or amend the judgment, ROA.110968-110999, which the District Court denied, ROA.111026-111030, and Holberg timely filed her notice of appeal, ROA.111031-111033.  This Court granted a certificate of appealability.  Dkt. 111-1.

## ISSUES PRESENTED FOR REVIEW

### *Suppression of Impeachment Evidence*

The prosecution suppressed evidence that Vickie Kirkpatrick, a "key prosecution witness," *Holberg v. State,* 38 S.W.3d 137, 139 (Tex. Crim. App. 2000), was a paid informant for police who procured her evidence against Holberg; tried to obtain leniency in her own felony case as a reward for that informant work and her cooperation against Holberg; and testified falsely to Holberg's jury about her motives for implicating Holberg. The State concedes this evidence was suppressed and favorable to Holberg. The state habeas court denied relief under *Brady v. Maryland,* 373 U.S. 83 (1963), for specific reasons that are contrary to or unreasonably apply clearly established federal law and therefore not subject to deference under 28 U.S.C. § 2254(d). Other hypothetical reasons not cited or relied upon by the state habeas court are not entitled to deferential review under section 2254(d). Is Holberg therefore entitled to relief under *Brady, Banks v. Dretke,* 540 U.S. 668 (2004), and their progeny?

### *Ineffective Assistance of Counsel*

Holberg's trial counsel failed to uncover and present compelling mitigation evidence that Holberg was born addicted to drugs, that her parents gave her alcohol and drugs at an early age and physically abused her while neglecting her basic needs, that she was subjected to repeated sexual violence, that she suffered from

major depression and cognitive impairments, and that her resulting drug addiction

caused psychosis and delirium. After a hearing at which witnesses favorable to

Holberg were not permitted to testify, the state habeas court denied relief,

unreasonably crediting counsel's claims that this evidence was not investigated or

presented because it would not have been mitigating. Is Holberg entitled to relief

under *Strickland v. Washington,* 466 U.S. 668, 691 (1984), *Wiggins v. Smith,* 539

U.S. 510, 522 (2003), and other cases that recognize the mitigating value of such

evidence?

## STATEMENT OF THE CASE

Brittany Holberg is a survivor of horrific and repeated sexual violence that

began in early childhood and continued through her teen years and into early

adulthood. *See* sections I(F-G), below. This included a violent gang rape in May

1995. She was hospitalized after that incident and told her treaters that "every time

I open my eyes I relive that rape," and "I don't care if I die … my soul is dead …."

ROA.77710, 77727.

Holberg also was addicted to drugs, born to a mother who used drugs

heavily during pregnancy, and exposed to constant drug use in a violent and

unstable home. *See* sections I(F-G). In October 1994, she was found lying in an

intersection, suffering from delirium, after an overdose. ROA.77492, 77601,

85879.  Her addiction, for which she sought treatment repeatedly, led her into sex work and other non-violent criminal acts.  *See, e.g.,* ROA.8934-8935, 8944:1-6.

On November 13, 1996, Holberg was involved in an auto accident. ROA.8992.  No one was hurt, but Holberg was high on drugs, and fearing arrest she left the scene.  She sought refuge at the Princess Apartments with A.B. Towery, Sr., an occasional prostitution client.  ROA.8993-97, 9054.  Their encounter ended in a violent struggle that left Towery dead and Holberg, injured and fearful, fleeing the scene.  ROA.9077:8-13.  When arrested she admitted killing Towery but explained he attacked her and she defended herself. ROA.8223:13-17, 8229:15-17, 8246:14-16, 8247:10-8248:3, 8250:18-8251:1.

Holberg was convicted of capital murder and sentenced to death.  ROA.803-806.  As explained below, prosecutors withheld critical impeachment evidence about a key witness in violation of *Brady,* and Holberg's trial defense counsel failed to investigate and present critical mitigation evidence, so her conviction and sentence were the result of an inaccurate and incomplete presentation of the homicide and Holberg herself.

The prosecution argued that Holberg's claim of self-defense was false and that she killed Towery in order to rob him.  To support those claims prosecutors presented testimony from Vickie Kirkpatrick, who briefly shared a jail cell with Holberg.  Kirkpatrick claimed Holberg admitted killing Towery to rob him, and

4

said she enjoyed killing Towery and would willingly kill again – statements she said Holberg made without remorse.  *See* section I(B), below.

Unbeknownst to the jury and Holberg's counsel, Kirkpatrick was a paid police informant, paid thousands of dollars by the same department that procured her evidence against Holberg.  The officer who handled her as an informant facilitated her statement against Holberg, then got a criminal charge against Kirkpatrick dismissed, and got her out of jail.  Kirkpatrick then sought leniency in her own pending felony case by touting her informant work and her cooperation against Holberg – but falsely told Holberg's jury that she only testified against Holberg to "do the right thing."  *See* section I(E), below.

During the penalty phase of Holberg's case, prosecutors told the jury Holberg had "a good childhood" in which "nothing particularly unusual" happened, and that "everything [was] handed to her on a silver platter."  Defense counsel responded that she was a "wonderful warm human being until she got hooked on crack cocaine," and presented a superficial portrait of Holberg as someone who "could return to her pre-drug self."  Defense counsel did not conduct any meaningful mitigation investigation before trial.  As a result they did not have, and could not present, abundant and readily available evidence of Holberg's unrelenting sexual victimization; her birth as an inconsolable infant addicted to drugs; her early childhood beatings, neglect, molestation, and involuntary use of

drugs and alcohol; and the psychiatric and cognitive damage caused by that lifelong trauma.  *See* sections I(F-G), below.

## I.    THE EVIDENCE PRESENTED – AND NOT PRESENTED – AT HOLBERG'S TRIAL

### A.    Holberg's Account of the Confrontation

Holberg testified that when she arrived at the Princess Apartments on November 13, 1996 she was high and had not slept for days.  ROA.9177:4-24. After leaving the scene of her accident Holberg intended to hide in Towery's apartment until she could reach the other passenger in the car in which she had the accident.  ROA.9097:24-9098:3.  But when Towery saw her smoking crack in his apartment he became enraged and began calling her names.  ROA.9102:14-9104:1. The argument escalated into a physical confrontation when Towery hit her on the head.  ROA.9010.

Holberg went to a bedroom to use the telephone but Towery followed her and shoved her.  ROA.9013-9014.  Holberg was frightened; she left the bedroom and armed herself with a kitchen knife, but he came out, grabbed her hair and bent her over.  She stabbed him.  ROA.9018-9020.  He grabbed her by the shirt and they continued to struggle.  ROA.9017-9018.  Holberg stabbed Towery again; she suffered several cuts, including a severe cut to her thumb that bled profusely. ROA.9021-9025.  Towery grabbed her hair several times and tore some of it out. ROA.8839:5-8842:1, 8852:6-9, 9020-9024.

During a pause in the struggle Towery sat in a chair, hurt but armed with a knife. Holberg struggled to breathe and feared she was having a heart attack. Towery came at her again, still armed with a knife. ROA.9026-9028.

He grabbed her hair again and they continued to fight. ROA.9029-9034. During this renewed struggle she shoved a lamp at him to get him away from her, but it lodged in his throat and he collapsed against a wall. ROA.9034-9035.

Realizing Towery was dead, and believing no one would credit her account of what happened, Holberg cleaned herself up, donned Towery's clothing, and fled the scene. ROA.9038-9042. She took two hundred-dollar bills Towery had thrown at her earlier, ROA.9040, but did not take any other money or any of Towery's drugs. ROA.9042.

To support her claim of self-defense, Holberg testified to some of the trauma that she had experienced, including being molested by an adult male caretaker when she was four or five years old, ROA.8888:20-8889:3, physically assaulted by two men in an alley when she was a teenager, ROA.8894:14-8897:25, and assaulted again while living in Oklahoma, ROA.8906:2-8908:19.

## B. The Prosecution Theory; Testimony by Paid Informant Vickie Kirkpatrick

The prosecution insisted Holberg's claim of self-defense was false and that she killed Towery to rob him. To convict her they had to disprove self-defense, *Saxton v. State,* 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc), and to

convict her of capital murder they had to prove an aggravating circumstance – robbery or burglary. TEX. PENAL CODE § 19.03(a)(2) (1996). Prosecutors focused almost entirely on the robbery theory, which required proof that Holberg formed an intent to kill before or during a robbery. An after the fact decision to steal would not suffice. *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993).

Their only direct evidence of Holberg's intent came from Vickie Kirkpatrick, a "key prosecution witness." *Holberg,* 38 S.W.3d at 139. Kirkpatrick testified Holberg made a number of incriminating admissions about the killing while they were briefly in jail together.

Kirkpatrick began her testimony by endorsing the prosecutor's suggestion that she implicated Holberg because she "wanted to do the right thing. You wanted to be as truthful as you could …." ROA.8618:21-8619:1.

Kirkpatrick then testified that Holberg said Towery gave her money on the day of the killing, something he had done before, which she used to buy drugs, and that she went back later for more money, but Towery refused. According to Kirkpatrick, Holberg said she tried to take the money, Towery resisted, and Holberg stabbed him. ROA.8621:8-8623:2.

In Kirkpatrick's telling, Holberg described seeing Towery bleeding as "amazing" and "pretty," and said the more she stabbed Towery the "prettier it was to her." ROA.8623:1-14. According to Kirkpatrick's story, Holberg said killing

Towery was "fun" and "amazing," ROA.8623:15-17, and that she would willingly kill again because "she'd do anything to get drugs or drug money." ROA.8624:14-23. Kirkpatrick testified Holberg showed "[n]o remorse." ROA.8624:24-8625:8.

Kirkpatrick also testified that Holberg described Towery laying on the floor making "gurgling noises… like pain noises," and said she "stuck a lamp thing down his throat because she got tired of hearing him make the noises." ROA.8623:18-8624:4.

Kirkpatrick was the only source for these alleged admissions. Holberg denied the conversation occurred. ROA.9055:20-9056:4. Kirkpatrick claimed Holberg spoke while "[e]verybody was up talking," ROA.8625:17-22, referring to the other women also sharing their cell, ROA.8629:15-19, but none of them corroborated Kirkpatrick's story.

## C. Use of Kirkpatrick's Testimony in the Guilt Phase

In opening the prosecutor mentioned Kirkpatrick twice by name and referred repeatedly to her testimony: that Holberg reveled in killing Towery, showed no remorse, would willingly kill again, and intentionally shoved the lamp into Towery's throat to silence him. ROA.8077:10-15, 8078:3-6, 11-15. He finished with this vivid image based on Kirkpatrick's testimony:

> And finally, finally, the lamp, the lamp to stop the gagging
> noises. …. I suspect that you, like those of us who worked on
> this case, will hear the gagging noises, not in this courtroom,

> but in your thoughts, your sleep and in your dreams maybe for
> the rest of your lives.

ROA.8084:5-15.

Prosecutors used Kirkpatrick's testimony to challenge Holberg's claim that she used the lamp as a defensive weapon when Towery attacked her. ROA.9137:2-13, 9140:18-25. They again referred to Kirkpatrick's testimony about using the lamp while questioning the medical examiner. ROA.8696:3-15. Their closing argument reiterated Kirkpatrick's testimony that Holberg killed Towery "for drugs" or a "fix," showed no remorse, and silenced Towery while he was "back down on the floor and likely he's making some noises and gurgling and she shoves that lamp down his throat." ROA.9282, 9288-9289.

Defense counsel attacked Kirkpatrick's testimony in closing, arguing the description of a "fountain of blood" she attributed to Holberg conflicted with the forensic evidence. ROA.9319:17-9320:3. In rebuttal the prosecutor defended Kirkpatrick's credibility and attacked Holberg's, telling the jury Kirkpatrick "is telling the truth," and insisting Holberg "really did talk to Ms. Kirkpatrick and she really did tell her these things." ROA.9339:7-22.

### D.    Use of Kirkpatrick's Testimony in the Penalty Phase

Prosecutors reintroduced their guilt phase proof, including Kirkpatrick's testimony, in the penalty phase. ROA.9378:1-3. They also called Dr. Richard Coons as an expert to opine that Holberg likely would commit additional acts of

violence. They asked Dr. Coons to assume Holberg said Towery "was making some kind of a gagging sound and that she shoved the lamp down his throat to stop the noise." ROA.9505:9-13, 9511:3-9. This was supported only by Kirkpatrick's testimony. Dr. Coons singled out the "gratuitous lamp down the throat," ROA.9512:4, telling jurors "the lamp was unnecessary" and reflected "overkill," ROA.9518:11-24.

The prosecutor underlined this in closing, arguing that Holberg "chose to hang around and cram a lamp down his throat, five inches into his mouth and throat. That scares [Dr. Coons] and that scares me. That bothers him about whether she's going to be a future danger." ROA.9990:3-13.

###    E.    The Undisclosed Impeachment Evidence

During brief cross-examination, Holberg's counsel tried to impeach Kirkpatrick by showing she was charged with a crime and had been a prostitute and drug addict. ROA.8629:6-14, 8630:14-8631:8. Kirkpatrick freely admitted this, but the same was true of Holberg and same defense witnesses. ROA.8858:1-8, 9060:6-20, 9068:14-9069:21, 9179:18-9180:4.

Defense counsel did not know Kirkpatrick was a paid informant for Amarillo police and had nearly daily contact with her police handlers. ROA.106754. They paid Kirkpatrick thousands in cash in approximately 40 drug cases. ROA.106754:2-106755:4, 106759:1-7. They knew she was a daily cocaine

user, ROA.29911, likely using their money to feed her addiction, ROA.106755:5-17, and frequently high when they met with her, ROA.106753:11-14.

One of those handlers, Corporal Stallings, arrested her for burglary, which put her in the cell with Holberg. ROA.29850, 29884. Two days later Stallings took Kirkpatrick to another officer in his department so she could give a statement implicating Holberg. ROA.110804-110805, 29884, 92731. That same day, Stallings got a criminal charge against Kirkpatrick dismissed. ROA.29756, 106755:20-106756:4. He then got her bonded out of jail. ROA.92731, 106756:5-20.

The felony burglary charge was still pending when Kirkpatrick testified against Holberg. Before she testified Kirkpatrick wrote to the judge in her burglary case, touting her informant work as a basis for probation rather than jail. ROA.30232-30233. That letter falsely claimed the burglary was her first felony. ROA.30232, 106726-106727. In a second letter to the judge she again asked for probation, this time citing her willingness to testify against Holberg. A copy of that letter was faxed to the DA's office months before Holberg's trial. ROA.30235-30237.

Shortly after Holberg's trial Stallings testified that "no one until today knew that Ms. Kirkpatrick had been an assistant to the Amarillo Police Department," other than the police officers handling her. ROA.106759-106760.

### F.    The Defense Presentation on Sentence

In the penalty phase Holberg's counsel offered a four-sentence opening statement.  She told jurors that Holberg was a "wonderful warm human being until she got hooked on crack cocaine."  She then said question No. 1 to be presented to jurors, about potential future violence, should be answered "no," and as a result "we will not proceed to question No. 2," relating to mitigation.  ROA.9533:5-15.

Holberg's counsel put on Holberg's stepfather, John Schwartz, to testify that Holberg was an "outgoing, energetic, intelligent," and "healthy" girl before she became addicted to drugs.  ROA.9535:13-23, 9543:11-16.  He claimed Holberg was an "honor roll" student and was "accepted – I was very proud – by Duke University because of her SAT scores."  ROA.9538:24-9539:2.  But Schwartz testified Holberg's behavior changed in high school when she became "boy crazy." ROA.9539:22-24.

Schwartz echoed some of what Holberg told the jury about prior assaults. ROA.9547:3-6, 9536:2-4, 9541:19-23.  But he contradicted key elements of Holberg's testimony, claiming she did not tell him at age five that a babysitter molested her, ROA.9570:1-18, and that she did not use drugs in their home, ROA.9536:23-9538:14.

Psychiatrist Dr. Dhiren Patel testified that Holberg suffered from drug dependency, Post-Traumatic Stress Disorder ("PTSD"), and Battered Woman

Syndrome ("BWS"), with drug dependency having the greatest impact on her behavior and the offense. ROA.9679:13-9680:7, 9718:4-9719:7. He opined she had a low probability of future violence because, to his knowledge, cocaine and heroin were not available in prison. ROA.9668:7-9670:18. On cross he admitted Holberg was his primary source and that he had not talked to her parents or friends, though he reviewed certain records. ROA.9666:1-9668:6, 9703:3-9705:10. He also admitted some information from Holberg may have been untrue and this could affect the accuracy of his conclusions. ROA.9705:11-14.

An investigator for the Texas Department of Criminal Justice testified drug cases were rare in prison and he had never had a case there involving crack. ROA.9835:1-8. In rebuttal the prosecution called another investigator who testified weapons, violence and drugs were prevalent in Texas prisons. ROA.9907:7-9908:13, 9920:17-9921-4.[1]

In closing the prosecutor belittled the defense case, asking "where is the mitigating evidence?" He asserted Holberg "had a good childhood" and "had everything handed to her on a silver platter." ROA.9946:5-9. He argued her parents only used "some marijuana" which "a lot of folks" do. ROA.9946:18-25.

---

[1] Defense counsel also inexplicably called two jail officers to testify Holberg had been involved in altercations while incarcerated. ROA.9886:8-9887:2, 9891:2-25, 9897:3-24.

14

He insisted Holberg had "a good relationship with her mother," "had everything she ever wanted except more attention and love from her parents," and that "her real problems with drugs began later, not at home." ROA.9946:10-11, 22-24, 9981:13-25. He insisted "she chose the drugs, she chose the prostitution, she chose to live a life of deception, manipulation and violence." ROA.9948:4-6.

In closing defense counsel acknowledged they had told the jury in opening that they would not address mitigation. But she then changed course, saying "I [now] want to talk to you about the issue of mitigating evidence." ROA.9965:2-12. Counsel then briefly discussed Holberg's parents' "partying," the traumatic death of Holbert's aunt, Holberg's leaving home as a minor, her later drug addiction, and her remorse. ROA.9969:1-9973:14.

The jury deliberated for 11 hours before concluding that Holberg presented a danger of future violence and that mitigating circumstances warranting life imprisonment were not present. ROA.9993:1-9996:3.

### G. The Mitigation Defense Counsel Did Not Investigate or Present

The trial defense team later admitted they did not investigate Holberg's early childhood or paternal family, ROA.1112, 11914:3-24; delegated to Dr. Patel the responsibility to review records for mitigating evidence, ROA.1127, 104191:24-104192:11; decided evidence of cognitive impairment was not mitigating, ROA.1097-1098, 11253:6-11254:7, 12038:10-25; and did not meaningfully

investigate Holberg's childhood sexual victimization, ROA.11928:24-11929:17, 104110:16-24, 12633:7-18, viewing abuse in her early teens as a "sexual relationship," ROA.12078:1-12079:2, 104109:4-104110:24.

Had they investigated they could have established that Holberg's mother, Pam Schwartz,[2] abused alcohol, heroin and other drugs during her pregnancy, that Holberg was born drug-addicted, and that this caused health problems and cognitive impairments. ROA.84951, 84956, 85672-73, 85785-85786, 85695.

For the first months of her life Holberg was "an addicted infant" going through "detoxification and drug withdrawal." ROA.85720, 85756(¶12). Holberg's father, Jimmy Brogdon, was "terrified that Pam's constant drug and alcohol use while she was pregnant would cause some sort of serious [birth] defect." ROA.85673. As an infant, he said, Holberg "threw 'fits' where her arms and legs shook violently like a body going through withdrawal," and was "excessively sensitive to touch and could not be soothed or calmed throughout this time." ROA.85720. It "seemed like it hurt to touch her," Brogdon recalled. ROA.85673(¶13). Holberg later developed chronic asthma, cognitive impairments, and her own addictions. ROA.85722-85723, 85798-85790.

---

[2] To avoid confusing them Pam Schwartz is sometimes referred to here as "Pam," and Holberg's stepfather John Schwartz as "Schwartz."

Her parents' extreme substance abuse continued throughout Holberg's childhood, but defense counsel did not collect evidence of "needles stuck in between towels in their bathroom," ROA.85779(¶11), and "cake pan lids full of pot and pills just lying around," ROA.85695(¶12). The home was a drug den for Holberg's parents and their friends. ROA.85688(¶19). They gave Holberg alcohol in early childhood, ROA.47591, and got Holberg and her cousin high on marijuana, ROA.85688(¶19). When Brogdon was imprisoned for dealing heroin ROA.47219, Pam took up with John Schwartz, ROA.49192. Their relationship centered on drug abuse. Prosecutors said in the penalty phase they just used "some marijuana," but in fact they injected heroin and methamphetamine, used cocaine, and cooked methamphetamine in the bathtub. ROA.85770(¶7), 85695(¶12).

Trial counsel also failed to collect evidence of extensive childhood abuse and neglect. ROA.84952-84953. When Holberg was an infant her mother "[o]ften ... would get impatient and shake Brittany real hard." ROA.85673(¶13). Holberg's uncle "could not believe the way they neglected" her. He bought her diapers and food because her parents spent their money on drugs. ROA.85696(¶14). When Holberg was a toddler her mother would "hit Brittany much too hard." ROA.85786(¶16). She "yell[ed] and scream[ed]" and "spanked Brittany all the time." ROA.85779(¶11).

Holberg also witnessed violence. Schwartz "slapped her [mother] around," and "she would fight ... back," ROA.85674(¶16). On one occasion he "[b]roke three toes trying to kick down the door" and "finally used the butt of the shotgun to beat the door in" to the bathroom where Holberg's mother hid, ROA.85672(¶9). Holberg's mother later "tried to punch" Schwartz and "her fist went through the wall and made a big hole." ROA.85771(¶12); *see also* ROA.49305, 49338, 49344-49346, 49354, 49265, 49272.

Defense counsel also did not collect evidence of extensive sexual abuse of Holberg, or her parents' indifference to it. ROA.84951. Hospital records described Holberg's sexual assault by a male babysitter when she was five, recording that when Holberg reported it Pam said Holberg was "exaggerating" and "shouldn't talk like that" – then left Holberg in the molester's care again. ROA.48927, 49000. Witnesses also could have testified that Andy Grimes, an adult friend of Schwartz who was having an affair with Pam, sexually abused Holberg for several years beginning when she was 12 or 13. ROA.85697(¶19), 85765-85766(¶7), 85774(¶22). Schwartz did not protect Holberg from sexual victimization; he sexualized Holberg himself, telling her she had a "nice ass" and asking intrusive questions about her sexuality. ROA.85766(¶9), 85702-85703(¶7).

As a result of prenatal drug and alcohol exposure and traumatic childhood, Holberg suffered "wide-reaching" and "significant brain dysfunction" that

impaired her executive functioning, including her ability to plan and self-inhibit, her memory, her emotional regulation, and her intellect. ROA.85801, 85808-85810. Schwartz's testimony about Holberg's SAT scores and acceptance to Duke University was false. ROA.78004. Her verbal score of 250 and math score of 260 placed her near the bottom nationally. ROA.78009-78010.

The jury did not hear about Holberg's "pattern and severity of brain dysfunction," ROA.85808-85810, or that Holberg could not "consistently describe information and/or events," and "because of brain dysfunction … could not relay information consistently and accurately." ROA.85798(¶24).

Because they did not investigate family history, defense counsel were unaware that "Brittany's family has an extensive history of severe, intractable mood disorders with psychotic features and other mental diseases on both her paternal and maternal side," along with "an extensive legacy of intra-familial violence and abuse" and "chronic and extreme chemical dependency." ROA.85709-85711. Pam suffered from psychiatric illness and normalized bizarre sexual behavior. ROA.85713-85715. Her numerous marriages coincided with multiple affairs: with her brother-in-law, the man who molested Holberg, Holberg's high school friends, and Holberg's husband. ROA.85697, 85702, 85714, 85719, 85765.

As documented in medical records, Holberg's adolescence and early adult years mirrored Pam's decline into severe depression, drug addiction, and extreme sexual behavior.  ROA.85726-85729.  In the two years or so preceding the homicide, Holberg's depression and addiction intensified to the point that she was hospitalized with "psychotic symptoms including visual hallucinations and tactile delusions," and later "severe delirium."  ROA.77492-77496, 77700-77706, 85827-85728.  During one hospitalization she would "recoil and scream out" when touched, ROA.85728, an extreme reaction that recalled her drug addiction as an infant.  Just 18 months before the homicide, Holberg was gang raped.  ROA.77700-77702, 77711-77712, 77727.

Hospital records documented that Holberg's husband physically "attacked her on at least two different occasions," causing injuries requiring stitches, and on another occasion "molested her and sodomized her."  ROA.47589; *see also* ROA.104182:17-10483:18.  When she confided this to Schwartz, he told her "she should stay with [her husband] and that a husband could not rape a wife."  ROA.47589.

## II.    STATE AND FEDERAL HABEAS PROCEEDINGS

After Holberg's direct appeal was rejected, *Holberg*, 38 S.W.3d at 139, she petitioned for state habeas relief.  Holberg alleged the prosecution violated her due process rights by eliciting false testimony from Kirkpatrick, and also that

Kirkpatrick "was a confidential informant" for Amarillo police and that "defense counsel was entitled to know that information," ROA.98624. She cited *Ex Parte Adams,* 768 S.W.2d 281, 293 (Tex. Crim. App. 1989), which cited *Brady* and vacated a conviction based in part on its rule "requiring disclosure of evidence favorable to an accused." ROA.98623-98624.

The State's answer provided further details about Kirkpatrick's informant work. ROA.1427, 1487-1490, 1496, 1500. Holberg's reply more fully developed her *Brady* claim, alleging suppression of various information including Kirkpatrick's work as a paid police informant. ROA.98848, 98851, 98856. The Texas Court of Criminal Appeals ("TCCA") held the reply provided "further evidentiary and legal support" for the original claims and should be considered along with the initial petition. *Ex Parte Holberg,* No. WR-68,994-01, 2008 WL 152725 (Tex. Crim. App. Jan. 16, 2008) (per curiam).

In findings and conclusions addressing Holberg's *Brady* claims, the state court cited *Strickler v. Greene,* 527 U.S. 263 (1999), which holds a defendant is entitled to relief if the state suppresses evidence favorable to the accused and the evidence is material. ROA.97963-64. The court ruled Holberg was not entitled to relief because, it said, (a) the prosecutor fulfills his *Brady* duty if he opens his file to defense counsel; (b) evidence is not suppressed if it is in defendant's possession;

and (c) relief is available only if the suppressed information is admissible. ROA.97964(¶¶2-3).

The court did not rule that Kirkpatrick's informant work was not the type of information that falls within the scope of *Brady* and therefore was not subject to disclosure. It also did not find that the information was contained in prosecution files furnished to Holberg or was otherwise known to her. The court did not address whether the Kirkpatrick evidence was material for purposes of the *Brady* rule. ROA.97963-97964.

Holberg also claimed ineffective assistance of counsel ("IAC") on grounds including failure to present mitigation evidence. The state district court conducted hearings on this claim, as directed by the TCCA, but limited the testimony to members of the trial defense team, excluding witnesses for Holberg who would have contradicted some of defense counsel's assertions. *See* ROA.52904-52912. After the hearing, the district court entered supplemental findings and conclusions endorsing counsel's performance as adequate. ROA.52894-52983.

The TCCA ultimately adopted the state district court's findings and conclusions and rejected Holberg's claims. *Ex Parte Holberg,* No. WR-68,994-01-03, 2014 WL 5389907 (Tex. Crim. App. 2014) (per curiam).

Holberg sought habeas relief from a federal district court, which denied relief and refused a certificate of appealability ("COA"). *Holberg v. Davis,* No.

2:15-CV-285-Z, 2021 WL 3603347, *151 (N.D. Tex. Aug. 13, 2021). In an Appendix attached to its opinion, the District Court encouraged Texas officials to consider clemency, noting that the "circumstances of [Holberg's] childhood and adolescence" provided "stark evidence that Holberg's family and her community allowed her to 'slip through the cracks,'" with "deadly consequences." ROA.110964-110966.

This Court granted a COA on the *Brady* and IAC claims. Dkt. 111-1 at 6-11. It granted relief on the *Brady* violation, but did not address the IAC claim. Dkt. 246-1. The State sought rehearing en banc, Dkt. 278, which this Court granted, Dkt. 307-1, 307-2.

# SUMMARY OF ARGUMENT

## *Suppression of Impeachment Evidence*

The prosecution suppressed evidence that would have impeached – indeed destroyed – Kirkpatrick's credibility.  It established a powerful financial incentive for her to give police the testimony they wanted, reinforced by Kirkpatrick's addiction, which made her dependent on their informant payments.  That impeachment was made more powerful by Kirkpatrick's attempt to use her informant work and cooperation against Holberg to get leniency in her own case, a motive she concealed from Holberg's jury by falsely claiming she only testified to "do the right thing."  The State concedes and the panel dissent accepted that the evidence was suppressed and favorable to Holberg but the State argues it is not material.  The record shows otherwise: there is a reasonable probability that if Kirkpatrick had been impeached the outcome would have been different.

The state habeas court denied relief for specific reasons that are contrary to or that unreasonably applied clearly established law in *Brady* and *Banks,* and therefore do not preclude relief under 28 U.S.C. § 2254(d).  An open file policy does not defeat a *Brady* claim; the suppressed evidence was not in the prosecution file and was not otherwise known to Holberg, as the State now concedes.  Supreme Court decisions preclude a rule of admissibility to obtain relief for a *Brady* violation – and anyway, the information *was* admissible to impeach Kirkpatrick.

Other hypothetical reasons to deny relief, not cited by the state court, are not entitled to deferential review under section 2254(d) and not supportable on the facts or law, and would be unsupportable even if given that deferential review.

### *Ineffective Assistance of Counsel*

Trial counsel never learned of Holberg's horrifying childhood. They presented an uninformed and misleading picture of Holberg that falsely suggested she was a gifted, loved, and nurtured child. They disavowed mitigation and tried to blame the homicide solely on Holberg's drug addiction. Not surprisingly, the prosecution ridiculed their paltry case and used it to persuade the jury that Holberg eagerly chose a life of partying, drugs, and prostitution.

Trial counsel failed to uncover and present readily available evidence that Holberg was born addicted to drugs and was subjected to childhood physical abuse, neglect, and sexual violence, and that these traumas resulted in her own debilitating addiction, as well as cognitive impairments that affected her behavior, including on the day of the homicide. In the one-sided state habeas hearing, counsel claimed to have made strategic decisions to avoid presenting this evidence, but their explanations were unsupportable post-hoc rationalizations, contradicted by Supreme Court precedent. The state court relied on unreasonable findings, and unreasonably applied *Strickland* and its progeny, in crediting counsel's rationalizations and denying the claim.

## STANDARD OF REVIEW

This Court reviews The District Court's factual findings for clear error and conclusions of law *de novo.  Virgil v. Dretke,* 446 F.3d 598, 604-05 (5th Cir. 2006).  Determinations of what constitutes clearly established federal law, and whether a state court decision is contrary to or unreasonably applies such law, are questions of law subject to *de novo* review.  *See Andrew v. White,* 604 U.S. 86, 95 (2025); *Reeder v. Vannoy,* 978 F.3d 272, 276 (5th Cir. 2020).

## ARGUMENT

## I.  HOLBERG IS ENTITLED TO RELIEF UNDER *BRADY* AND ITS PROGENY.

### A.  Holberg Exhausted This Claim in State Court.

The State agrees she did.  Doc. 232 at 4.  So did the District Court. ROA.110803.  The panel dissent acknowledged this "is no longer an issue …." Dkt. 246-1 at 29 n.1.

An amicus filer contended this Court should not accept the "waiver of exhaustion."  Dkt. 298 at 7.  But such waivers are almost always enforced, *Graham v. Johnson,* 94 F.3d 958, 970 (5th Cir. 1996), and the State did not waive, it affirmatively argued exhaustion.  Dkt. 232.  It also did not seek a different ruling on rehearing, which settles any remaining issue.  *Squyres v. Heico Cos., LLC,* 782 F.3d 224, 234 n.5 (5th Cir. 2015); *Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,* 933 F.2d 1285, 1292 (5th Cir. 1991).

The record shows Holberg exhausted the claim, "fairly present[ing her] federal claims to the state courts," *Duncan v. Henry,* 513 U.S. 364, 365 (1995) (per curiam), by presenting the substance of her claim, *Vasquez v. Hillery,* 474 U.S. 254, 258 (1986), "specifying both the legal and factual basis," *Lucio v. Lumpkin,* 987 F.3d 451, 464 (5th Cir. 2021) (en banc). Holberg explicitly alleged the factual basis relating to Kirkpatrick's informant relationship and invoked the rule in *Brady*. The petition and reply asserted this claim "in terms sufficiently particular as to call to mind a specific right protected by the Constitution," *Sofar v. Dretke,* 368 F.3d 441, 465 (5th Cir. 2004), *amended on reh'g in part,* 391 F.3d 703 (5th Cir. 2004) (internal citations and quotations omitted), citing precedent that "explicitly connect[s] the error ... to an accused's federal [constitutional] rights," *Taylor v. Cain,* 545 F.3d 327, 334 (5th Cir. 2008). *See* page 21, above.

## B. *Brady* Required Disclosure of the Kirkpatrick Evidence.

Prosecutors violate due process by failing to disclose "evidence favorable to an accused ... material either to guilt or to punishment," "irrespective of the good faith or bad faith of the prosecution," *Brady,* 373 U.S. at 87, even if the evidence is known only to law enforcement and not prosecutors, *Kyles v. Whitley,* 514 U.S. 419, 437-38 (1995).

This includes impeachment "on the basis of bias or interest arising from inducements offered by the Government." *United States v. Bagley,* 473 U.S. 667,

683 (1985). Such bias or interest arises when a prosecution witness is a paid informant for the law enforcement agency that procures her evidence against the defendant. *See Banks,* 540 U.S. at 691, 701-02. Indeed, whenever a witness is employed by a party for money an inference of bias arises and the opposing party may impeach on that basis. *See, e.g., United States v. Abel,* 469 U.S. 45, 50-52 (1984); *G. & H. Equip. Co. v. Alexander,* 533 S.W.2d 872, 875 (Tex. Civ. App. 1976); 37 TEX. JUR. 3D Evidence § 801 (3d ed. 2023). This right has a constitutional dimension. *Delaware v. Van Arsdall,* 475 U.S. 673, 678-79 (1986) ("exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination") (internal quotations omitted); *Hurd v. State,* 725 S.W.2d 249, 252 (Tex. Crim. App. 1987) (en banc).

The State argues that applying *Brady* and *Banks* here would improperly extend Supreme Court precedent, because the Supreme Court has not specifically stated that *Banks* or *Brady* require disclosure, in a situation in which the state pays its informant witness in connection with other cases, but not the defendant's. Dkt. 278 at 14-15. But the clearly established federal law in *Brady* and *Banks* required the prosecution had to disclose the Kirkpatrick impeachment here.

The federal court independently determines what the clearly established law is, without deferring to the state court. *Andrew,* 604 U.S. at 95. It does so by reviewing relevant Supreme Court holdings, bearing in mind that when that Court

28

"relies on a legal rule or principle to decide a case, that principle is a 'holding' of the Court for purposes of AEDPA," *id.* at 92, and that "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court," *id.* at 94.

AEDPA focuses on the controlling legal principles and does not require an identical fact pattern in a prior case in which relief was granted. *Panetti v. Quarterman,* 551 U.S. 930, 953 (2007). "Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Andrew,* 604 U.S. at 95 (quoting *White v. Woodall,* 572 U.S. 415, 427 (2014)).

The fundamental principles that dictate a disclosure obligation are clear. The prosecution must disclose favorable evidence, including evidence showing bias in the prosecution's favor. *Bagley*, 473 U.S. at 675. Employment as a paid informant for law enforcement is impeaching because informant testimony is inherently suspect. *Banks,* 540 U.S. at 701-02. It is "beyond genuine debate" that a witness' "paid informant status qualifies as evidence advantageous" to the defense, because of its obvious tendency to establish bias. *Id.* at 691. The touchstone of these cases is that due process requires disclosure if the evidence is favorable to defendant – and the State concedes here that it is. *See* https://www.ca5.uscourts.gov/OralArgRecordings/21/21-70010_6-5- 2024.mp3

("Or. Arg.") at 40:30-42:00; Dkt. 246-1 at 11. The panel dissent accepted it was, for purposes of decision. Dkt. 246-1 at 29.

A state court unreasonably applies clearly established federal law if it fails to follow Supreme Court holdings in a case with "materially indistinguishable" facts. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). The identity of the particular cases for which Kirkpatrick was paid is not material. Kirkpatrick's paid employment by the same police department that procured her evidence against Holberg establishes the bias that makes the relationship impeaching. *See Maxwell v. Roe,* 628 F.3d 486, 509, 511 (9th Cir. 2010) (state court unreasonably applied Brady to evidence of a witness' "prior cooperation with law enforcement as an informant," which showed he was a "sophisticated informant with developed connections and relationships" within the police department); *Robinson v. Mills,* 592 F.3d 730, 738 (6th Cir. 2010) (although witness "only informed on behalf of the State in unrelated cases," a ruling that *Brady* did not require disclosure unreasonably applied clearly established law, because he had a working relationship with "the agencies spearheading the investigation of this case" that could have been introduced to show "lack of credibility and the possibility of bias").

The State relies on the unreported decision in *Dennes v. Davis,* 797 F. App'x 835 (5th Cir. 2020) (cited Dkt. 278 at 15). But that ruling is inconsistent with

*Brady* and *Banks* for the reasons explained here. It is, in any event, distinguishable. In *Dennes* the arrangement between informant and police was "wholly independent of" the murder case. 797 F. App'x at 842-43. Kirkpatrick's arrangements were not. She was an informant for the same department during the same time period, her police handler was directly involved in procuring her evidence against Holberg, and she attempted to use her informant work and her cooperation against Holberg to get leniency for herself, clearly establishing bias relevant specifically to Holberg's case.

### C. The State Court Ruling Is Contrary to and Unreasonably Applies Clearly Established Law.

The state habeas court ruled Holberg was not entitled to relief because: (a) the prosecutor complied with *Brady* by opening his file to defendant; (b) evidence is not suppressed if defendant already has it; and (c) relief is available only if the suppressed information is admissible. ROA.97964(¶¶ 2-3).

The first reason is contrary to and unreasonably applied *Strickler,* which makes no exception to disclosure where prosecutors open their file but it does not contain the information, and *Banks,* which found a *Brady* violation despite an "open file" policy because the informant evidence was not there. *Banks,* 540 U.S. at 692. An open file policy does not defeat a *Brady* claim; it demonstrates defense counsel may rely on the prosecution's promise to disclose favorable evidence. *Id.* at 692-94. This ruling also unreasonably applied *Kyles,* which established

prosecutors' "duty to learn" the favorable information known to police. 514 U.S. at 437.

The state court did not find the suppressed information was in a prosecution file or otherwise disclosed. In fact prosecutors proved the information was not known to anyone other than police, ROA.106759:1-106760:5, and that Kirkpatrick was a "confidential informant," ROA.106759:19-23. Any finding of disclosure would have been unreasonable. 28 U.S.C. § 2254(d)(2). More importantly, the State never argued disclosure occurred, Dkt. 176 at 13-22, *see* Oral Arg. At 38:34-42:01, 50:33-51:12, and ultimately conceded suppression here, Dkt. 246-1 at 11, 29.

The same fatal flaw infects the state court's second reason: "the State cannot suppress information that the applicant actually possesses." ROA.97964. Holberg indisputably did not.

Finally, the ruling that "allegedly suppressed evidence must also be admissible," ROA.97964(¶2), unreasonably applied *Banks,* which precludes any rule of admissibility as to disclosure. 540 U.S. at 701-03. *Accord United States v. Brown,* 650 F.3d 581, 588 (5th Cir. 2011) ("suppressed evidence need not be admissible to be material under *Brady*"). Anyway, this evidence would have been admissible to impeach Kirkpatrick. *See* page 28, above.

**D.     AEDPA Deference Does Not Apply to Materiality Because the State Court's Decision Did Not Rest on a Finding the Evidence Was Not Material.**

This Court cannot uphold the denial of relief under section 2254(d)(1) on the basis that the state habeas court could have found the Kirkpatrick impeachment was not material, without unreasonably applying clearly established federal law.

When the state court ruling is "unsupported by [any] explanation," the federal court must consider reasons that might have supported denial of relief, and affirm if any would not involve an unreasonable application of clearly established law.  *Williams v. Thaler,* 684 F.3d 597, 603 (5th Cir. 2012) (citing *Harrington v. Richter,* 562 U.S. 86 (2011)).  But where, as here, the state court explains its basis, the "federal habeas court … [must] train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims," to determine whether the decision "involved" an unreasonable application of federal law.  *Wilson v. Sellers,* 584 U.S. 122, 125 (2018) (quotation marks and citations omitted); *Lucio,* 987 F.3d at 465.

In a case such as this, where the state court explained its "particular reasons," other reasons not relied upon are not entitled to 2254(d) deference.  *Brumfield v. Cain*, 576 U.S. 305, 323 (2015) (where the state court "never made any finding that [petitioner] failed to produce evidence suggesting he could meet" a particular requirement for relief, the federal habeas court must review that issue

*de novo*, because "[t]here is thus no determination on that point to which a federal court must defer in assessing whether [petitioner] satisfied § 2254(d)") (citing *Wiggins*, 539 U.S. at 534) (reviewing *Strickland* prejudice *de novo* where state court decision was based solely on deficient performance)); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (same); *Atkins v. Hooper,* 979 F.3d 1035, 1049 (5th Cir. 2020) (because no state court evaluated whether a Confrontation Clause violation was harmless error "no deference is due under AEDPA" on that issue).[3]

Because the state court did not find the Kirkpatrick impeachment was not material, and rejected the *Brady* claim on explicitly stated and entirely unrelated grounds, Holberg need only show materiality under a *de novo* standard. For the reasons discussed below, she has.

For the same reason, the Court cannot uphold denial of relief on the basis that the state habeas court could have determined, without unreasonably applying clearly established federal law, that disclosure of a prosecution witness' informant work is not required where the informant is paid only in cases other than defendant's. Again, the state court rejected the *Brady* claim on explicitly stated

---

[3] Where the relevant state court decision does not explain its rationale, the federal court "looks through" to the last reasoned state court decision and applies a rebuttable presumption that its rationale was relied on by the later decision. *Wilson,* 584 U. S. at 125-26. But that is not an issue here, because the TCCA expressly adopted the findings and conclusions of the state district court. *Ex Parte Holberg,* 2014 WL 5389907 at *1.

and entirely unrelated reasons. The *Dennes* decision, cited by the State here, noted that the state habeas court in that case distinguished *Banks* on the basis that the witness in *Banks* was a paid informant in defendant's case but the informant in *Dennes* was not. The Court held that was not an unreasonable application of clearly established law. 797 F. App'x at 842-43. But the state habeas court did not rely on any such conclusion in rejecting Holberg's claim.

### E.   The Evidence Was Suppressed, Favorable and Material.

The State concedes the Kirkpatrick impeachment was suppressed and favorable. *See* pages 29-30, 32, above. It argues the evidence was not material, but the record shows otherwise.

### 1.   Materiality on Guilt

Resolutely ignoring the state court finding, binding here under AEDPA, that Kirkpatrick was a "key prosecution witness," and the fact that prosecutors did everything they could to inject Kirkpatrick's narrative into the trial, the State insists her testimony did not matter because other evidence refuted self-defense and proved the aggravators.

But materiality requires only a "reasonable probability" of a different outcome. *Kyles*, 514 U.S. at 434; *Floyd v. Vannoy*, 894 F.3d 143, 166 (5th Cir. 2018). Materiality is not a sufficiency of evidence test; that other evidence is

legally sufficient to convict does not preclude a finding of materiality. *Kyles,* 514 U.S. at 434.

Kirkpatrick testified to alleged admissions by Holberg to critical facts the prosecution had to prove beyond a reasonable doubt – that the killing was not in self-defense and that Holberg intended to rob Towery before or during the homicide. *Saxton,* 804 S.W.2d at 913; *Robertson,* 871 S.W.2d at 705. The materiality question is whether there is a reasonable probability that if the impeachment evidence had been disclosed and Kirkpatrick's credibility undermined, at least one juror would have harbored reasonable doubt on at least one of those issues.

It matters – immensely – that Kirkpatrick testified to a purported confession. Juries attach enormous importance to confessions and usually disregard contrary evidence regardless how strong. *See, e.g., Floyd*, 894 F.3d at 157 ("[c]onfessions are generally considered strong evidence of guilt, and a sound confession alone may significantly influence a juror's decision"); *McCarthy v. State*, 65 S.W.3d 47, 56 (Tex. Crim. App. 2001) ("confession is likely to leave an indelible impact on the jury … [i]f the jury believes that a defendant has admitted the crime, it will doubtless be tempted to rest its decision on that evidence alone, without careful consideration of the other evidence"). Confession evidence is "uniquely potent" and usually conclusive. S. Kassin and K. Neumann, *On the Power of Confession*

*Evidence:  An Experimental Test of the Fundamental Difference Phenomenon,* 21 LAW & HUMAN BEHAV. 469, 481-82 (1997).

And prosecutors' extensive reliance on Kirkpatrick, *see* pages 9-11, above, underlines the critical nature of her testimony and the materiality of devastating impeachment evidence.  "The likely damage" of withholding impeachment evidence "is best understood by taking the word of the prosecutor." *Kyles,* 514 U.S. at 444.  Their words during Holberg's trial confirm that Kirkpatrick was a "key prosecution witness." *Holberg,* 38 S.W.3d at 139.  Kirkpatrick's testimony cut through the questions and doubts left by the circumstantial proof, which was conflicting, incomplete, or consistent with acquittal, and established for the jury unequivocal admissions to the key facts.

For example, the State points to the violent nature of the killing to refute self-defense and establish the homicide was committed to facilitate robbery.  But Kirkpatrick provided the only direct evidence of Holberg's intent.  Other evidence, including evidence of prior assaults against Holberg and her impairment by drugs at the time of the confrontation, is consistent with a conclusion that this was not a robbery aided by homicide but an argument that spiraled out of control.

If Kirkpatrick had been impeached there is a reasonable probability Holberg's jurors would have harbored reasonable doubt on the required intent, and perhaps concluded that, impaired and under extreme stress, she simply overreacted

in the confrontation with Towery.  *See Glossip v. Oklahoma,* 604 U.S. 226, 248

(2025) (because testimony was the "only direct evidence" of capital murder "the

jury's assessment of credibility was necessarily determinative").  The State

disdains self-defense here but at trial prosecutors conceded it was one way "to

make sense out of" the killing.  ROA.9268:14-17.  And even if jurors did not

believe her actions constituted self-defense, there is a reasonable probability they

would have doubted she killed Towery to rob him, and instead concluded she was

guilty of a lesser offense, not capital murder.

The prosecution presented testimony to suggest Towery was kindly and

unaggressive, *see, e.g.,* ROA.8351:7-22, but his own family testified to multiple

incidents of violent behavior, including incidents in which he stabbed his son with

a knife and destroyed property, and the police had to be called, ROA.8350:7-

8354:25, 8359:10-8360:13, 9163:21-9169:21, 9172:3-91734:25.  The prosecution

also argued Towery was infirm and unlikely to have assaulted Holberg, calling

witnesses who testified to his physical limitations, *see, e.g.,* ROA.8343:12-8344:7,

but presented evidence that established Towery was physically capable of

attacking Holberg and engaging in a protracted struggle with her.  The medical

examiner testified the autopsy showed Towery was "in pretty good shape,"

ROA.8675:1-6, and that he could have engaged in the extended struggle Holberg

described, ROA.8695:8-24.  Forensic evidence confirmed Towery tore out some of

Holberg's hair and inflicted other injuries, ROA.8852:6-8854:24, and prosecutors acknowledged these injuries, ROA.8084:1-4, 9275:4-12. Taking all this evidence into account, without crediting Kirkpatrick's claim that Holberg admitted to an unprovoked homicide to take Towery's money, there is a reasonable probability of reasonable doubt on self-defense or intent to rob.

And other evidence is inconsistent with robbery. Prosecutors claimed Holberg went through Towery's pockets, found his wallet and took multiple hundred-dollar bills. ROA.8405:13-8406:1, 8418:16-23, 8362:16-8363:15. But evidence showed a substantial amount of cash left behind, "strewn around the apartment." ROA.8120:13-17, 8118:9-12, 9270:17-21, 99353-99354. Prosecutors offered no explanation why someone would dig through Towery's wallet and steal money from a hidden compartment but leave plenty of money in plain sight.

Furthermore, both Holberg and Towery bled profusely, Holberg from a severe cut to her hand that bled for hours. ROA.8598:2-8599:10, 8612:2-8, 9041, 8606:9-13, 8612:2-10, 9025, 9041. But prosecutors proved her blood and fingerprints were not on the wallet, ROA.8795:16-17, 62785 (evidence log 40, "no prints identifiable"), even though her prints were found elsewhere in the apartment, ROA.8083:17-19, 8148:3-12. The prosecution had no proof her DNA was on it

(and resisted efforts to test it). *Holberg v. State*, 425 S.W.3d 282 (Tex. Crim. App. 2014).[4]

Prosecutors also pointed to the fact that Holberg did not pay the cab driver, who brought her to the Princess Apartments, supposedly proving she had no money, but then paid two witnesses $200 "in bloodstained bills to drive her away from the scene," Dkt. 278 at 6, *see* ROA.8081:8-11, suggesting she stole that money. But Holberg had several hundred dollars earned through prostitution. ROA.9000, 9097:1-5. Prosecutors told the jury Holberg "would not or could not" pay the cabbie, ROA.8072:13-16, conceding she might have had the money but chose not to pay. She also may have left the cab without paying because she was panicked and high. *See* ROA.9099:3-17. And with respect to the "bloodstained" bills, neither witness testified to seeing blood on the money. ROA.8572:1-8587:2, 8570:22-8571:9.

---

[4] Prosecutors argued that evidence indicating that Towery's wallet was found lying on his body also supported robbery, but there was evidence the wallet could have been handled by someone else – the apartment was open and unsecured after Holberg left, *see* ROA.8371:11-8373:17, 8421:4-8422:21, and the prosecution elicited evidence of frequent criminal activity at the Princess Apartments, ROA.8540:1-5, 8548:12-8549:11. And even if Holberg handled the wallet, notwithstanding the forensic evidence refuting that, it does not establish intent to rob before or during the homicide, as the jurors' question during deliberations recognized. ROA.9350:13-18.

Prosecutors also pointed to testimony that when apprehended Holberg knew how much money allegedly had been stolen from Towery, ROA.8459:1-7, but a prosecution witness admitted the amount may have been publicly reported in media coverage, ROA.9237:1117-24.

The evidence is even less compelling on the theory that Holberg killed Towery to rob him of prescription pills.  The prosecution did not prove how many bottles or pills were in the apartment.  Contrary to their claim at trial, exhibits showed at least five pill bottles still there after Towery was killed, and a defense investigator found 14, all marked with Towery's information, ROA.8733:7-8734:5. No witness saw Holberg after the killing with pills or pill bottles, or taking any pills.  And family members testified Towery was dependent and using the pills to excess, ROA.8354:6-16, 8359:18-20, 8392:3-7, so he may have had very little medication on hand.

The indictment also alleged a burglary aggravator, but the evidence was weak – which may be why the prosecution gave it little attention, and why the TCCA did not even address the sufficiency of the evidence for it.  ROA.810.  The theory was that Towery did not know Holberg from prostitution – that she was a stranger who conned her way into the apartment.  ROA.9938.  But two prostitutes, one of whom knew the layout of Towery's apartment, testified he patronized them multiple times.  ROA.8858:1-6, 8858:13-8859:6, 9179:18-9180:4, 9186:7-10,

9180:2-9182:23.  And prosecutors relied heavily on Kirkpatrick's story, which indicated Holberg *did* know Towery.  ROA.8621:8-16, 8622:4-11.  That is inconsistent with the assumption underlying their burglary theory.

Importantly here, the adequacy of the proof for both aggravators was very much on jurors' minds.  During deliberations jurors asked the court "can you commit robbery after you murder someone or is it theft," clearly indicating they doubted Holberg intended to commit robbery before or during the killing.  They also asked about "effective consent of the owner," relating to burglary, suggesting they doubted the prosecution proved that necessary element.  ROA.9350:13-25.  *See Gordon v. State*, 633 S.W.2d 872, 875 (Tex. Crim. App. 1982).  But with no clarification of the instructions, and Kirkpatrick's unimpeached testimony before them, they had a basis to find an aggravator.

Kirkpatrick's testimony was decisive because she supplied an explicit confession to the disputed allegations.  Why would a juror hold onto reasonable doubts left by the other evidence if defendant admitted the allegations?  And why would jurors doubt the confession was given when Kirkpatrick was left untouched on cross?  (Only because, of course, the prosecution suppressed evidence that would have destroyed her credibility.)  "The question is not whether [Holberg] would more likely than not have received a different verdict" had Kirkpatrick been

impeached, "but whether in its absence [she] received a fair trial." *Kyles,* 514 U.S. at 434.

## 2. Materiality on Sentence

Kirkpatrick's testimony portrayed Holberg as a sadistic monster – in her own (alleged) words. Kirkpatrick claimed Holberg found the killing "fun" and "amazing," said she would kill again, and boasted she shoved a lamp into Towery's throat to silence his dying groans, saying all this, Kirkpatrick insisted, without remorse. This explosive testimony went directly to both questions on sentence: likelihood of future violence and mitigating facts justifying life rather than death. TEX. CODE CRIM. PROC. ANN., ART. 37.071, § 2(b).

The testimony was not incidental to the prosecution case. Prosecutors touted it from their opening statement, reminded the jury of it repeatedly, hammered home Kirkpatrick's supposed credibility in closing, and then re-introduced the testimony on penalty. The State argues Kirkpatrick was not referred to by name during the penalty phase, but it defies belief that a jury would ignore her lurid account when choosing Holberg's punishment. The prosecution introduced this evidence on sentencing and cannot now claim it must have been ignored or overlooked. Undermining this testimony almost certainly would have changed a sentencing decision that took 11 hours, when one juror's reasonable doubt would have altered the outcome.

Moreover, the prosecution depended heavily on its expert, Dr. Coons, who in turn relied on Kirkpatrick. He assumed Holberg silenced a dying Towery by shoving a lamp into his throat – a "fact" that came only from Kirkpatrick – and singled out the gratuitous nature of that act as indicating likely future violence. ROA.9512:4, 9518:11-24. That prosecutors did not mention Kirkpatrick by name during the penalty phase did not make her testimony immaterial. They argued the points her testimony supported and used Dr. Coons to amplify it.[5]

The panel dissent acknowledged the rest of the penalty phase evidence was conflicting. Dkt. 246-1 at 39-40. This underlines the significance of Kirkpatrick's testimony and the importance of impeaching her. Destroying the credibility of prosecutors' "key witness" would have created a reasonable probability of a different sentence.

### F. Even if AEDPA Deference Applied to Materiality, Holberg Would Be Entitled to Relief.

Even if AEDPA deference applied to the issue of materiality, Holberg would be entitled to relief. As explained in Argument § I(B), above, the legal principles that constitute the holdings in *Brady, Bagley* and *Banks* apply here.

---

[5] The prosecutor suggested in rebuttal argument that he did not actually believe Holberg enjoyed killing Towery, notwithstanding the pains he took to elicit that very testimony. ROA.9339:23-25. But he took the opportunity to reinforce Kirkpatrick's credibility, and never disavowed reliance on her testimony that Holberg showed no remorse and said she would kill again.

Every relevant factor here points to materiality. The powerful impact confessions have on juries. The fact that Holberg's alleged admissions went directly to allegations on guilt, and to the issue of future violence, on which she needed only one juror with reasonable doubt to change the outcome. The extraordinary sadism suggested by the alleged statements, undermining any argument for mitigation. And the tremendous impeaching power of the suppressed evidence. No reasonable theory, faithful to clearly established law, supports a conclusion that the suppressed information was not material.

## II.  HOLBERG IS ENTITLED TO RELIEF UNDER *STRICKLAND* AND ITS PROGENY.

The jurors who sentenced Brittany Holberg to death did not know her true story.

Holberg was addicted at birth to drugs her mother abused during pregnancy. In her first months of life her limbs shook convulsively and she screamed in pain when touched. She learned to walk in a drug den where her parents gave her drugs and alcohol, shook her violently, hit her, and neglected her most basic needs. Her mother modeled shockingly inappropriate sexual behavior and allowed adult men to sexually exploit Holberg. In the District Court's words, "[a]lmost every man in Holberg's life ... treated her as a sexual object," and subjected her to "repeated sexual victimization." ROA.110964-110965.

Holberg's personal and family history left her with cognitive impairments that undermined her ability to regulate emotions and to remember and describe her experiences. This led to drug addiction and sexual degradation as a teenager and young woman, and to heavy cocaine use that induced delirium and psychosis and ultimately led to this homicide. As the District Court recognized in the Appendix to its opinion, the "sexual victimization and addiction" Holberg suffered provided "stark evidence that her family and community allowed her to 'slip through the cracks," with "deadly consequences." ROA.110964-110966.

The State has not disputed the accuracy of these mitigating facts, nor contended the jurors knew them.

The state court excused trial counsel's failure to collect and present this evidence by crediting their self-serving explanations that mitigating evidence from early childhood was too remote to matter, ROA.1112, 1136; that cognitive impairment would merely show her to be "defective" and not worth saving, ROA.1097-1098; and that Holberg was at fault for failing to detail her childhood sexual victimization, ROA.1109, 1134-1135. The state court likewise excused counsel's decisions not to interview key mitigation witnesses out of fear that they might testify unhelpfully if called at trial. These rulings were contrary to and unreasonably applied Supreme Court precedent, and were based on unreasonable

factual determinations made after an evidentiary hearing at which the court heard only from the trial defense team, while excluding Holberg's witnesses.

Instead of collecting and presenting evidence the Supreme Court has long recognized as mitigating, counsel told the jury "we will not proceed to" address mitigation. ROA.9533:5-15. Counsel failed to complete a social history of Holberg, a core duty of capital defense lawyers, and failed to interview key witnesses. These failures, and the state court decision endorsing them, were unreasonable and left the jury in the dark about Holberg's background and character.

The state court unreasonably discounted this evidence completely. It ruled unreasonably that the uninvestigated mitigation was "not so remarkable that it would have offset the brutality and depravity of her crime," and found, contrary to the record, that the jury heard "the majority of the evidence" anyway. ROA.52835.

At trial prosecutors emphasized the absence of mitigation evidence, arguing that, despite having "everything handed to her on a silver platter" at home, ROA.9946:5-9, Holberg "chose the drugs, she chose the prostitution, she chose to live a life of deception, manipulation and violence," ROA.9948:4-7. Jurors deliberated for 11 hours before sentencing Holberg to death, but did not know that she did not choose a life of drugs, sexual degradation, and violence, but rather was

born into and shaped by that life. Had they known, there is a reasonable probability at least one would have opted for a life sentence.

## A. Trial Counsel Performed Deficiently.

Capital defense counsel must "'conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (quoting *Williams*, 529 U.S. at 396). This required counsel to investigate their client's "*family and social history*," *Wiggins*, 539 U.S. at 524, including "mistreatment, abuse, and neglect during ... early childhood," *Williams*, 529 U.S. at 370. Supreme Court precedent recognized counsel's duty to investigate evidence of sexual victimization, *see Wiggins*, 539 U.S. at 535, and cognitive impairment, *see id.* *See also Rompilla*, 545 U.S. at 391 (2005); *Porter v. McCollum*, 558 U.S. 30, 41 (2009).

Holberg's counsel made unreasonable decisions not to investigate mitigation. They failed to complete a family and social history and ignored red flags indicating that avenues of investigation likely to be fruitful. The state court unreasonably applied *Strickland*, *Williams*, *Wiggins*, *Rompilla*, and *Porter*, by failing to recognize the deficiency of counsel's performance in each of these respects, and based its ruling on unreasonable factual determinations.

### 1. Counsel unreasonably disavowed reliance on mitigation.

The state court unreasonably applied *Strickland* by failing to recognize counsel's deficiency in abandoning mitigation. A defendant convicted of capital

48

murder can only avoid death by raising reasonable doubt on the likelihood of future violence, or by establishing mitigating facts that warrant a life sentence. Tex. Code Crim. Proc. Ann., art. 37.071, § 2(b), (e)(1). In their opening Holberg's counsel simply abandoned the second issue, effectively announcing that Holberg had no mitigation case: "I think you will see that the answer to Question No. 1 should be 'no.' And we will not proceed to Question No. 2." ROA.9533:13-15.

Focusing only on future danger was not "a reasonable decision that ma[de] particular investigations unnecessary" as to mitigation. *Strickland*, 466 U.S. at 691. The Supreme Court recognized "[t]here is no squaring that conduct" – relinquishing one "of only two procedural pathways for opposing the State's pursuit of the death penalty" – "with objectively reasonable judgment." *Andrus v. Texas*, 590 U.S. 806, 821 (2020). In *Walbey v. Quartman*, 309 F. App'x 795, 801 (5th Cir. 2009) (per curiam), this Court ruled "the decision not to investigate potentially mitigating evidence was based on an erroneous legal conclusion," because counsel decided "to focus on future dangerousness when Texas law dictates that the facts of Walbey's crime themselves are sufficient to prove this aggravating factor."

As noted above, the state court found Holberg's counsel were reasonable in deciding to focus on future dangerousness and avoid mitigating evidence they

assumed would show Holberg to be irredeemable.  But there is nothing

contradictory in contesting both special issues, particularly since the crime itself

was sufficient to show future dangerousness.  Here, as in *Walbey*, counsel faced a

"virtually impossible battle" on the issue of future dangerousness.  309 F. App'x at

801.  Reasonable professional judgment did not justify their decision to disavow

mitigation, and their decision to limit their mitigation investigation was "all the

more unreasonable."  *Id.*

### 2. Counsel's professed strategies were based on inadequate investigation.

The state court unreasonably applied *Strickland* by endorsing counsel's

decision to limit their investigation based on preconceptions about jurors, while

remaining unaware of evidence the Supreme Court recognizes as mitigating.

Counsel's theory at sentencing was that Holberg was a "wonderful warm

human being until she got hooked on crack cocaine."  ROA.9533:5-9.  As the State

acknowledged, Dkt. 176 at 29, counsel "absolutely" adopted this theory "early on,"

ROA.104048:21-104050:24, before investigators were even retained, and counsel

maintained it throughout trial.  They rationalized this pre-determined strategy

based on presumptions about jurors, not on any actual investigation.  This led to

counsel's failure to collect readily available and vital mitigation evidence.

Counsel claimed "the more remote the history of the client is, the less

concerned the jury is with it," ROA.11914:3-14, and "jurors would care more

about what had been going on in Holberg's life and the family household most immediately before Towery's killing," ROA.1112(¶28).  On these assumptions, they did not contact Holberg's father and other paternal relatives who could have shed light on her genetic history, birth, and early childhood.  ROA.11914:5-24. Counsel were required to investigate "mistreatment, abuse, and neglect during [Holberg's] early childhood."  *Williams*, 529 U.S. at 370.  The Court recognizes that "severe privation and abuse in the first six years of [a defendant's] life" provide "powerful" mitigation.  *Wiggins*, 539 U.S. at 534-35.

Counsel failed to meet their obligation to investigate despite multiple red flags.  Shortly after being appointed, counsel interviewed Holberg's paternal grandfather — the only paternal relative they contacted — who reported that "when Brittany was born ... both [her parents] were really messed up with drugs." ROA.11681:21-25.  Counsel knew when Holberg was young her father was incarcerated on drug charges, ROA.1107, and her mother gave birth to a stillborn child, ROA.11124:16-19.  This information "would have led a reasonable attorney to investigate further."  *Miller v. Dretke*, 420 F.3d 356, 363 (5th Cir. 2005) (citing *Wiggins*, 539 U.S. at 536).

Had they done so they "would have found a range of mitigation ... that no other source had opened up."  *Rompilla*, 545 U.S. at 390.  Paternal relatives would have attested to Holberg's mother's heavy drug and alcohol use during pregnancy,

Holberg's drug addiction at birth, extensive physical abuse and neglect, forced drug and alcohol use during childhood, and a family history of psychiatric illness. This would have prompted testing demonstrating related cognitive impairments and psychological disorders. ROA.85758-85759.

Counsel also discounted evidence of Holberg's sexual victimization, ROA.12078:1-12079:2, 104109:4-104110:24, even though the Supreme Court has long recognized the mitigating power of such evidence, *see Wiggins*, 539 U.S. at 535. Holberg reported to Dr. Patel "fondling [that] lasted three years," "by her [step]father's best friend," beginning when she was 12. ROA.11928:20-11929:17. Counsel were aware of this but viewed it as a "sexual relationship," 104109:4-104110:24, and did not meaningfully investigate it, ROA.11929:2-17, 104110:10-24, 12633:7-18, or elicit testimony about it from Dr. Patel.

Had counsel followed up they would have found multiple witnesses to testify that the friend, Andy Grimes, had an affair with Pam while also sexually abusing Holberg for years, beginning when she was 12 or 13, well before the age of consent. ROA.85697, 85765-85766, 85774. That was a repeated crime of sexual violence, TEX. PENAL CODE, ch. 5, sec. 21.02(b), but what the jury heard from the main defense witness on sentence was something radically different and completely wrong – that Holberg simply went "boy crazy." ROA.9539:22-24.

During the guilt phase Holberg testified she was molested by a babysitter at age four or five. ROA.8888:20-8889:9. Counsel did nothing to substantiate her account and in fact elicited contradictory testimony from their main sentencing witness, Schwartz, who denied Holberg told him about it. ROA.9570:1-18. Effective counsel would have investigated and presented medical records documenting the assault and recounting her parents' failure to protect her, proving her mother scolded her and left her in the molester's care again. ROA.48927, 49000.

Counsel could have presented other powerful evidence of Holberg's sexual victimization, including multiple rapes – one a brutal gang rape that left her suicidal, 18 months before the fatal struggle with Towery. This information was readily available in medical records. ROA.47589, 77700-77706, 77727, 85883, 85774. But counsel failed to corroborate Holberg's account of abuse, leaving her open to the prosecutor's attack that she was merely a "party girl," ROA.8081:12-23, 8602:5-6, 15-16, 9272:23-9273:5, 9506:24-9507:3, "trained and experienced in deception" through prostitution, ROA.9076:8-25.

Counsel also failed to collect and present evidence of Schwartz's sexually predatory behavior toward Holberg, ROA.85766, 85702-85703, and Pam's extraordinary sexual behavior, including having sex with Holberg's teenaged friends, ROA.85697(¶¶19-20), 85702(¶5), 85714, 85719, 85766. Despite

counsel's failure to collect this evidence available from multiple sources, the state court blamed Holberg, ROA.1109(¶22), 1134-1135, 1144-45, a ruling that unreasonably applies Supreme Court precedent. *See Rompilla*, 545 U.S. at 381 (counsel's mitigation investigation was deficient even though defendant was "uninterested in helping" and "even actively obstructive"); *Porter*, 558 U.S. at 40 (same, defendant was "fatalistic and uncooperative").

Counsel also failed to uncover Holberg's cognitive impairments, claiming it would not be mitigating, ROA.12038:10-25, and believing a jury would see it as making Holberg "defective" and unworthy of being saved, ROA.1097-1098(¶12), 11253:6-11254:7. Instead they presented an opposing (and false) account, putting on testimony suggesting Holberg was highly intelligent and accepted to Duke University based on SAT scores, ROA.9538:17-9539:2, when in fact her scores were so low (near the bottom nationally) that she could not even attend a summer program there. ROA.78004, 78009-78010. It is unclear whether counsel even knew this, but it is clear they failed to obtain neuropsychological testing despite indicators of brain damage. ROA.12527:2-19.

Counsel likewise were unaware of the other facts described above, including Holberg's prenatal drug and alcohol exposure and early childhood trauma that led to cognitive impairments. This information would have prompted effective counsel to get testing done. Testing later demonstrated substantial impairments.

ROA.85758-85759.  Contrary to trial counsel's unsupported assumption, the

Supreme Court has long recognized the mitigating power of such evidence.  *See*

*Porter*, 558 U.S. at 41; *Rompilla*, 545 U.S. at 391; *Wiggins*, 539 U.S. at 535.

Counsel's professed views that jurors would reject mitigating evidence were

misguided for a more fundamental reason:  they limited their *investigation* based

on how they assumed information might be received if *presented at trial*.  This

turns the duty to investigate on its head.  *See Strickland*, 466 U.S. at 690-91;

*Wiggins*, 539 U.S. at 521-22.  "[T]he record will not support the ... conclusion that

counsel could have made an informed strategic choice not to present mitigation

evidence" where the "information and the opportunity to weigh this evidence was

never before counsel."  *Lockett v. Anderson*, 230 F.3d 695, 715 (5th Cir. 2000).

Counsel cannot make "a strategic choice" to "prevent the jury from hearing"

damaging evidence if counsel has not collected the evidence in the first place.  *Id*.

Counsel had no knowledge of these multiple mitigating issues and only a

vague and unsubstantiated understanding of Holberg's extensive sexual

victimization.  The "assertion of a 'strategic decision' must be rejected because no

informed decision was made."  *Id*.  *Accord Lewis v. Dretke*, 355 F.3d 364, 366-67

(5th Cir. 2003).  Counsel accepted, and even helped the prosecution present, the

false and aggravating narrative that Holberg chose to be a boy-crazy party girl who

turned down a Duke education in favor of drugs and prostitution.  Such

uninformed "offerings of seemingly aggravating evidence further demonstrate counsel's constitutionally deficient performance." *Andrus*, 590 U.S. at 818.

The state court also unreasonably endorsed counsel's claim that they decided not to interview witnesses, including Holberg's ex-boyfriend Loren Knight, her maternal grandparents, and her ex-husband Ward Holberg, because they might reveal damaging information if they testified. ROA.1137-1141, 104235:4-25, 104239:2-25, 12638:10-12639:25. These witnesses could have alerted counsel to extreme drug abuse, bizarre and incestuous sexual behavior by Holberg's parents, and Holberg's chronic depression and suicidality. ROA.85701-85703; *see also* ROA.85143. These were fruitful areas for further investigation whether or not these witnesses testified. Counsel's limited investigation did not allow informed adoption of their professed strategies.

### 3. Counsel's professed strategies were *post hoc* rationalizations.

The hearing in state court was limited to considering the deficient performance prong of this claim, and only the trial defense team was heard. But even on this one-sided record it is clear their "strategy choices" were *post hoc* rationalizations for a belated and inadequate investigation. Because the record undermines those purported choices, and because development of the record was limited and one-sided, the state court's ruling endorsing those "choices" was both based on unreasonable factual determinations, and legally unreasonable. *See*

*Richter*, 562 U.S. at 109 ("courts may not indulge '*post hoc* rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions").

The record refutes counsel's insistence (and the court's subsequent findings) that counsel *strategically* avoided evidence of Holberg's childhood exposure to substance abuse, history of sexual trauma, and teenage descent into drug addiction and sex work. In fact, counsel told the jury they would present the same types of evidence they later claimed, during habeas proceedings, would be harmful. *See, e.g.,* ROA.1097-98, 1127, 57756:9-22, 58649:5-14, 8085:17-8088:10. And they did – but to a woefully limited extent.

At the guilt phase, counsel introduced Holberg's childhood trauma and family substance abuse in opening, explaining "there were incidences in her young childhood when she was attacked criminally," and "by the time she was 13, she was already consuming alcohol and marijuana that was freely available to her in her own home." ROA.8085:20-25. Due to these circumstances, they said, Holberg's life later "took a downward spiral" into prostitution and beatings at the hands of "various tricks, various pimps." ROA.8087:21-8088:10. Counsel returned to these issues when questioning Holberg. *See* ROA.8889:2-8897:25, 8906:2-8907:20, 8912:6-8916:18. In their guilt-phase closing they argued that

Holberg's testimony about her "background, her upbringing," showed she had "been battered."  ROA.9307:3-9308:2.

The guilt-phase evidence was introduced in the penalty phase, ROA.9377:3-9378:11, where counsel presented other witnesses including Schwartz, their first witness and "main gun," ROA.11865:2-4, 11740:14-25.  He briefly addressed his and Pam's drug abuse during Holberg's childhood, Holberg's aunt's murder, and Holberg's struggles with addiction.  ROA.9536:2-25, 9541:2-25, 9590:2-9592:25, 9628:2-9629:23.  But his testimony did not address the childhood abuse and trauma Holberg suffered at home or the addictions and psychiatric disorders that ravaged her extended family.  And it undercut Holberg's account of early drug use, because Schwartz claimed Holberg did not use illegal substances in the house.  ROA.9536:5-9538:23.  It also belittled Holberg's sexual trauma; Schwartz denied Holberg told him about being molested, ROA.9570:1-21, and explained her later problems as being "boy crazy," ROA.9539:22-24.

In like fashion, defense counsel in *Wiggins* told the jury in opening statement that the defendant "had a difficult life" but failed to support the assertion with readily available evidence.  539 U.S. at 515.  The Supreme Court recognized the later assertion of intentional strategy was "a *post hoc* rationalization" for failing to complete a thorough investigation.  *Id*. at 526-27.  So too here.  Readily available records and witnesses would have provided what the District Court

described as "stark evidence" of Holberg's "repeated sexual victimization," and the fact that Holberg's "family exposed her to rampant abuse of prescription medication and illicit drugs." ROA.110964-110966. *See, e.g.,* ROA.47589-91 (hospital records documenting husband's physical and sexual abuse); 77700-77712, 77727 (hospital records of rape and trauma symptoms); 85883 (police report of rape by drug dealer); 85829-85830 (police report of assault in alley). *See also* ROA.49562, 49710, 85773-85774, 77796-77797.

Available evidence would have corroborated and greatly expanded on Holberg's account. She obviously could not testify about the physical abuse, neglect, and forced drug use in the earliest years of her life, but other witnesses could have, if counsel had contacted them. *See* ROA.85673-85674, 85688, 85696, 85779, 85787. Despite introducing the jury to "incidences in her young childhood when she was attacked criminally," and the "alcohol and marijuana freely available to her in her own home," ROA.8085:17-25, counsel failed to investigate and substantiate those problems. Instead, they presented limited testimony from Holberg, left it almost entirely uncorroborated, and opened the door to prosecutors to ridicule their half-hearted mitigation case by arguing Holberg had a "good childhood" and freely "chose" a life of violence, drugs, and prostitution. ROA.9948:4-7, 9981:3-24.

Nor did counsel grasp when Holberg's drug addiction began or how severe and debilitating it became. Counsel told the jury Holberg first became addicted to pills during her marriage and to cocaine during her divorce. ROA.9972:5-18. In fact Holberg's addiction began *in utero* and continued in the first months of her life. ROA.85672, 85720, 85756. The fact that her drug addiction was involuntary would have strengthened immeasurably counsel's argument about Holberg's inability "to make choices," ROA.9973:3-10, but counsel were unaware of it.

Similarly, counsel argued in closing that Holberg's drug use was the primary cause of the homicide. ROA.9963:4-10. But counsel failed to substantiate this with medical records showing that, only two years before the homicide, Holberg overdosed on cocaine and manifested "psychotic symptoms including visual hallucinations and tactile delusions," and experienced "severe delirium" that caused her to "recoil and scream out" when touched. ROA.85727-85728; *see also, e.g.*, ROA.47578, 47595-47596, 77710-77712, 85879-85880, 85888-85889. This evidence would have provided a strong basis to argue that Holberg's addiction undermined her volition and would have helped the jury understand the intensity of her reaction in the struggle with Towery.

The state court record makes clear why counsel failed to present a thorough mitigation case. They simply waited too long. Shortly after they were appointed, and before investigators were engaged, counsel conducted initial interviews of

Holberg's mother, stepfather and paternal grandfather. But they interviewed no other mitigation witnesses until January 1998, the month voir dire began. ROA.1090-1091, 11113:7-20, 11125:3-20. Nearly the entire mitigation investigation, such as it was, occurred during trial. ROA.1095-1097, 1131, 1133.

By that point it was too late to follow up on pertinent leads. For example, the defense team first interviewed Holberg's friend Holly Ruffin in February 1998. Ruffin revealed that Holberg "was all hung up about being molested by someone in her family when she was very young," and said Holberg believed this was "why she went bad," but there was no time to develop the information. ROA.12671:15-24, 12674:4-13. When the defense next spoke to Schwartz, five days before the punishment phase began, they did not ask about Ruffin's statements. ROA.11865:5-11866:25.

Counsel's interviews of other family members likewise failed to explore Holberg's sexual victimization. ROA.1266-1267. And when counsel later obtained more information about sexual abuse from Corena Norrell, it was too late to substantiate it, as counsel admitted. ROA.12674:4-13. Similarly, as stories of Pam's drug and alcohol abuse emerged, the "thought occurred" to counsel that Holberg had been impacted *in utero*, but they did nothing to explore further. ROA.11681:4-11682:24.

Counsel's mitigation investigation must be "diligent." *Wiggins*, 539 U.S. at

523. That duty is not met where counsel does not "prepare for [sentencing] until a

week before the trial," *Williams*, 529 U.S. at 395; *see Walbey*, 309 F. App'x at

801. By waiting until the eve of trial to start most of the mitigation investigation,

Holberg's counsel painted themselves into a corner. Their claims that these

omissions were strategic decisions are unsupportable *post hoc* rationalizations. *See*

*Richter*, 562 U.S. at 109.

The state court's endorsement of counsel's purported strategic choices was

also based on unreasonable factual determinations, in light of substantial evidence

the state court refused to consider. Section 2254(d) is satisfied where, as here, "the

evidence in the state-court record provided substantial grounds" in support of a

claim and "none of the countervailing evidence could be said to foreclose" it.

*Brumfield*, 576 U.S. at 319-21. In these circumstances, there is ample "cause to

believe [a petitioner] might prove such a claim in a full evidentiary hearing," and

the state "court's failure to do so resulted in an unreasonable determination of the

facts." *Id*. at 321-22; *see also Panetti*, 551 U.S. at 954 (section 2254(d) deference

does not apply where "the factfinding procedures upon which the [state] court

relied were 'not adequate for reaching reasonably correct results' or, at a

minimum, resulted in a process that appeared to be 'seriously inadequate for the

ascertainment of the truth'") (citation omitted).

The TCCA ordered a limited evidentiary hearing to consider testimony of only four witnesses, the trial defense team, ROA.1054, 1078, all of whom took positions aligned with the State. The state court refused to hear evidence that directly contradicted their self-serving testimony, including their claims about critical records they say they obtained and provided to Dr. Patel. *See, e.g.*, ROA.12655:14-24, 12693:7-12695:13, 44446:1-44448:23. And even in this hearing limited to one side's witnesses, the court prevented Holberg from inquiring about relevant issues, including whether counsel directed Dr. Patel's attention to particular documents, ROA.58319:2-19, investigated Holberg's mother's delivery of a stillborn child, ROA.11124:16-23, or discussed their views of the jurors with Holberg to dissuade her from testifying, ROA.58148:24-58150:1. Because this one-sided process was "seriously inadequate for the ascertainment of the truth," *Panetti,* 551 U.S. at 954 (citation omitted), the state court's findings unreasonably applied federal law and "resulted in an unreasonable determination of the facts," *Brumfield,* 576 U.S. at 322.

### 4. Counsel's failures undermined the substance and strength of Dr. Patel's testimony.

The state court unreasonably applied *Strickland* by failing to recognize that counsel performed deficiently in not providing their expert, Dr. Patel, with critical information. Dr. Patel was their "star witness ... for family background." ROA.11892:3-21; *see also* ROA.11741:3-19, 11905:8-21. But he did not testify

about that beyond euphemistic references to an "abusive situation" and a "dysfunctional family." ROA.9680:1-9681:23. He tentatively concluded that Holberg's chemical dependency, PTSD, or being a battered woman "*may* be a reasonable explanation" for the crime. ROA.9680:1-9681:23 (emphasis added). But he admitted Holberg was his primary source of information and that some of it may have been untrue, which could undermine his conclusions. ROA.9666:1-9668:25, 9703:1-9705:25. Due to counsel's inadequate investigation, Dr. Patel's testimony was narrow and inadequately substantiated.

During the state habeas proceedings, Dr. Patel received "several categories of materials" he did not have at trial: "medical and psychiatric records of Brittany and her family; affidavits from family members and others concerning Brittany's life and background; educational records; legal records (e.g., domestic, criminal, etc.); the results of testing for neurological impairment; and the results of assessment for traumatic and mood disorders." ROA.85754. This new information revealed "highly significant mental health issues," including "an extensive [family] history of psychosis and major mood disorders," and exposure "to chronic and severe child abuse and neglect, including prenatal exposure to dangerous neurotoxins, narcotics and alcohol," which had "significant adverse consequences on her development." ROA.85754-85755.

Had this information been provided before trial, Dr. Patel "would have requested diagnostic tests to determine the presence, severity, and effect of brain dysfunction," ROA.85754, "to assess the level and degree of traumatization," ROA.85759-85760. Such testing later showed cognitive impairments that "substantially compromise[d] Brittany's ability to function in situations that require the complex and critical thought processes that are mediated by the frontal cortex of the brain," ROA.85758-85759, and "indicate[d] that Brittany meets the criteria for PTSD," ROA.85760.

Armed with this information Dr. Patel could have given markedly stronger testimony. He could have explained that Holberg experienced "extreme neglect and abuse during her early childhood developmental period," and suffered from chronic major depression, PTSD, and brain damage largely attributable to her upbringing and prenatal exposure to drugs and alcohol. Holberg abused drugs to "shut[] off the intense mental and emotional pain" that characterized her life, and her addictions became so severe that they induced psychosis, including at the time of the crime. ROA.85757-85761. In contrast to his uncorroborated and tentative trial testimony, Dr. Patel could have presented details about specific traumas and mental health crises Holberg experienced, and substantiated his testimony with records and accounts from family members. *See* ROA.85760-85761. He also could have explained that trauma and "brain impairments prevented [Holberg]

from making coherent, consistent or factually reliable statements ... concerning the circumstances of the offense," ROA.85762, countering the prosecution narrative that she was a manipulative liar.

This case mirrors *Rompilla*, 545 U.S. at 392, in which three mental health experts failed to find significant mitigation at the time of trial, but post-conviction experts – who provided thorough background information the trial experts did not have – promptly recognized "plenty of 'red flags' pointing up a need to test further." *Id*. (citation omitted). That testing found "organic brain damage . . . significantly impairing several of [Rompilla's] cognitive functions," and showed the impairments "relate[d] back to his childhood." *Id*. Counsel's deficient performance prevented Holberg's jury from hearing similar testimony.

The state court also unreasonably applied *Strickland* and its progeny in sanctioning counsel's decision to delegate to Dr. Patel responsibility for identifying mitigating evidence in Holberg's records. Despite failing to provide Dr. Patel with necessary information, counsel relied on him to guide their investigation. ROA.12172:1-25, 12563:23-12564:25. The state court found "[t]he trial team ... relied on Dr. Patel's expertise to identify any particular medical record provided to him that was relevant to mitigation." ROA.1127. In defense counsel's words: "I handed him all the documents and relied on his expertise ... to instruct us what would be relevant." ROA.104191:24-104192:5.

Counsel is obligated to "reach an independent conclusion about the viability of a mitigation defense, instead [of] delegating that task to an expert." *Walbey*, 309 F. App'x at 801. Holberg's pre-offense medical records were replete with information that effective counsel would have recognized as mitigating. A record from the year before the homicide reported that after being gang raped days earlier Holberg was having nightmares, flashbacks, and constant suicidal thoughts: "I just don't want to live feeling like this, every time I open my eyes I relive that rape." ROA.77700-77712, 77727. Other medical records recounted Holberg's molestation by a babysitter and her mother's harsh response to it, ROA.48927, 49000; showed that Holberg "began her use of alcohol at about the age of seven or eight," after "[h]er father would give it to her as a small child," ROA.47591; and documented that she was hyper-sensitive to "any touch" when suffering drug-induced psychosis, ROA.77496.

Any counsel independently considering a mitigation defense would recognize the importance of such records, as established by Supreme Court precedent. In relying on Dr. Patel "to instruct us what would be relevant," ROA.104192:2-5, counsel were constitutionally deficient.

## B.    Counsel's Deficient Performance Prejudiced Holberg.

The State accepted that the prejudice analysis here was properly done on a *de novo* basis. Dkt. 176 at 35. But even if the Court applied section 2254(d), the state court's ruling was contrary to and unreasonably applied *Strickland*.

The state court ruled that: (1) the "uninvestigated and unpresented mitigation was not so remarkable that it would have offset the brutality and depravity of her crime," and; (2) the jury had already heard "the majority of the evidence." ROA.1073, 52835. This "standard" substantially heightens the "reasonable probability" threshold, and is more onerous even than the outcome-determinative standards the Supreme Court rejected as inconsistent with *Strickland*. *See Williams*, 529 U.S. at 397. The requirement that mitigating evidence "offset the brutality and depravity" of the crime is indistinguishable from an argument this Court deemed "a non-starter." *See Walbey*, 309 F. App'x at 804.

The state court ruling likewise was "unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding." *Williams,* 529 U.S. at 397-98. Rather than cumulating the trial and post-conviction mitigation as the Supreme Court requires, *see Porter*, 558 U.S. at 41, and *Wiggins*, 539 U.S. at 534, the state court subtracted one from the other, finding that prejudice cannot occur if the "majority" of mitigating evidence was presented at trial, ROA.52835.

68

Moreover, characterizing the new evidence as duplicative of what the jury heard was a quintessential example of a state court "unreasonably discount[ing] the mitigation evidence adduced" in post-conviction. *Porter*, 558 U.S. at 42. Clearly established federal law "stands for the proposition that counsel can be prejudicially ineffective even if some of the available mitigation evidence is presented and even if there is psychiatric testimony." *Walbey*, 309 F. App'x at 802 (citing *Williams*, 529 U.S. at 369); *see also Rompilla*, 545 U.S. at 392-93. The state court unreasonably applied these bedrock principles.

Holberg was prejudiced for four reasons. First, the Supreme Court recognizes the inherent power of these types of mitigating evidence. Second, the evidence is especially mitigating in this case. Third, the unpresented mitigating evidence would have refuted key arguments in favor of a death sentence. Fourth, the sentencing decision was a close one. Had this evidence been presented there is "a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### 1. The unpresented mitigation was powerful.

"The mitigating evidence counsel failed to discover and present in this case is powerful." *Id*. at 534. The Supreme Court has recognized the mitigating power of all the types of evidence available but not presented here. *Porter*, 558 U.S. at 41-43 (childhood physical abuse and cognitive deficits); *Rompilla*, 545 U.S. at

69

390-93 (prenatal alcohol exposure, parental alcoholism, physical abuse, neglect, mental health problems, alcoholism); *Wiggins*, 539 U.S. at 534-35 (maternal alcoholism, early childhood neglect and privation, physical and sexual abuse, diminished mental capacity); *Williams*, 529 U.S. at 395-96 (childhood neglect, physical abuse, substance abuse, mental health problems).

So has this Court. *Walbey*, 309 F. App'x at 803 (ingestion of drugs and alcohol before age five, parental alcoholism, physical and mental abuse); *Lewis*, 355 F.3d at 368-69 (parental drug addiction, domestic violence, physical and sexual abuse); *Lockett*, 230 F.3d at 709, 713-17 (brain damage and psychiatric illness). The evidence Holberg's counsel failed to collect and present mirrors the evidence that supported findings of prejudice in these cases.

The District Court characterized evidence of Holberg's childhood sexual abuse as "extremely problematic" and "highly double-edged," ROA.110927-29 n.65, reasoning that evidence of family mental illness, parental drug addiction, and physical and emotional abuse would put Holberg's family in an "extremely bad light" and do "just the opposite" of "giv[ing] the jury a reason not to kill [her]." ROA.110931 n.67. But controlling precedents of the Supreme Court and this Court hold otherwise, rejecting the incongruous notion that jurors somehow would see abusive behavior that *victimized* Holberg as grounds to *blame* her, and sentence her to death rather than spare her life.

70

## 2. The unpresented evidence was uniquely mitigating here.

The unpresented evidence would have been powerful in any case, but is particularly so here. Holberg had just been convicted of killing an older man during a violent struggle in his home. Yet the jury heard no evidence of the early childhood physical abuse that Holberg endured or the domestic violence she witnessed throughout childhood. Instead, the jury was given a "benign conception of [her] upbringing." *Rompilla*, 545 U.S. at 391. Effective counsel would have used the evidence of violence in her home to show how her childhood trauma manifested during, and helped to explain, the offense.

Holberg and other witnesses testified that she knew Towery as a prostitution client. ROA.8630:3-17, 8649:4-23, 8989-8990. But her history of sexual victimization was unsubstantiated, minimized, and incomplete. Had counsel presented the sexual assaults and rapes she endured throughout her life it would have helped explain her terror, and why she acted as she did during the violent struggle with Towery.

The unpresented mental health evidence was uniquely mitigating as well. Witnesses and medical records would have shown that Holberg's exaggerated fear of even gentle touches dated to her birth as a drug-addicted baby, ROA.85672-85673, 85720, 85756, and that, as a young woman, this fear was the product of "psychotic symptoms including visual hallucinations and tactile delusions,"

brought on by extended cocaine use, like the use preceding this offense,

ROA.85727.  Effective counsel would have used this evidence, including hospital

records recounting how she would "recoil and scream out" at "any touch,"

ROA.85728, to explain her fearful and violent reaction to Towery.  Effective

counsel likewise would have shown that Holberg's sex work was a manifestation

of her extreme trauma and suffering and not, as the prosecution contended, a

choice through which she became "trained and experienced in deception."

ROA.9076.  *See* ROA.9948:4-7.

### 3. The unpresented evidence would have refuted the State's arguments.

By abandoning mitigation in their opening statement, and failing to present

the evidence detailed here, defense counsel opened their client to devastating

arguments by the prosecution.

The prosecutor mocked the lack of mitigating evidence, ROA.9946:5-

9950:21, told the jury Holberg had "a good childhood," ROA.9981:13-20, and

insisted Holberg "had everything handed to her on a silver platter."  ROA.9946:8-

9.  He minimized drug use in the home with a claim that her parents only used

"some marijuana," which "a lot of folks" do.  ROA.9946:21-24.  He told the jury

Holberg had "a good relationship with her mother," "had everything she ever

wanted except more attention and love from her parents,"  ROA.9981:3-25,

9946:10-11, and that "her real problems with drugs began later, not at home."

ROA.9946:18-9947:25, 9981:3-25. He argued Holberg "chose the drugs, she chose the prostitution, she chose to live a life of deception, manipulation and violence." ROA.9948:4-6.

Effective counsel could have refuted all these arguments. Holberg did not choose drugs; her genetic predisposition, addiction *in utero* and in infancy, and compelled substance use as a young child chose drugs for her. She did not choose prostitution; her extensive history of being sexually victimized by older men, and her parents' outrageous sexual behavior, were its genesis. Her "real problems" did not begin after she left home; they date to her birth and continued throughout her childhood. The only things "handed to her on a silver platter" were drugs, alcohol and grossly inappropriate sexual behavior. The unpresented mitigation evidence "would have destroyed the benign conception of [Holberg's] upbringing and mental capacity." *Rompilla*, 545 U.S. at 391.

### 4. The sentencing verdict was close.

Even without hearing the overwhelming mitigation evidence detailed here, the jury deliberated 11 hours. The prosecution's aggravating evidence clearly was not overwhelming. Even a portion of the unpresented evidence would have tipped the scales in favor of life. *See, e.g., United States v. Delvalle*, 444 F. App'x 336, 342 (11th Cir. 2011) (deliberations that "lasted over six hours" supported finding reasonable probability of a different result); *United States v. Ottersburg*, 76 F.3d

73

137, 140 (7th Cir. 1996) (nine hours of "deliberations makes clear that this case was not an easy one"). Had counsel performed effectively there is a reasonable probability at least one juror would have chosen life. A contrary determination would unreasonably apply *Strickland* and its progeny.

### 5. Counsel's failures justify relief.

Regardless of trial counsel's purported justifications for their inadequate investigation, "certain principles" – counsel's duty to investigate, and the mitigating power of evidence of abuse, privation, and impairment, as set out in *Strickland* and its progeny – "are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Andrew*, 604 U.S. at 95 (citation omitted). Trial counsel's failure to collect the extensive evidence of Holberg's traumatic upbringing rested on unreasonable decisions and inadequate investigation, and prejudiced Holberg. Because the state court unreasonably sanctioned counsel's deficient performance and discounted the mitigation evidence, Holberg is entitled to relief.

## CONCLUSION

This Court should reverse the judgment of the District Court and remand with instructions to grant the writ and order a new trial on guilt and sentence.

Dated: October 6, 2025

Respectfully submitted,

*/s/ David F. Abernethy*
David F. Abernethy
PA Bar No. 36666
FAEGRE DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia PA 19103-6996
Telephone (215) 988-2502
Fax (215) 988-2757
david.abernethy@faegredrinker.com

D. Alexander Harrell
TX Bar No. 24055624
FAEGRE DRINKER BIDDLE & REATH LLP
2323 Ross Avenue, Suite 1700
Dallas TX 75201
Telephone (469) 357-2500
Fax (469) 327-0860
alex.harrell@faegredrinker.com

Sonali Shahi
PA Bar No. 319898
FEDERAL COMMUNITY DEFENDER OFFICE
FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
Capital Habeas Unit
601 Walnut Street, Suite 545 West
Philadelphia PA 19106
Telephone (215) 928-0520
sonali_shahi@fd.org

Counsel for Petitioner-Appellant

**CERTIFICATE OF SERVICE**

I certify that on October 6, 2025, a copy of this document was filed electronically with the Clerk for the Court of the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ David F. Abernethy*
David F. Abernethy

**CERTIFICATE OF COMPLIANCE WITH RULE 32**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as enlarged by this Court's Order dated August 13, 2025, Dkt. 327-1, allowing 16,000 words, because the brief contains 15,674 words, excluding portions exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word, in Times New Roman in at least 14-point font.

Dated:  October 6, 2025          */s/ David F. Abernethy*
                                  David F. Abernethy