No. 21-70010

# In the United States Court of Appeals for the Fifth Circuit

Brittany Marlowe Holberg,

*Petitioner-Appellant,*

*v.*

Eric Guerrero, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, Amarillo Division

## SUPPLEMENTAL EN BANC BRIEF FOR APPELLEE

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

William R. Peterson
Solicitor General

William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Cameron Fraser
Assistant Solicitor General

Mohmed I. Patel
Assistant Attorney General

Counsel for Appellee

# CERTIFICATE OF INTERESTED PERSONS

No. 21-70010

BRITTANY MARLOWE HOLBERG,

*Petitioner-Appellant,*

*v.*

ERIC GUERRERO, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

/s/ William F. Cole
WILLIAM F. COLE
*Counsel of Record for*
*Appellee*

i

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set this case for oral argument on January 21, 2026. Appellee respectfully submits that oral argument will assist the Court in its review of this factually complex habeas case.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument ..........................................................ii

Table of Contents ........................................................................................iii

Table of Authorities .....................................................................................v

Introduction ..................................................................................................1

Issues Presented ..........................................................................................2

Statement of the Case ..................................................................................2

    I.   Factual Background ...........................................................................2

       A.   The murder and robbery of 80-year-old A.B. Towery. ...............2

       B.   Holberg is arrested and confesses to killing Towery. ...............6

       C.   Holberg is tried for capital murder, and the jury convicts her. ............6

          1.   The prosecution's case-in-chief......................................6

          2.   Holberg's case-in-chief.................................................9

          3.   The jury convicts Holberg of capital murder. ............12

       D.   The jury unanimously recommends the death penalty, and Holberg is sentenced to death. ...................................12

          1.   Evidence of future dangerousness ..............................13

          2.   Evidence of mitigating circumstances.........................15

    II.   Procedural History ..........................................................................18

       A.   The TCCA affirms Holberg's conviction and sentence on direct appeal...............................................................18

       B.   Holberg files a state-habeas application, which the trial court and TCCA reject. .............................................19

       C.   Holberg files a federal-habeas application, which the district court rejects in a 322-page order.......................22

       D.   A divided panel vacates Holberg's conviction, and this Court grants en banc review....................................23

Summary of the Argument..........................................................................23

Standard of Review .....................................................................................27

Argument..................................................................................................28

I.  Holberg is Not Entitled to Habeas Relief Under *Brady*. ...........................28

   A.  AEDPA applies to Holberg's *Brady* claim. ......................................28

   B.  Holberg cannot overcome AEDPA's relitigation bar. .......................31

      1.  The state court did not unreasonably determine the facts under section 2254(d)(2) as to suppression. ...........................................31

      2.  The state court did not unreasonably apply *Brady* or its progeny under section 2254(d)(1) as to favorability or materiality. ...........34

   C.  Even if Holberg could overcome AEDPA's relitigation bar, she is not entitled to habeas relief. ....................................................................37

      1.  Kirkpatrick's confidential-informant status was not material to the jury's conviction at the guilt-innocence stage. ......................39

      2.  Kirkpatrick's confidential-informant status was not material to the jury's sentence at the punishment stage................................43

      3.  Kirkpatrick's confidential-informant status was not material in the light of its cumulative effect and Holberg's trial strategy. ......44

II.  Holberg Is Not Entitled to Habeas Relief Under *Strickland*. ....................46

   A.  The state court did not unreasonably apply *Strickland* in determining—after a two-week evidentiary hearing—that trial counsel's mitigation strategy was reasonable.....................................47

   B.  The state court did not unreasonably apply *Strickland* in determining that trial counsel's mitigation strategy was not prejudicial. ...............57

Conclusion................................................................................................61

Certificate of Compliance .....................................................................62

# Table of Authorities

Page(s)

**Cases:**

*Banks v. Dretke,*
540 U.S. 668 (2004) ........................................................ 24, 35, 36, 37

*Brown v. Davenport,*
596 U.S. 118 (2022) ......................................................................27

*Canales v. Stephens,*
765 F.3d 551 (5th Cir. 2014) ........................................................38

*Dennes v. Davis,*
797 F. App'x 835 (5th Cir. 2020) ................................... 25, 35, 36, 37

*Dorsey v. Stephens,*
720 F.3d 309 (5th Cir. 2013) ........................................................28

*Floyd v. Vannoy,*
894 F.3d 143 (5th Cir. 2018) ........................................................38

*Gibbs v. Johnson,*
154 F.3d 253 (5th Cir. 1998) ........................................................32

*Harrington v. Richter,*
562 U.S. 86 (2011) ................................. 24, 25, 28, 29, 30, 46, 47, 58

*Holberg v. Davis,*
No. 2:15-cv-285, 2021 WL 3603347
(N.D. Tex. Aug. 13, 2021) ........................... 9, 32, 48, 49, 50, 51, 55, 56

*Holberg v. Guerrero,*
130 F.4th 493 (5th Cir. 2025) ........................................................7

*Holberg v. State,*
38 S.W.3d 137 (Tex. Crim. App. 2000) ..........................................5

*Holberg v. Texas,*
534 U.S. 972 (2001) ......................................................................18

*Ex parte Holberg,*
2008 WL 152725 (Tex. Crim. App. Jan. 16, 2008) ..........................19

*Ex parte Holberg,*
2013 WL 2120253 (Tex. Crim. App. May 15, 2013) ..........................21

*Ex parte Holberg,*
2014 WL 5389907 (Tex. Crim. App. Sept. 17, 2014) ............... 22, 29, 47

*Jackson v. Virginia,*
443 U.S. 307 (1979) ......................................................................28

*Jimenez v. Guerrero,*
    133 F.4th 483 (5th Cir. 2025) ........................................ 23, 29, 30, 31

*Johnson v. Williams,*
    568 U.S. 289 (2013) ..........................................................29, 56, 57

*King v. Davis,*
    883 F.3d 577 (5th Cir. 2018) ..................................................... 52, 55

*Langley v. Prince,*
    926 F.3d 145 (5th Cir. 2019) (en banc) ..................................24, 34, 35-36, 37, 56

*Lawrence v. Lensing,*
    42 F.3d 255 (5th Cir. 1994)..........................................................31, 32

*Murphy v. Davis,*
    901 F.3d 578 (5th Cir. 2018)....................................................24, 31, 44

*Nelson v. Lumpkin,*
    72 F.4th 649 (5th Cir. 2023) ..................................................... 52, 55

*O'Sullivan v. Boerckel,*
    526 U.S. 838 (1999) ..................................................................27

*Porter v. McCollum,*
    558 U.S. 30 (2009) ...................................................................56

*Printz v. United States,*
    521 U.S. 898 (1997) ..................................................................27

*Rompilla v. Beard,*
    545 U.S. 374 (2005) ............................................................. 56, 57

*Sexton v. Beaudreaux,*
    585 U.S. 961 (2018)..........................................................23-24, 30

*Shinn v. Ramirez,*
    596 U.S. 366 (2022) ..................................................................27

*Shoop v. Hill,*
    586 U.S. 45 (2019) ...............................................................35, 37

*Spence v. Johnson,*
    80 F.3d 989 (5th Cir. 1996) .........................................................38

*Strickland v. Washington,*
    466 U.S. 668 (1984) ............................................................. 46, 58

*Terry Williams v. Taylor,*
    529 U.S. 362 (2000).............................................................. 34, 57

*Turner v. United States,*
    582 U.S. 313 (2017) ..................................................................38

*United States v. Augurs*,
   427 U.S. 97 (1976) ................................................. 32

*United States v. Barraza*,
   655 F.3d 375 (5th Cir. 2011) ................................. 37

*United States v. Cessa*,
   872 F.3d 267 (5th Cir. 2017) .......................... 25, 38, 42, 43

*United States v. Martinez*,
   159 F.3d 1357 (5th Cir. 1998) ............................... 60

*United States v. Miller*,
   520 F.3d 504 (5th Cir. 2008) ............................. 38, 42

*Uvukansi v. Guerrero*,
   126 F.4th 382 (5th Cir. 2025) .............................. 34

*West v. Johnson*,
   92 F.3d 1385 (5th Cir. 1996) ................................ 32

*Wiggins v. Smith*,
   539 U.S. 510 (2003) ................................. 47, 56, 57

*Wilson v. Sellers*,
   584 U.S. 122 (2018) ........................................ 47

*Woods v. Etherton*,
   578 U.S. 113 (2016) ..................................... 35, 37

**Constitutional Provisions and Statutes:**

28 U.S.C.
   § 2254(a) ................................................... 37
   § 2254(b) ................................................... 27
   § 2254(d) .................... 1, 23, 24, 27, 28, 31, 33, 34, 46, 55 56
   § 2254(e) ...................... 26, 33, 36, 48, 55, 58

Tex. Code Crim. Proc. art. 37, § 2(d)(2) ................. 12

# Introduction

In 1998, Brittany Holberg was sentenced to death after an Amarillo jury convicted her of the gruesome murder and mutilation of a "kind little old man" who had no teeth and could barely walk. The slaying was uniquely depraved. Holberg stabbed 80-year-old A.B. Towery 58 times, tied him up with an electrical cord, shoved a lamp base 5.5 inches down his throat, and robbed him. She stabbed and beat him with knives, a fork, scissors, and an iron. She stabbed him in the head, face, nose, lips, chin, neck, shoulder, chest, back, abdomen, forearms, wrists, and hands. She shoved the lamp base down his throat while he was still alive. And she continued stabbing him after he was already dead. After murdering Towery, Holberg showered and changed into his clothes, spent the night partying with drugs purchased with his stolen money, and then fled the State.

The jury rejected the implausible tale of "self-defense" Holberg spun when taking the stand, convicted her, and sentenced her to death. Nearly 30 years of post-conviction litigation have followed, and only two claims remain: a *Brady* claim and a *Strickland* claim. But the state habeas court rejected both, and this Court should too because the Antiterrorism and Effective Death Penalty Act's (AEDPA) relitigation bar forecloses them. 28 U.S.C. § 2254(d). The state habeas court did not unreasonably apply *Brady*, *Strickland*, or their progeny in rejecting her claims. Holberg's arguments otherwise gloss over material distinctions between this case and those ones and attempt to ignore or rewrite the state habeas court's extensive and detailed factual findings, which are presumed correct absent clear and convincing evidence to the contrary. Because she offers no such evidence, AEDPA forecloses her claims.

## Issues Presented

**1.**    Whether the state habeas court unreasonably applied *Brady* in rejecting Holberg's claim where the evidence shows that a prosecution witness's past work as a confidential informant in unrelated drug cases was (1) not suppressed and (2) not favorable or material to Holberg's conviction or sentence in the light of the overwhelming evidence independently corroborating that witness's testimony.

**2.**    Whether the state habeas court unreasonably applied *Strickland* or its progeny in rejecting Holberg's claim given the extensive factual findings it made confirming that trial counsel conducted a thorough, detailed investigation into Holberg's background and made a strategic choice to focus the mitigation case on portraying Holberg as a person with problems that could be fixed, rather than a person whose depraved childhood made her defective.

## Statement of the Case

### I.  Factual Background

#### A.  The murder and robbery of 80-year-old A.B. Towery.

**1.**    On the morning of November 14, 1996, A.B. Towery, Jr. (Rocky) encountered a grisly scene at the apartment of his 80-year-old father, A.B. Towery. Unable to reach his father by telephone either that morning or the night before—an unusual circumstance—Rocky grew concerned and set off to check up on his dad. ROA.8369–70. Upon entering the apartment, Rocky discovered that his father had been savagely murdered. *See* ROA.8371–73.

Towery was found lying on the floor on his back, ROA.8107, with an 11.5-inch brass and wooden lamp base lodged in his throat, ROA.8108, 8214, and a paring knife

protruding from his abdomen, ROA.8128, 8184. His upper body was partially tied up with an electrical cord. ROA.8213. Most gruesomely, Towery's nose was "pulverized," ROA.8319, and he had at least 58 stab wounds:

- Four to the top of the head (one of which chipped part of his skull);

- Eight to the face, lips, chin, and nose (one of which "went into the nasal cavity and broke the nasal bones");

- Four to the neck;

- One to the back of the head;

- One to the shoulder;

- Nine to the chest;

- Four to the abdomen, penetrating the liver, intestines, and diaphragm;

- Eighteen to the back, penetrating the lungs, the "mediastinum" (which contains the heart), the esophagus, and the stomach; and

- Nine defensive stab wounds to the hands, wrist, and forearms.

ROA.8677–88.

Towery also had multiple "blunt force injuries," including "multiple abrasions, contusions and lacerations of the head, face and the ears." ROA.8688. The 11.5-inch lamp base was lodged with "significant force" nearly six inches down his throat, ROA.8688–89, which caused "lacerations of the tongue and lacerations of the back of the throat," ROA.8689, meaning Towery was still alive when the lamp base was inserted, ROA.8703. The paring knife in Towery's abdomen, however, was inserted after he was already dead. ROA.8128, 8184.

Towery had also been robbed. At the time of his murder, Towery had been saving up for a pickup truck and thus was carrying more cash than usual—more than $1,000, all in hundred-dollar bills. ROA.8345, 8362. But his wallet, which had been "gone through," was lying open on his chest. ROA.8107, 8210, 10209. His pants pockets were "pulled out" and "emptied of their contents." ROA.8109, 8115, 8210. And a $10 bill was on the floor next to Towery's hand. ROA.8300. Several of Towery's many prescription bottles were also missing. *Compare* ROA.8129 (officer testifying that only two prescription bottles were recovered from the crime scene) *with* ROA.8355 (Towery's son testifying that his father typically had seven to ten prescription bottles).

**2.** The brutality of Towery's slaying stands in stark contrast to his physical condition. At the time of his murder, Towery was 80 years old, 5 feet 6 inches tall, and 162 pounds. ROA.8674. He was a "kind little old man that wanted to make everybody happy," ROA.8351, and "loved to tell" stories, ROA.9385. Towery also had several health issues. ROA.8343. He had no teeth and was found without his dentures, ROA.8490, and he "would shake as he ate," ROA.9384. But his biggest struggle was with walking. He "shuffled" so much when he walked that he wore out the soles of his shoes. ROA.8416. And because he "couldn't walk long distances without tiring pretty easily," ROA.9382–83, his daughter, when she took him to the state fair, had to push him around in a wheelchair, ROA.9384.

**3.** It is undisputed that Brittney Holberg is responsible for the ghastly scene described above. On the afternoon of November 13, 1996, as he was walking home from purchasing groceries, Towery was approached in his apartment courtyard by

Holberg, "a 23–year–old prostitute and drug addict[,] . . . who asked to use his tele-phone." *Holberg v. State*, 38 S.W.3d 137, 139 (Tex. Crim. App. 2000) (published in part). Towery agreed "and the two proceeded into his apartment. Once inside, [Hol-berg] asked Towery for money, but he refused. [Holberg] then tried to take Towery's money by force, and the two struggled." *Id.* During the struggle, Holberg murdered and robbed Towery. *Id.*

After the murder, Holberg showered and changed into Towery's clothes, ROA.9037–41, and then walked to a different apartment building and offered a stranger two $100 bills for a ride away from the scene, ROA.8556. One of the bills had blood on it. ROA.8571. The stranger, Cody Mayo, and his wife, Misty Votaw, agreed to give Holberg a ride. Holberg first asked the couple to take her to a Hardy's drive-thru so that she could buy a large Dr Pepper. ROA.8560, 8579. Holberg then asked the couple to take her to a "friend's house," which was a crack house. ROA.8565–66. During the drive, Holberg took out a "wad of money," spread the bills out on her lap, and began counting them. ROA.8568, 8583. According to Mayo, Holberg "counted . . . at least ten $100 bills." ROA.8568. These were in addition to the $200 Holberg paid for the ride, meaning Holberg had at least $1,200—all in hun-dred-dollar bills—before entering the car. ROA.8570. According to Mayo, during the drive Holberg had a "calm demeanor." ROA.8566. She was "relaxed and laid back" with her "feet up on the dash" and "one hand stuck out the window." ROA.8562. Neither Mayo nor Votaw saw any injuries on Holberg. ROA.8564, 8581.

After the couple dropped Holberg off at the crack house, Holberg spent the night buying cocaine and partying. ROA.8593, 8602–03, 8608. Holberg left Amarillo the next morning with a "truck driver." ROA.9047.

## B. Holberg is arrested and confesses to killing Towery.

Holberg was arrested three months later in Memphis, Tennessee, ROA.8227–29, where she quickly confessed to killing Towery, though she claimed it was in self-defense, ROA.8246. Holberg stated that she met Towery for the first time on the day of the murder. ROA.8252. During the drive from Memphis to Amarillo, Holberg rhetorically asked the officers why she would rob and kill a man for $1,400 when she was making $2,000 a day. ROA.8459.

## C. Holberg is tried for capital murder, and the jury convicts her.

### 1. The prosecution's case-in-chief

Holberg was indicted and tried for capital murder. The prosecution's theory was that Holberg murdered and robbed Towery as part of a crime of opportunity and to feed her drug addiction. *See, e.g.*, ROA.9282–88 (State's guilt-phase closing). It proved this theory through a succession of 20 witnesses, many of whom testified as to Holberg's whereabouts and actions before and after the murder.

For example, the State offered the testimony of the cab driver who dropped Holberg off at Towery's apartment complex before the murder, ROA.8426–36; three employees of Towery's apartment complex who observed Holberg encounter Towery at the apartment complex the afternoon of his murder, ROA.8498–8507, 8519–25, 8542–47; the couple whom Holberg paid to drive her away from the scene

after the murder, ROA.8552–66, 8574–85; and the individual with whom she spent the night of the murder partying and ingesting drugs, ROA.8592–8604. The State also presented several witnesses to whom Holberg confessed, including her mother, Pamela Jean Schwartz, ROA.8648–51, 8655–58; three police officers, ROA.8246–54, 8452–59, 8479–80; and her cellmate, Vickie Kirkpatrick, ROA.8618–25. But "[t]he climax of the State's case was . . . the chief medical examiner's description of Towery's horrific injuries," *Holberg v. Guerrero*, 130 F.4th 493, 513 (5th Cir. 2025) (Duncan, J., dissenting), which he painstakingly detailed injury-by-injury and stab-wound by stab-wound, ROA.8674–96.

Relevant to this appeal is the brief testimony of Vickie Kirkpatrick, a cellmate to whom Holberg confessed. Kirkpatrick knew Holberg "from the streets," ROA.8616, 8619, and shared a cell with her after the murder. According to Kirkpatrick, Holberg told her that Towery "had some money on him" that she "wanted," but Towery "wouldn't give it to her." ROA.8621. When Holberg "reached" for the money in Towery's shirt pocket, they "started fighting." ROA.8621, 8631. Holberg reached for a fork and started stabbing Towery. Holberg said the blood was "pretty," like a "fountain," that she "couldn't stop" stabbing Towery, and that "[t]he more she did it, the prettier it was to her." ROA.8623. Holberg said it was "fun and amazing." ROA.8623–24. Holberg told Kirkpatrick that she "[s]tuck the lamp thing down his throat" to stop the "[g]urgling" and "pain" noises, which she "got tired" of hearing. ROA.8623. Holberg said that she didn't take all of Towery's money and that "some was left behind." ROA.8624. Holberg said that she'd do it again because she'd do anything "to get drugs or drug money." ROA.8624.

During closing, the State argued that Holberg shoved the lamp down Towery's throat to stop the "noises and gurling." ROA.9288. But the State argued that Holberg was not "so callous and uncaring that she actually really did enjoy stabbing him, that she actually really did think the blood was pretty in a fountain." ROA.9338–39. Those comments were, according to the State, just "jailhouse talk": "That's what you tell your roommate to let them know you're bad." ROA.9339. Even though the State was "not suggesting" that Holberg actually believed those things, it argued that Kirkpatrick was testifying truthfully because Holberg "included details" Kirkpatrick couldn't have known "unless she learned them from [Holberg]." ROA.9338–39.

As would become relevant in post-conviction litigation, the jury was not informed that Kirpatrick had been a confidential informant for the Amarillo Police Department in unrelated drug cases. Specifically, Amarillo PD officer Corporal Stallings would give Kirkpatrick money to buy drugs in a house "where drug sales were going on and [they] needed to get in there." ROA.106754. Kirkpatrick would buy the drugs and give them to Stallings, who would "book" the drugs and obtain a search warrant for the house. ROA.106754. Stallings would then pay Kirkpatrick if the search warrant was successful. ROA.106755. Amarillo PD obtained approximately 40 "search warrants with [Kirkpatrick's] help," ROA.106759, and Kirkpatrick helped Amarillo PD secure multiple convictions in those cases, ROA.106757–58.

### 2.  Holberg's case-in-chief

Holberg's case-in-chief centered on her claim that she killed Towery in self-defense. *See, e.g.*, ROA.9290 (Holberg's guilt-stage closing). To establish this claim, Holberg aimed to prove "that Towery was a regular customer of Holberg and other prostitutes, had a violent reputation, and had attacked Holberg in anger after seeing her pipe for smoking crack cocaine." *Holberg v. Davis*, No. 2:15-cv-285, 2021 WL 3603347, at *4 (N.D. Tex. Aug. 13, 2021). To do so, Holberg called several witnesses, including two prostitutes (who, like Kirkpatrick, had been confidential street-informants in unrelated cases) who testified Towery had previously solicited their services, ROA.8859, 9180; Towery's youngest son, who testified about violent behavior perpetrated by Towery in the past, including domestic violence, ROA.9163–69; and a criminologist and hair-and-fiber expert who testified that Holberg's blood and hair were found throughout Towery's apartment, ROA.8766–82, 8832–43, thus indicating a significant struggle.

The centerpiece of Holberg's defense, however, was her own testimony in which she admitted to killing Towery but argued that she acted in self-defense. According to Holberg's trial counsel, the State offered no "evidence whatsoever to show who was the first aggressor," and thus the only evidence of self-defense was Holberg's testimony. ROA.9293. Holberg testified that, on the day of the murder, she had been awake smoking crack cocaine for "almost ten days." ROA.8992. That day, she got into a car accident while driving and "ran from the scene of the accident" because she "had warrants." ROA.8993. Holberg then called a cab and asked

the driver to take her to the Princess Apartments, where Towery lived. ROA.8996. Once at the Princess Apartments, Holberg left the cab without paying. ROA.9099.

Holberg testified that Towery was one of her prostitution clients. ROA.8989. But when confronted with the fact that she told officers she met Towery for the first time on the day of the murder, she claimed that she had been "confused." ROA.9090. Nevertheless, Holberg testified that when she entered Towery's apartment, she began smoking crack, and when Towery saw this, he began berating her and calling her names. ROA.9009. Then, "the next thing" she knew, she "got hit in the back of the head." ROA.9010. The two engaged in what Holberg described as an intense back-and-forth fight during which Towery repeatedly grabbed her hair. ROA.9013–14, 9017–18, 9020. Holberg eventually grabbed a knife and threatened to stab Towery, ROA.9018–19, but Towery responded by walking toward her and grabbing her hair again, which "bent" her "to the side," ROA.9020–21. Holberg then began stabbing Towery in "his side." ROA.9022.

According to Holberg, the stabbings didn't affect 80-year-old Towery, and he continued grabbing her hair, so she continued stabbing him. ROA.9022–24. With respect to the defensive wounds on Towery's hands, wrists, and forearms, Holberg claimed that she stabbed Towery's hands "trying to get his hands to let go" of her hair. ROA.9024. At this point, Towery was "very wounded" but still "had a knife from, I guess, the table that he was standing at." ROA.9025. Towery then "backed into his chair and sat down in the chair." ROA.9025. According to Holberg, Towery was "very hurt" but still had a knife in his hand. ROA.9027. Holberg testified that she did not leave the apartment at this point because she couldn't catch her breath.

ROA.9027. Instead, while Towery was slumped on a recliner, bleeding from multiple stab wounds, and "hurt bad," she grabbed an electrical cord and tried to tie him up. ROA.9123–25, 10209.

After sitting for an unknown amount of time, Towery again tried to "stand up" and approach Holberg with "a knife in his hand." ROA.9027. Holberg told Towery to stop, but he continued approaching her and then grabbed her hair again. ROA.9029. Holberg then "lost it," ROA.9030, and began stabbing Towery with anything she could "get a hold of." ROA.9031. This included "knives," "a fork," "a pair of scissors," and "an iron." ROA.9031–32. According to Holberg, during this tussle they'd fall to their knees, get back up, and "fall again." ROA.9032. Holberg claimed that, after being beaten and repeatedly stabbed, 80-year-old Towery still had a knife in his hands and still had hold of Holberg's hair and shirt. ROA.9034. Holberg then claimed she unintentionally "shoved the lamp in his throat" to "get him off" of her. ROA.9034, 9140–41. Towery then slid "down the wall." ROA.9035. According to Holberg, after being stabbed 57 times and laying on the floor with a cord wrapped around him and a lamp base 5.5 inches down his throat, Towery once again moved his hand toward a knife, so Holberg "grabbed the knife and stabbed him again" in the abdomen. ROA.9036.

Although Towery was stabbed 18 times in the back, ROA.8682–86, Holberg did not remember stabbing him in the back, ROA.9141. She initially told police that Towery bit her and that she had bite marks, but Towery had no teeth or dentures; when confronted with that evidence at trial Holberg acknowledged that Towery did

not bite her. ROA.9142. Holberg testified that she did not put Towery's wallet on top of his body or "turn out his pockets searching them." ROA.9041–42.

Holberg testified that, after the murder, she took off her shoes and clothes, ROA.9037, and took a shower, ROA.9038. She then changed into Towery's pants and shirt before leaving. ROA.9041. She testified that she didn't call the police because they wouldn't believe "anything" she said. ROA.9040.

### 3. The jury convicts Holberg of capital murder.

The jury unanimously convicted Holberg of capital murder after finding that she did not act in self-defense, ROA.21669, but instead intentionally caused Towery's death "in the course of committing or attempting to commit" burglary or robbery, ROA.21672.

## D. The jury unanimously recommends the death penalty, and Holberg is sentenced to death.

For the trial court to sentence Holberg to death, the jury had to find unanimously and beyond a reasonable doubt that there was a "probability" that Holberg "would commit criminal acts of violence that would constitute a continuing threat to society," ROA.21456, and at least 10 of the 12 jurors had to find that there were not "sufficient mitigating circumstances or circumstances to warrant . . . a sentence of life imprisonment rather than a death sentence," ROA.21451, 21457; *see* Tex. Code Crim. Proc. art. 37, § 2(d)(2). The punishment stage of trial therefore focused on future dangerousness and mitigation.

### 1.    Evidence of future dangerousness

**a.**    To prove future dangerousness, the prosecution marshalled evidence describing Holberg's past violent conduct and her psychological state.

As to the former, the jury heard evidence that Holberg repeatedly asked a fellow inmate to "shut . . . up" Kirkpatrick, ROA.9395–96, which the inmate interpreted as Holberg offering to pay her to "murder" Kirkpatrick, ROA.9399. The jury also heard testimony from two separate witnesses that Holberg had confessed to beating another elderly man, E.R., over the head with a cane after he refused to give Holberg money, and that man died two days later. ROA.9422–23, 9434–36. Holberg expressed concern that she would be charged for his murder. ROA.9422. A prison employee also testified that Holberg had "disciplinary problems" while incarcerated, ROA.9887, including involvement in five or six altercations, most of which she instigated. ROA.9891. And the jury also heard evidence that Holberg once "cut somebody with a knife" and broke her ex-husband's nose. ROA.9468.

As to Holberg's psychological condition, the jury heard testimony from the State's forensic psychiatrist, who testified that Holberg had a psychology of "controlling others" and lacked a "conscience that would cover violent acts against other people." ROA.9513. He testified that Holberg exhibited a "pattern of behavior of controlling others and violent acts and violent attitudes about others." ROA.9513. And he opined that there was "a significant probability that [Holberg] would commit criminal acts of violence in the future." ROA.9514. The jury also heard from Holberg's former probation officer, who testified about an interview he conducted with Holberg well before the murder, while she was on probation for check fraud.

ROA.9454. During that interview, Holberg revealed that she did not "like to obey the law," did dangerous things "just for fun," "wish[ed she] could control [herself] better" and did "not like having self-control to keep anger in," did not think carefully about all her actions, and when she felt angry with people, her thoughts were of "revenge." ROA.9465–68.

At closing, the State summed up this evidence by arguing that Holberg was violent, beat another elderly man with a cane "and may have killed him," ROA.9944, broke her ex-husband's nose, ROA.9943, had cut someone with a knife in the past, ROA.9943, admitted to being involved in 76 other crimes, ROA.9941, manipulated others to commit violent acts for her, ROA.9945, and had a high probability of future violence.

**b.**   Holberg's trial counsel aimed to counter the prosecution's future-dangerousness presentation by arguing that Towery's murder was a product of Holberg's drug-addled state, which she had since cleaned up, thus making it unlikely that she posed an ongoing danger to the community. *See, e.g.*, ROA.9952–54.

Dr. Patel, the defense's psychiatrist, testified that Holberg had a "very dysfunctional family" and that there was a low probability she would commit acts of violence in the future, because drug addicts become "disinhibited" and do things they would not do while sober. ROA.9668, 9681. The structure of being in prison would make it unlikely that Holberg would commit acts of violence. ROA.9670. The defense further argued that the number of female inmates "who commit acts of violence after their incarceration is very low, less than two percent." ROA.9952. Based on that

data, there was a "[s]ix-tenths of one percent [chance] that Brittany would commit a crime in the penitentiary." ROA.9953.

### 2. Evidence of mitigating circumstances

**a.** In making her mitigation case to the jury, Holberg's counsel urged the jury to "look at the secrets and look at the sorrows and look at the suffering" of Holberg's life when deciding mitigation. ROA.9967. When Holberg was "maturing" and "learning to cope in our society, learning what was appropriate, . . . she didn't learn to make choices the right way." ROA.9969. Instead, Holberg was "forced to be grown up to fend for herself" when she left home at fifteen, and she "wasn't ready for that." ROA.9970. Although Holberg "never complained about her home life before" trial and "never said that it was bad," her counsel explained that she told a different story now because she learned to talk about it and "deal with it" while receiving drug treatment. ROA.9970–71.

These comments from Holberg's counsel put into context the harrowing description of the troubled and abusive upbringing Holberg testified to at the guilt phase. For example, Holberg testified that she was molested by a babysitter when she was four or five, ROA.8888–89, yet her parents did nothing about it, ROA.8890–91. She also stated that her parents gave her marijuana and alcohol beginning when she was ten years old. ROA.8893–94. She similarly testified that she was assaulted by two adult men when she was 13 years old, ROA.8894, but her parents were too distracted with drug use to be protective or upset, ROA.8898. Later, while on a run, she was assaulted by a different man. ROA.8906–07. At this time, she began drinking and using marijuana "[a] lot." ROA.8909. She was also taking "100 pain pills a day."

ROA.8924. Holberg also testified that she was beaten "three or four times—one time severely . . . beaten with a tire iron by a black man that was a pimp." ROA.8987.

Holberg also testified that her aunt was murdered when she was 12, and this event caused her parents to begin ignoring her and using drugs and alcohol heavily. ROA.8891–92. Holberg's stepfather, John Schwartz, confirmed this, testifying that his sister's murder was a "very traumatic" experience for "the entire family," and it caused him and Holberg's mother to begin "drinking way too much." ROA.9536–37. He testified that, during Holberg's "formative years," she was "molested" at "different times" and beaten, and that drugs were a good way for her to "run away" from her "own life." ROA.9552. Schwartz and Holberg's mother were also "smoking marijuana and eating Valium" in front of Holberg when she was a child. ROA.9537. So Holberg learned about the drug life "by example" from Schwartz and her mother. ROA.9551. Schwartz believed that his problems with Holberg's mother caused many of Holberg's problems, and he couldn't "even begin to describe" how guilty he felt about that. ROA.9544. Schwartz testified that he had seen Holberg "beaten" five or six times. ROA.9546. He saw her after she was "gang raped," "severely beaten," and "injured with a knife." ROA.9546. These experiences had a significant mental impact on Holberg, making her "very distrustful of men in general." ROA.9547.

Dr. Patel, the defense's psychiatrist, tied all of these threads together by testifying extensively about Holberg's substance abuse, post-traumatic-stress disorder (PTSD), and battered-woman syndrome (BWS). ROA.9672–81. He opined that

Holberg's actions during the murder were influenced by chemical dependency, PTSD, and BWS. ROA.9680.

**b.** The State responded by attempting to cast doubt on the truthfulness of Holberg's mitigation case. To wit: The State argued that Holberg told everyone she had a good childhood until she needed "to create mitigating evidence" at trial. ROA.9981. And although the State acknowledged that Holberg did not have "the perfect home life," she admitted to having "everything handed to her on a silver platter." ROA.9946. In the end, according to the State, there was "no amount of mitigating evidence" that would justify the murder. ROA.99891. At bottom, the State argued, Holberg's mitigation evidence was little more than "an excuse." ROA.9982.

For example, the State elicited testimony that Holberg's home life was not as dysfunctional as she would have the jury believe. Holberg's probation officer testified that, during an interview, Holberg indicated that her childhood was "happy," ROA.9458, and she "had everything that she ever wanted," ROA.9456. She expressly stated that she was never abused by her parents or stepfather. ROA.9457–58. She also explained that her ex-husband was her "good friend" and did not indicate that he was abusive. ROA.9460. Instead, she indicated that "she dominated her relationships" with men. ROA.9462. One of Holberg's lifelong friends further confirmed this, testifying that Holberg wrote her letters explaining that she had a "good background," a loving family, a "spoiled and sheltered life," and that she simply decided at some point to "walk on the dark side." ROA.9646–47, 9652. Holberg

even remarked that she "couldn't believe she'd done some of the things she did, especially with a family as loving as she had." ROA.9648.

The State also elicited testimony that tended to show Holberg was manipulative. For example, Holberg's aunt testified that Holberg "always ha[d] been a good manipulator" and would frequently call to tell her "that the [drug] dealer was going to kill her if she didn't have money." ROA.9595. She also reported Holberg to the police for breaking into her car on one occasion and stealing her purse on another occasion. ROA.9614–15. Holberg also told her probation officer that she felt responsible for her stepfather's problems, ROA.9459, and that she could always "melt him," ROA.9471. Indeed, she "felt somewhat responsible" for her parents' divorce because "she used them against each other to get what she wanted." ROA.9473.

**c.** The jury unanimously found beyond a reasonable doubt that Holberg presented a risk of future dangerousness and that there were not sufficient mitigating circumstances to justify a sentence other than the death penalty. ROA.9997–98.

## II. Procedural History

### A. The TCCA affirms Holberg's conviction and sentence on direct appeal.

Holberg directly appealed her conviction and sentence to the Texas Court of Criminal Appeals (TCCA), raising 50 points of error. ROA.807–808. The TCCA rejected each point and affirmed Holberg's conviction and sentence. ROA.808, 851. The Supreme Court later denied review. *Holberg v. Texas*, 534 U.S. 972 (2001).

18

**B. Holberg files a state-habeas application, which the trial court and TCCA reject.**

**1.** On July 19, 2000, Holberg filed an application for writ of habeas corpus in Texas state court. *See* ROA.1509–1691. Holberg raised 35 claims, ROA.1510–19, two of which are relevant here.

Claim 28 alleged ineffective assistance of trial counsel on the ground that her counsel "failed to adequately investigate, prepare, and present at trial exculpatory, mitigating, and corroborating evidence through their own witness, psychiatrist Dr. Patel." ROA.1675. Claim 34 alleged *Brady* violations based on, as relevant here, the State's alleged failure to "provide exculpatory and mitigating . . . information in its possession." ROA.1689. Holberg later clarified the nature of these claims in a reply in support of her application.[1] As to the *Strickland* claim, Holberg alleged that trial counsel did not investigate or present mitigating evidence related to, among other things, Holberg's family and social history. ROA.1858. And as to the *Brady* claim, Holberg alleged, as relevant here, that the State withheld evidence that Kirkpatrick "had been involved as an informant for the police," ROA.1905, and "intentionally suppressed . . . at a minimum . . . [that] Vicki Kirkpatrick . . . had been an informant for the police," ROA.1909–10.

---

[1] Although the state habeas trial court dismissed Holberg's reply as a subsequent habeas application, the TCCA reversed and remanded, concluding that Holberg's reply did "not assert additional claims" but rather expanded "upon a claim already raised," so the "argument, authorities, and evidence raised in the[] [reply] should [have] be[en] considered, to the extent the trial court believe[d] them appropriate." *Ex parte Holberg*, 2008 WL 152725, at *1 (Tex. Crim. App. Jan. 16, 2008) (per curiam).

The state habeas court ordered further factual development on various issues, including the *Brady* claim but not the *Strickland* claim. ROA.99293–94. Specifically, it requested affidavits from Holberg's trial counsel, District Attorney James Farren, and assistant district attorneys Dave Blount and Robert Love. ROA.99295. It also requested a videotaped deposition of Kirkpatrick in response to the allegation that her trial testimony was coerced and misleading, and it allowed DA Farren to file an affidavit in response. ROA.99295.

After considering the post-conviction evidence and testimony, the state habeas court entered 128 pages of findings of fact and conclusions of law, rejecting each of Holberg's claims, including the *Brady* and *Strickland* claims. ROA.97838, 97915, 97964. As for the *Brady* claim, the court held that the State did not "violate[] its obligations under *Brady*" as to "Holberg's [s]uppressed [e]vidence [a]llegations." ROA.97963–64. Specifically, the court concluded "that Holberg's allegations regarding Kirkpatrick have no merit." ROA.97957. It also held "that there was no plea agreement reached between the State and Kirkpatrick," that "Kirkpatrick testified truthfully at Holberg's trial," and that Kirkpatrick "did not testify at Holberg's trial thinking it would help her get a better deal on her own charges." ROA.97941. In fact, the court found that "Kirpatrick did not ask for any kind of deal" and was "the one who initiated contact with the State about Holberg." ROA.97941–42.

As to Holberg's *Strickland* claim, the state habeas court found that "Holberg has not established either deficient performance or prejudice under *Strickland*." ROA.97960. Specifically, the court found no prejudice because "Holberg's allegedly uninvestigated and unpresented evidence, even taken at face value, is not so

remarkable that it would have offset the brutality and depravity of her crime." ROA.97915. Further, the court found "that the majority of the evidence that Holberg alleges was not presented at the punishment phase and would have resulted in a different verdict *was* actually presented." ROA.97915.

**2.**    The state habeas court filed its findings and conclusions in the TCCA. But due to an explosive allegation from Holberg's stepfather that her trial counsel told him "she was going to 'throw the trial'"—an allegation later determined to be unfounded, ROA.98033, 98062—the TCCA remanded the *Strickland* claim and ordered the trial court to conduct an evidentiary hearing with respect to trial counsel's "efforts to investigate and present mitigating evidence at the punishment phase" of trial. *Ex parte Holberg*, 2013 WL 2120253, at *1 (Tex. Crim. App. May 15, 2013) (per curiam). On remand, the court heard testimony—for nearly two weeks—from Holberg's trial counsel and others regarding trial counsel's mitigation investigation. ROA.97997–98.

The trial court then issued detailed supplemental findings of fact and conclusions of law—with particular focus on trial counsel's performance—and rejected the *Strickland* claim for the second time. In doing so, it "considered the witnesses' live testimony, the exhibits admitted as substantive evidence at the hearing, the trial record, and the parties' relevant pleadings and arguments." ROA.97981. After more than 60 pages of detailed findings of fact regarding trial counsel's mitigation investigation—the most pertinent of which are described below, *infra* at 48–55—the state habeas court held that trial counsel "did not perform deficiently in their investigation of mitigating evidence," and they made "strategic decisions that were well within

21

the range of reasonable professional judgment." ROA.98068. The court then re-entered its "findings previously entered . . . including its finding that no prejudice occurred." ROA.98068.

The TCCA adopted these supplemental findings of fact and conclusions of law. *Ex parte Holberg*, 2014 WL 5389907, at *1 (Tex. Crim. App. Sept. 17, 2014) (per curiam).

### C. Holberg files a federal-habeas application, which the district court rejects in a 322-page order.

Having exhausted her options in state court, Holberg turned to federal court, filing a federal habeas petition, ROA.54, which she later amended, ROA.29463, raising 19 claims. In a 322-page order, the district court rejected each claim, including the *Brady* and *Strickland* claims at issue here.

*Brady claim.* The district court concluded that regardless of whether Holberg's trial counsel knew about Kirkpatrick's unrelated informant work—which was unclear from the evidence, ROA.110804–05—the "state habeas court could reasonably conclude that Holberg . . . failed to demonstrate under *Brady* that Kirkpatrick's informant status was favorable . . . or material," ROA.110805.

*Strickland claim.* The district court concluded that the state habeas court did not unreasonably apply *Strickland*. ROA.110948. It then concluded, in the alternative, that even under de novo review, the *Strickland* claim would not succeed, ROA.110948, because "Holberg's defense team undertook an extensive, objectively reasonable investigation into Holberg's offense and background," ROA.110924.

22

The district court denied Holberg's habeas petition and declined to issue a certificate of appealability. ROA.110962.

### D. A divided panel vacates Holberg's conviction, and this Court grants en banc review.

Holberg filed an application for a certificate of appealability in this Court. A divided panel, over Judge Duncan's partial dissent, ECF 111 at 12–13, granted Holberg a certificate of appealability on the *Brady* claim and the *Strickland* claim, *id.* at 1–2.

On March 7, 2025, over Judge Duncan's dissent, ECF 246 at 28–41, the panel majority granted relief and vacated Holberg's conviction based on the *Brady* claim, *id.* at 1–2. The panel did not reach the *Strickland* claim. *Id.* at 8.

On July 30, the en banc Court granted rehearing. ECF 307, 309.

## Summary of the Argument

AEDPA forbids a prisoner whose claims were adjudicated on the merits in state court to relitigate them in federal court unless the state court's decision (1) was contrary to, or an unreasonable application of, clearly established federal law, or (2) based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Application of the relitigation bar forecloses Holberg's *Brady* and *Strickland* claims.

**I.** Holberg is not entitled to habeas relief under *Brady*. At the outset, AEDPA applies to Holberg's *Brady* claim because it was adjudicated on the merits—and rejected—in state court. ROA.97957, 97963–64; *Jimenez v. Guerrero*, 133 F.4th 483, 489 (5th Cir. 2025). Where, as here, "a state court rejects [a claim] without explicitly addressing it," *id.*, "the federal court 'must determine what arguments or theories . . . could have supported . . . the state court's decision," *Sexton v. Beaudreaux*,

585 U.S. 961, 964 (2018) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). Holberg thus bears the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

She cannot do so here, and thus AEDPA's relitigation bar forecloses relief. To prevail on a *Brady* claim, a petitioner must show that evidence that was favorable to the defense was suppressed by the prosecution and material to the outcome of the trial. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018). As for the suppression element of the *Brady* claim, the state habeas court did not reach a result that constitutes an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), because evidence in the record shows that Kirkpatrick's confidential-informant status was not concealed from the defense. A declaration from Holberg's trial counsel explains, in defending against the *Strickland* claim, that she did not challenge Kirkpatrick's credibility more forcefully because the State in response would have called "law enforcement officers to testify that Kirkpatrick has a reputation in the community for truth and veracity *because she has provided them truthful information to solve other crimes*." ROA.76006 (emphasis added). This declaration supports a finding that Kirkpatrick's confidential-informant status was not concealed from the defense.

Nor was the state habeas court's rejection of Holberg's *Brady* claim contrary to or an unreasonable application of *Banks v. Dretke*, 540 U.S. 668 (2004), as to favorability and materiality. *See* 28 U.S.C. § 2254(d)(1). *Banks* is "materially []distinguishable," *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc), because it involved a circumstance where, unlike here, the witness was a police informant in the *very case* at issue and had even helped to set up the defendant. *Banks*, 540 U.S. at

701. But as this Court held just five years ago, where "the arrangement between" the police and undisclosed informant "existed prior to and wholly independent of the case against" the defendant, *Brady* is not triggered. *Dennes v. Davis*, 797 F. App'x 835, 842 (5th Cir. 2020). It was hardly unreasonable for the state habeas court to reach the same result that three members of this Court did on similar facts.

Last, and even if Holberg could overcome AEDPA's relitigation bar, she cannot prevail on her *Brady* claim under a *de novo* standard because the impeachment value of Kirkpatrick's confidential-informant status was not material to the result of either the guilt-innocence or the punishment stage. Because Kirkpatrick's testimony "is strongly corroborated by additional evidence," *United States v. Cessa*, 872 F.3d 267, 272 (5th Cir. 2017), there is no reasonable probability that impeaching Kirkpatrick would have led to a different result at guilt-innocence or punishment. As to the former, powerful physical evidence (including forensic evidence), Holberg's own contradictory and implausible theory, and other witness testimony independently undermined her self-defense theory. And as to the latter, Holberg admits that "the crime itself was sufficient to show future dangerousness," Appellant.Br.50, and she does not explain how Kirkpatrick's testimony was relevant to mitigation.

**II.** Holberg is not entitled to habeas relief under *Strickland* and AEDPA's "doubly" deferential standard of review, either. *Richter*, 562 U.S. at 105. Holberg argues that her trial counsel did not adequately investigate or present mitigation evidence at the punishment stage. But the state habeas court conducted a two-week evidentiary hearing on that claim and then found as a factual matter that trial counsel were experienced, knowledgeable of 1990s Amarillo juries, and did everything they could

to gather mitigation evidence. ROA.98007. Based on the mitigation evidence they did discover, their mitigation strategy was reasonable, and the mitigation evidence Holberg discusses now was either (1) already presented to the jury, (2) unsubstantiated or outright inconsistent with Holberg's pre-trial statements, (3) inconsistent with Holberg's trial strategy, or (4) more harmful than helpful. Those factual findings are presumed correct under 28 U.S.C. § 2254(e)(1), and Holberg's offers no clear and convincing evidence to rebut that presumption.

Nor can Holberg show that the state habeas court unreasonably determined that trial counsel's mitigation investigation and strategy were not prejudicial. The state habeas court correctly found that Holberg's post-hoc mitigation evidence, even "taken at face value," would not have "offset the brutality and depravity of her crime." ROA.997. It also correctly found that most of that evidence "*was* actually presented" to the jury. ROA.997. The jury heard testimony that Holberg was neglected and molested multiple times as a child, exposed to drugs by her parents at a young age, beaten multiple times, and "gang raped." The jury had to weigh this testimony against conflicting evidence, like testimony from multiple witnesses that Holberg was dishonest, manipulative, and violent, as well as Holberg's own pre-trial statements that she was "spoiled" and "sheltered" as a child, had "everything she ever wanted," manipulated her parents and used them against each other to get what she wanted, and decided to "walk on the dark side." Given this contradictory evidence, the state habeas court reasonably determined that presenting more, cumulative mitigation evidence likely would have backfired with the jury and led to a shorter

deliberation and, ultimately, the same result. Because that decision was reasonable and based on extensive factual findings, Holberg is not entitled to relief.

## Standard of Review

AEDPA respects "our system of dual sovereignty," and the principles of federalism and comity undergirding it, by greatly restricting the availability of federal habeas relief for those convicted of crimes in state court. *Shinn v. Ramirez*, 596 U.S. 366, 375 (2022) (citing *Printz v. United States*, 521 U.S. 898, 918 (1997), and *Brown v. Davenport*, 596 U.S. 118, 132–33 (2022)).

A state prisoner seeking issuance of a writ of habeas corpus from a federal court must first "exhaus[t] the remedies available in the courts of the State" before seeking federal habeas relief. 28 U.S.C. § 2254(b)(1). This burden is typically satisfied by a prisoner "raising [their] federal claim before the state courts in accordance with state procedures." *Shinn*, 596 U.S. at 378 (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999)). When a petitioner's claim has been "adjudicated on the merits in State court," a federal court may not award habeas relief unless the prisoner can overcome AEDPA's daunting relitigation bar—which requires the prisoner to show either (a) that the state court's decision "was contrary to, or involved an unreasonable application of," law clearly established by the Supreme Court, or (b) that the decision "was based on an unreasonable determination of the facts" in the light of the state-court record. 28 U.S.C. § 2254(d)(1), (2).

This "standard is difficult to meet . . . because it was meant to be": "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error

correction through appeal." *Richter*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)).

This Court reviews "the district court's findings of fact for clear error and its conclusions of law de novo," and "may affirm on any ground supported by the record," *Dorsey v. Stephens*, 720 F.3d 309, 314 (5th Cir. 2013).

**ARGUMENT**

## I. Holberg is Not Entitled to Habeas Relief Under *Brady*.

The Court should affirm the district court's denial of Holberg's *Brady* claim. Holberg argues that the prosecution failed to disclose that its guilt-stage witness, Vickie Kirkpatrick, served as a paid, confidential informant for the Amarillo Police Department in unrelated drug cases. Appellant.Br.2. But AEDPA applies to her *Brady* claim, and AEDPA's relitigation bar forbids re-adjudication of that claim here. And even if it did not, the state habeas court properly rejected Holberg's *Brady* claim because it fails on the merits.

### A. AEDPA applies to Holberg's *Brady* claim.

At the outset, Holberg errs by arguing (at 33–35) that AEDPA does not apply to her *Brady* claim and that the Court should review it *de novo*. AEDPA "bars relitigation of any claim adjudicated on the merits in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)." *Richter*, 562 U.S. at 98 (cleaned up). "[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." *Id.* Indeed, AEDPA does not require a "statement of

reasons," *id.*, or state courts to "address every single claim that a petitioner cooks up," *Jimenez*, 133 F.4th at 489 (cleaned up). A state court need not even "discuss separately every single claim." *Id.* (cleaned up). Instead, as long as the claim is adjudicated on the merits, AEDPA deference applies. *Id.*

As this Court has explained, "[t]he Supreme Court has repeatedly confirmed that we must presume a federal claim was adjudicated on the merits when a state court rejects it without explicitly addressing it." *Id*. And "the '*Richter* presumption,' of merits adjudication also applies when the state court addressed 'some but not all of a defendant's claims.'" *Id.* (quoting *Johnson v. Williams*, 568 U.S. 289, 298 (2013)).

Here, the state trial court and the TCCA adjudicated Holberg's *Brady* claim on the merits and rejected it. But neither court provided a rationale "explicitly" rejecting it. *Id.* The TCCA rejected Holberg's *Brady* claim based "upon the trial court's findings and conclusions" as well as its "own review" of "the record." *Ex parte Holberg*, 2014 WL 5389907, at *1. And the trial court merely stated that Holberg "failed to show that the State violated its obligations under *Brady*." ROA.97964. Its analysis, however, focused on addressing Holberg's distinct argument that "the State knowingly procured the false testimony of Vickie Kirkpatrick through threats." ROA.97944. And in rejecting that claim, the court incorporated the findings it made in rejecting Holberg's separate *Napue* claim and reiterated its conclusion "that Holberg's allegations regarding Kirkpatrick have no merit." ROA.97956–57. But the Court did not provide reasons for rejecting Holberg's confidential-informant *Brady* theory.

Where, as here, "there is no reasoned state-court decision on the merits, the federal court 'must determine what arguments or theories . . . could have supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of'" the Supreme Court. *Sexton*, 585 U.S. at 964–65 (quoting *Richter*, 562 U.S. at 102). Holberg therefore bears the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This standard requires Holberg to "show far more than that the state court's decision was merely wrong or even clear error." *Jimenez*, 133 F.4th at 492 (citation omitted). Instead, Holberg must show that the state court was "*so* wrong" that it is "beyond the realm of possibility that a fairminded jurist could agree." *Id.* (cleaned up). As described below, she does not come close to satisfying that burden here.

In a bid for *de novo* review (at 33–34), Holberg resists this conclusion by arguing that the state habeas court rejected her confidential-informant *Brady* claim on three specific grounds—that the prosecutor complied with *Brady* by opening his file, Holberg already had the evidence, and the evidence was not admissible, Appellant.Br.31 (quoting ROA.97964)—and AEDPA deference would be limited to *only* those three grounds. Not so. What Holberg points to are three statements of law the court articulated in the context of a multi-part *Brady* claim, *see* ROA.1902-24, but which it never attempted to apply to any particular *Brady* evidence, *see* ROA.97964. Certainly, nowhere in the state habeas court's findings of fact did it apply those three conclusions of law to Holberg's confidential-informant *Brady* claim.

### B.  Holberg cannot overcome AEDPA's relitigation bar.

"To surmount AEDPA's relitigation bar, a petitioner must show that the state court's adjudication of the relevant claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Jimenez*, 133 F.4th at 491–92 (quoting 28 U.S.C. § 2254(d)(1)–(2)).

Holberg does not qualify for either exception. Petitioners advancing *Brady* claims "must show three things: (1) the evidence at issue is favorable to the defense, either because it is exculpatory or impeaching, (2) the prosecution suppressed the evidence, and (3) the evidence is material." *Murphy*, 901 F.3d at 597. Here, Holberg cannot show it would be an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), for the state habeas court to have rejected her *Brady* claim on the ground that Kirkpatrick's confidential-informant status was not suppressed. And she cannot demonstrate that the state court, in rejecting her claim, unreasonably applied *Brady* or its progeny as to favorability or materiality. 28 U.S.C. § 2254(d)(1).

### 1.  The state court did not unreasonably determine the facts under section 2254(d)(2) as to suppression.

Holberg's *Brady* claim falters at the outset because she cannot demonstrate that Kirkpatrick's informant status was suppressed. "*Brady* claims involve 'the discovery[] after trial of information which had been known to the prosecution but unknown to the defense.'" *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994)

(quoting *United States v. Augurs*, 427 U.S. 97, 103 (1976)). But "[e]vidence is not 'suppressed' if 'the defendant either knew, or should have known, of the essential facts permitting him to take advantage of" the evidence. *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) (quoting *Lawrence*, 42 F.3d at 257). Thus, "there is no duty to furnish a defendant with [*Brady*] evidence that is fully available to the defendant through the exercise of reasonable diligence." *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998).

Holberg argues that her trial counsel "indisputably did not" know that Kirkpatrick was a confidential informant. Appellant.Br.32. But the record contradicts this assertion. In her state-habeas application, Holberg raised a *Strickland* claim attacking trial counsel's purportedly minimal cross examination of Kirkpatrick—specifically their failure to challenge Kirkpatrick's credibility. ROA.1858. And in response to that claim, Holberg's trial counsel submitted an affidavit in which she explained that attacking Kirkpatrick's credibility would have been "a double edge sword" because, in response, "the State in all likelihood would then call in law enforcement officers to testify that Kirkpatrick has a reputation in the community for truth and veracity *because she has provided them truthful information to solve other crimes*." ROA.76006 (emphasis added).

As the district court explained, "Holberg's trial counsel recognized" that "a challenge to Kirkpatrick's credibility would have invited the State to emphasize her role as a trusted, confidential informant." *Holberg*, 2021 WL 3603347, at *77. This affidavit demonstrates that Holberg's counsel *did* know that Kirkpatrick was an informant and chose not to cross examine her on credibility because it did not want the

State to rehabilitate her with that fact. ROA.76006. The affidavit is particularly instructive, because it was submitted to rebut a *Strickland* claim, meaning that it is a sworn statement about trial counsel's strategy *at trial*.

As proof of suppression, Holberg relies entirely on the testimony of a Corporal Stallings, made in Kirkpatrick's unrelated plea hearing. Appellant.Br.12. At that hearing, Stallings testified that *he* had not "divulged" Kirkpatrick's informant work "publicly to anyone outside of the S.W.A.T. unit or the drug task force." ROA.106759. But Stallings did not testify—and could not have testified—whether Holberg or her counsel knew that Kirkpatrick had been an informant. Stallings did not know whether Kirkpatrick herself told anyone about her prior informant work. Kirkpatrick could have told Holberg's trial counsel that fact during her pre-trial interview with them. Or she could have told Holberg that fact, either during their time on "the streets," ROA.8619, or when the two shared a cell, ROA.8621.

AEDPA resolves any doubt on this score in favor of the State. At a bare minimum, "in light of the evidence presented in the State court proceeding" concerning trial counsel's affidavit indicating knowledge of Kirkpatrick's informant status, it would not have been an "unreasonable determination of the facts" for the state court to find no suppression. 28 U.S.C. § 2254(d)(2). And if Holberg is correct that the state court affirmatively made a factual finding as to suppression, *see* Appellant.Br.31–32, she runs into another insuperable problem: that fact is presumed correct absent "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1). Holberg has not even tried to offer such evidence.

33

Holberg's only other option is to assert repeatedly throughout her brief that the State has "conceded suppression." Appellant.Br.32. In support of this concession, Holberg cites only the panel opinion—which is now vacated and, in any event, cites nothing in support of that claim—and the oral argument transcript, which also contains no such concession. The State has never conceded that evidence of Kirkpatrick's informant status was suppressed.[2]

### 2. The state court did not unreasonably apply *Brady* or its progeny under section 2254(d)(1) as to favorability or materiality.

The state court's rejection of Holberg's *Brady* claim was also not "contrary to" or "an unreasonable application of" *Brady* or its progeny as to favorability or materiality. 28 U.S.C. § 2254(d)(1); *see Uvukansi v. Guerrero*, 126 F.4th 382, 387, 392 n.7 (5th Cir. 2025) (explaining that the "materiality" prong "is a mixed question of law and fact considered under Section 2254(d)(1), not Section 2254(d)(2)").

"A state court decision is 'contrary to' clearly established federal law only if it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if' it resolves 'a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" *Langley*, 926 F.3d at 155 (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 413 (2000)). And a state court decision is an "unreasonable application of" Supreme Court precedent only if "the state court was *so*

---

[2] Nor has the State forfeited this argument. In response to Holberg's federal habeas claim under *Brady*, the State argued that Holberg cited no evidence in support of the claim that the "the State never revealed Kirkpatrick's extensive history as a police informant." ROA.36207.

34

wrong that the error was 'well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* at 156 (quoting *Shoop v. Hill*, 586 U.S. 45, 48 (2019) (per curiam)). "In other words, the unreasonable-application exception asks whether it is 'beyond the realm of possibility that a fairminded jurist could' agree with the state court." *Id.* (quoting *Woods v. Etherton*, 578 U.S. 113, 118–19 (2016) (per curiam)). Holberg cannot satisfy either exception.

Holberg claims (at 30–31) that the state court's rejection of her *Brady* claim is both contrary to, and an unreasonable application of *Banks*. Specifically, she argues (at 29) that it is "beyond genuine debate" that a witness' "paid informant status qualifies as evidence advantageous" to the defense, because of its "obvious tendency to establish bias."

But *Banks* is easily distinguishable. There, the witness was paid by law enforcement to "set . . . up" the defendant. *Banks*, 540 U.S. at 701. Specifically, the witness "instigated" the defendant to acquire the weapon that he used to commit a murder. *Id.* at 699. That witness then testified against the defendant at trial. Because the jury was not aware of the witness's "true role in the investigation and trial *of the case*," the evidence was impeaching and material. *Id.* at 702–03 (emphasis added). In other words, *Banks* stands for the principle that "a *Brady* violation . . . occur[s] where the prosecution fail[s] to turn over evidence of a money payment to the testifying informant *for his involvement in the case against* [*the*] *defendant*." *Dennes*, 797 F. App'x at 842 (emphasis original).

The state court's rejection of Holberg's *Brady* claim could not be "contrary to" *Banks* because it involves "materially []distinguishable facts.'" *Langley*, 926 F.3d at

155. Here, unlike in *Banks*, Kirkpatrick was not involved in the "scenario that led to the indictment." 540 U.S. at 699. Nor was she paid by law enforcement to "set . . . up" Holberg. *Id.* at 701. Instead, Kirkpatrick had, in the past, helped Amarillo PD obtain search warrants and convictions in unrelated drug cases. ROA.106755–58. That is, "the arrangement between" Kirkpatrick and the Amarillo PD "existed prior to and wholly independent of the case against" Holberg. *Dennes*, 797 F. App'x at 842. And Kirkpatrick received no "benefit from testifying" in Holberg's case, unlike the witness in *Banks*. *Id.* As this Court held on similar facts, "*Banks* is" materially "distinguishable." *Id.*

Holberg resists this conclusion (at 31), arguing that the circumstances here show "bias relevant specifically to Holberg's case" because Kirkpatrick "was an informant for the same department during the same time period, her police handler was directly involved in procuring her evidence against Holberg, and she attempted to use her informant work and her cooperation against Holberg to get leniency for herself." The state court found to the contrary, namely that Kirkpatrick "did not testify at Holberg's trial thinking that it would help her get a better deal on her own charges," "did not ask for any kind of deal," and "the plea offer [the State] made in Kirkpatrick's burglary case had nothing to do with Kirkpatrick's testimony in the Holberg case." ROA.97941–42. Those fact findings are presumed correct, and Holberg points to no "clear and convincing evidence" to overcome them. 28 U.S.C. § 2254(e)(1).

For similar reasons, the state court's rejection of Holberg's *Brady* claim was not an unreasonable application of *Banks*. It can hardly be "'beyond the realm of

possibility that a fairminded jurist could' agree with the state court," *Langley*, 926 F.3d at 156 (quoting *Woods*, 578 U.S. at 118–19), when three members of this court distinguished *Banks* on these same grounds just five years ago, *see Dennes*, 797 F. App'x at 842. This Court's distinction in *Dennes* makes good sense: where a witness's informant status is "prior to and wholly independent of the case against" the defendant, *id.*, the impeachment value of such information is far more remote and attenuated. But even if that distinction is "wrong," it is not an error that is "well understood and comprehended in existing law," so Holberg cannot clear the relitigation bar. *Langley*, 926 F.3d at 156 (quoting *Shoop*, 586 U.S. at 48).

### C. Even if Holberg could overcome AEDPA's relitigation bar, she is not entitled to habeas relief.

"Overcoming AEDPA's relitigation bar is necessary but not sufficient to win habeas relief." *Id.* "Even after overcoming the bar, the prisoner still must show, on de novo review, that [she is] in custody in violation of the Constitution or laws or treaties of the United States." *Id.* (cleaned up); 28 U.S.C. § 2254(a). Holberg cannot do that here because she cannot establish that Kirkpatrick's confidential-informant status was material to her conviction or sentence; she therefore fails the materiality prong of the *Brady* test.

Evidence is material only if there is a reasonable probability that the result of the trial would have been different had the prosecution disclosed the evidence. *United States v. Barraza*, 655 F.3d 375, 380 (5th Cir. 2011). To determine materiality, "the proper inquiry is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Canales v. Stephens*, 765 F.3d 551, 574 (5th Cir. 2014) (cleaned up). "[W]ithheld evidence is more likely material when the State presents a weaker case for guilt." *Floyd v. Vannoy*, 894 F.3d 143, 166 (5th Cir. 2018) (per curiam). But where "a substantial body of evidence establishing . . . guilt . . . is left unscathed," *United States v. Miller*, 520 F.3d 504, 515 (5th Cir. 2008), or "the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material," *Cessa*, 872 F.3d at 272.

The materiality inquiry is not a "sufficiency of the evidence" test. But the Court "must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,'" and determine in the light of that examination whether "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 582 U.S. 313, 324–25 (2017) (citations omitted). Indeed, "the materiality of *Brady* evidence depends almost entirely on the value of the evidence relative to the other evidence mustered by the State." *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

Here, "examin[ing] the trial record" as a whole, *Turner*, 582 U.S. at 324, Kirkpatrick's confidential-informant status was not material to guilt or punishment because there is no reasonable probability that impeaching Kirkpatrick on the ground that she had served as a confidential information for Amarillo PD in past, unrelated drug cases would have led to a different result at either phase of trial.

### 1. Kirkpatrick's confidential-informant status was not material to the jury's conviction at the guilt-innocence stage.

Start with the guilt phase. Holberg argues (at 36) that Kirkpatrick's informant status was material to guilt because Kirkpatrick testified "that the killing was not in self-defense and that Holberg intended to rob Towery before or during the homicide." Indeed, Holberg argues (at 37) that, other than Kirkpatrick's testimony, there was only "circumstantial proof, which was conflicting, incomplete, or consistent with acquittal." But Holberg is wrong: there was overwhelming evidence that Holberg was not acting in self-defense and that she murdered Towery during a robbery or burglary. Attempting to impeach Kirkpatrick's testimony on the ground that she had a motive or bias for the testimony she gave would not have led to a different result given the trove of evidence—including the physical evidence from the crime and Holberg's contradictory and implausible testimony—independently supporting Holberg's guilt.

*Self-defense.* The only evidence that Holberg was acting in self-defense was her own self-serving testimony. *See supra* at 9–12. But the evidence showing that she was not acting in self-defense was essentially insurmountable. Holberg claims (at 38) that Towery was "in pretty good shape" and "could have engaged in the extended struggle Holberg described." Yet the evidence showed that Towery was a frail, crippled 80-year-old man who had no teeth, required use of a wheelchair, shuffled when he walked, and shook when he ate. *Supra* at 4. The jury saw this picture of Towery, which was taken more than a year before the murder:



Holberg, on the other hand, was 23 years old, healthy, and high on crack cocaine.

The physical evidence of the crime similarly eliminated any doubt that Holberg was acting in self-defense. Towery was stabbed 58 times, including nearly 20 times in the back. He had 9 defensive stab wounds to his hands, wrists, and forearms. And a lamp base was shoved down his throat while he was still alive. Yet, according to Mayo and Votaw—the first people to see Holberg after the murder—Holberg had no visible injuries. ROA.8564, 8581; *cf.* ROA.8598 (drug dealer testifying that, the night of the murder, Holberg had a "cut on her hand, some kind of a mark on her neck, and a scratch on her face"). That is evidence of a one-sided murder, not the back-and-forth, self-defense scenario Holberg described.

Holberg's testimony was also implausible, at best. Holberg described a 45-minute altercation during which frail, 80-year-old Towery was an unstoppable force who barely responded to being stabbed nearly 60 times. ROA.9022. When Towery was likely mortally wounded and sitting in a chair, Holberg decided to tie him up

with an electrical cord. ROA.9123–25. When confronted with the fact that Towery had been stabbed nearly 20 times in the back, Holberg claimed that she did not remember stabbing him in the back. ROA.9141. And to explain Towery's nine defensive stab wounds to his hands, wrists, and forearms, Holberg claimed that she stabbed his hands "to get his hands to let go" of her hair. ROA.9024.

Perhaps least credible of all was Holberg's testimony about shoving the lamp base 5.5 inches down Towery's throat. The medical examiner testified that inserting the lamp base required "significant force," ROA.8689, yet Holberg testified that she did so unintentionally while she was trying to "get him off" of her, ROA.9034. Equally absurd was Holberg's claim that after Towery had been stabbed 57 times and had a lamp base 5.5 inches down his throat, he once again moved his hand near a knife, so Holberg "grabbed the knife and stabbed him again" in the abdomen and left the knife there. ROA.9036. This claim is unbelievable on its face and is also contradicted by the medical examiner's testimony that the knife in Towery's abdomen was inserted after Towery was already dead. ROA.8128, 8184.

Other evidence contradicted the self-defense theory. Holberg told her mother that Towery's window was open and she was screaming for help during the murder. ROA.9114–15. But a neighbor testified that, at the time of the murder, Towery—not Holberg—was heard yelling "quit that." ROA.8806. The jury also heard testimony that, immediately after the murder, Holberg took a shower and changed into Towery's clothes. ROA.9038, 9041. And during the car ride away from the apartment, while Holberg was "real relaxed and laid back" with her "feet up on the dash" and "one hand stuck out the window," ROA.8562, she asked to get a large Dr

Pepper, ROA.8559–8560, 8579. The jury could have reasonably concluded that this was not the behavior of someone who just killed another human being in self-defense during a 45-minute-long life-and-death struggle.

In short, the evidence that Holberg was not acting in self-defense was overwhelming. The only evidence of self-defense was Holberg's own testimony, and the jury obviously did not believe her. There is no reasonable probability that the jury's knowledge that Kirkpatrick was an informant in unrelated cases would have led it to believe Holberg's self-defense theory. The "substantial body of evidence" described above disproving the self-defense theory would have been "left unscathed," *Miller*, 520 F.3d at 515, because Kirkpatrick's testimony was "strongly corroborated by additional evidence supporting a guilty verdict," *Cessa*, 872 F.3d at 272.

*Robbery/Burglary*. The same is true as to the jury's finding of the capital-murder aggravator: that Holberg committed the killing "in the course of committing or attempting to commit" a robbery or burglary. ROA.21672. The evidence of robbery was overwhelming. Towery's children testified that he was carrying more cash than usual—over $1,000, all in hundred-dollar bills—at the time of the murder. ROA.8345, 8362. Towery kept the cash in his wallet. ROA.8346, and when the police entered Towery's apartment, they found his wallet lying open on his chest, ROA.8107. The wallet had been "gone through," and his pants pockets were "pulled out" and "emptied of their contents." ROA.8210.

On the way to Towery's apartment, Holberg paid someone $20 for a ride and refused to pay a cab driver. ROA.8995, 9098. After the murder, however, Holberg paid ten times that amount for a ride—$200, in hundred-dollar bills. ROA.8556,

8570. One of the bills had blood on it.[3] ROA.8571. During the drive, Holberg took out a "wad of money," spread the bills out on her lap, and began counting them. ROA.8568, 8583. She counted "at least ten $100 bills" in addition to the $200 she paid for the ride, meaning right after the murder Holberg had at least $1,200 in cash—all in hundred-dollar bills—the exact amount Towery was carrying in his wallet at the time. ROA.8568. After being arrested, Holberg asked officers why she would rob a man for $1,400 when she was making $2,000 a day. ROA. 8459. Holberg does not explain how, at the time of her arrest, she knew the exact amount of money that had been taken from Towery.

The evidence that Holberg robbed Towery was not subject to reasonable dispute, and there is no probability that impeaching Kirkpatrick would have changed the jury's answer on that charge: Kirkpatrick's testimony that Holberg robbed Towery was "strongly corroborated by additional evidence." *Cessa*, 872 F.3d at 272.

### 2. Kirkpatrick's confidential-informant status was not material to the jury's sentence at the punishment stage.

Holberg makes no meaningful argument that impeaching Kirkpatrick would have been material to her sentence. Appellant.Br.43–44. The two issues at sentencing were future dangerousness and mitigating circumstances. Holberg offers no argument that evidence of Kirkpatrick's unrelated informant work would have been

---

[3] Holberg asserts (at 40) that neither Mayo nor Votaw "testified to seeing blood on the money." Not true. Cody Mayo, who was in the car during the ride, testified that blood was found on one of the bills that Holberg gave them and that a bill in Votaw's purse "had some blood on the corner of it." ROA.8571.

relevant—let alone material—to mitigation. As to future dangerousness, Holberg concedes that "the crime itself was sufficient to show future dangerousness," Appellant.Br.50, which is fatal to any claim that Kirkpatrick's unrelated informant work was material as to future dangerousness.

And indeed, there was ample evidence of future dangerousness. As described above, *supra* at 13–14, Holberg was violent, beat another elderly man with a cane "and may have killed him," ROA.9944, broke her ex-husband's nose, ROA.9943, had cut someone with a knife in the past, ROA.9943, admitted to being involved in 76 other crimes, ROA.9941, manipulated others to commit violent acts for her, ROA.9945, and had a high probability of future violence..

### 3. Kirkpatrick's confidential-informant status was not material in the light of its cumulative effect and Holberg's trial strategy.

Kirkpatrick's confidential informant status was immaterial to both guilt-innocence and punishment for two additional overarching reasons.

*First*, impeaching Kirkpatrick on the ground that she was a confidential informant would have been cumulative of other evidence the jury heard impeaching Kirkpatrick's credibility. But evidence is not material when it is "cumulative with already presented impeachment evidence." *Murphy*, 901 F.3d at 598. That is the case here. For example, Kim Pirtle, who was incarcerated with Kirkpatrick for a month, ROA.9225–26, testified that Kirkpatrick had a "bad" reputation for truthfulness. ROA.9226. Melissa Wisemen, who shared a cell with Holberg and Kirkpatrick when Holberg supposedly confessed to Kirkpatrick, testified that she never heard Holberg

44

say anything about murdering Towery. ROA.9865. And of course, Holberg herself testified that she never discussed her case with Kirkpatrick. ROA.9055–56.

Further, during closing argument at the guilt phase, Holberg's trial counsel argued that Kirkpatrick's testimony was untrue because there was no blood spatter consistent with an arterial bleed, and thus Kirkpatrick's testimony about blood "squirting like a fountain" could not be true. ROA.9319. And finally, Holberg's counsel told the jury that Kirkpatrick had "something to gain by saying something that would help the State," ROA.9320, like "money" or "charges reduced or dropped," ROA.9320. Thus, Holberg's counsel already impeached Kirkpatrick's credibility and implied she was being helped by the State (which she was not, as the state habeas court found, ROA.97941–42).

*Second*, impeaching Kirkpatrick on the ground that she was not trustworthy because she was a confidential informant would have conflicted with Holberg's trial strategy. Holberg herself called two confidential informants to testify on her behalf— Connie Baker and Diana Wheeler—to prove that Towery had a history of soliciting prostitutes. ROA.9180, 9764, 9766. And during closing argument at the guilt phase, Holberg's counsel argued that Baker and Wheeler "must be pretty credible because they're confidential informants." ROA.9313. In other words, Holberg argues that the same evidence her trial counsel used to bolster the credibility of her own witnesses would have simultaneously "destroyed" the credibility of Kirkpatrick. Holberg cannot have it both ways.

## II.  Holberg Is Not Entitled to Habeas Relief Under *Strickland*.

Under *Strickland v. Washington*, a defendant complaining of "the ineffective-ness of counsel's assistance" must show (1) "that counsel's representation fell be-low an objective standard of reasonableness" and (2) prejudice, meaning an "effect on the judgment." 466 U.S. 668, 688, 691 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," *id.* at 689, and courts considering *Strick-land* claims "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance," *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). Every effort must be made to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The question is whether "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defend-ant by the Sixth Amendment," *Richter*, 562 U.S. at 104, because counsels' represen-tation "amounted to incompetence under 'prevailing professional norms,'" *id.* at 105.

Under AEDPA, establishing a *Strickland* claim is "all the more difficult" be-cause the "standards created by *Strickland* and § 2254(d) are both highly deferen-tial." *Richter*, 562 U.S. at 105 (quotation marks omitted). So "when the two apply in tandem, review is doubly so." *Id.* (quotation marks omitted). Holberg cannot meet these standards as to either performance or prejudice.

**A. The state court did not unreasonably apply *Strickland* in determining—after a two-week evidentiary hearing—that trial counsel's mitigation strategy was reasonable.**

*Strickland* claims based on insufficient investigations involve a "heavy measure of deference to counsel's judgments." *Wiggins v. Smith*, 539 U.S. 510, 521–22 (2003). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Richter*, 562 U.S. at 109 (quotation marks omitted). *Strickland* "does not require counsel to investigate every conceivable line of . . . evidence no matter how unlikely the effort would be to assist the defendant." *Wiggins*, 539 U.S. at 533. Instead, "counsel has a duty to make reasonable [professional] investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 521. The ultimate question is not whether the decision to forgo presenting certain mitigating evidence was unreasonable but whether the "investigation" supporting that decision "was *itself reasonable.*" *Id.* at 523.

Here, after a nearly two-week evidentiary hearing, during which the state habeas court considered live witness testimony, post-trial exhibits, and the trial record, the court[4] held that trial counsel "did not perform deficiently in their investigation of mitigating evidence," because they made "strategic decisions that were well within

---

[4] Because the TCCA did not provide reasons for denying relief on the *Strickland* claim but instead "adopted the trial judge's findings" as its own, *Ex parte Holberg*, 2014 WL 5389907, at *1, the Court "looks through" that decision to the last-reasoned state-court opinion, here the trial court's detailed findings of fact and conclusions of law. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

the range of reasonable professional judgment." ROA.98068. That holding—based on 88 pages of detailed factual findings that are presumed correct, 28 U.S.C. § 2254(e)(1)—was not an unreasonable application of *Strickland* or its progeny. *See* ROA.97981–98069.

1.    At the outset, the state habeas court found that Holberg's trial team was highly experienced, knowledgeable about 1990s Amarillo juries, and hardworking. ROA.98035–36, 97999. To assist in their investigative efforts, Holberg's counsel retained two highly experienced investigators, ROA.98000–02, and a mental-health expert, ROA.98041–46. As the district court explained, "Holberg's defense team undertook an extensive, objectively reasonable, investigation into Holberg's offense and background." *Holberg*, 2021 WL 3603347, at *135.

They interviewed many witnesses, including family members, "acquaintances," "dozens of Holberg's fellow prostitutes, drug addicts, and strippers," "former school counselors," Holberg's "former 'sugar daddy,'" and "multiple jail personnel." *Id.* Holberg's trial team traveled several times to "locate witnesses." ROA.98010–11. One of Holberg's attorneys "traveled to West Memphis, Arkansas and Memphis, Tennessee[,] trying to locate individuals to build a mitigation case." ROA.98046. Her counsel even walked the streets and went to a "'crack house' at '1:00 a.m. in the morning' to try and interview . . . witnesses." ROA.98039.

Holberg's trial team reviewed Holberg's medical, school, employment, and criminal records; interviewed many potential witnesses; investigated Holberg's "family troubles," "sexual and drug history, Holberg's non-violent character, and Holberg's relationship with her ex-husband and daughter;" interviewed Holberg

48

multiple times; interviewed Holberg's stepfather about "the family's troubles with drugs and alcohol," "Holberg's drug history, the physical trauma and abuse she suffered," and Holberg's ex-husband's "abuse of Holberg during their marriage." ROA.98008–10.

Despite these efforts, trial counsel struggled to develop "evidence that would ultimately be more helpful to Holberg than harmful." ROA.98007. Holberg herself "furnished inconsistent, ambiguous, often conflicting, information about her own background." *Holberg*, 2021 WL 3603347, at *135. And counsel were unable "to find anyone who ascribed positive attributes to Holberg;" the "general consensus was that she 'was mean.'" ROA.98046. All this led counsel to conclude that many of Holberg's witnesses, including "some family members and close friends who could potentially serve as mitigation witnesses[,] might do more harm than good." ROA.98008.

At the punishment stage, "[t]he trial team wanted Holberg to look like a person with problems that could be fixed." ROA.98016. "The hope was that a juror would view Holberg's crime as an aberration for a girl who was basically and intrinsically good." ROA.98016. So "the defense team's strategy was to help at least one juror to see Holberg as someone who could be the juror's sister, daughter, or friend." ROA.98016. This strategy was motivated by counsel's professional experience trying death-penalty cases in Randall County, Texas. ROA.98015. That experience provided insight into "the punishment attitude of typical jurors in Randall County," ROA.98016, who "were tough on punishment," "did not like drug-related crimes or murder," "felt that brain damage made one defective," and "would not 'save'

someone whom they saw as defective," ROA.98015–16. In the light of this experience, the state habeas court found trial counsel's "strategic decisions" "well within the range of reasonable professional judgment." ROA.98068.

**2.**    Holberg, advances a slew of arguments to show that trial counsel's investigation and presentation of mitigation evidence was deficient. None has merit.

*First*, Holberg argues (at 48–50) that her trial counsel abandoned and "disavowed reliance on mitigation." But this claim is untrue. As the state habeas court found, "the trial team by no means abandoned a punishment investigation." ROA.98029. Holberg plucks out of context her counsel's statement during opening that "you will see that the answer to Question No. 1 [future dangerousness] should be 'no.' And we will not proceed to Question No. 2 [mitigation]." ROA.9533. But as her counsel explained in closing, that opening statement meant she "didn't believe [the jury] would deliberate on the issue of mitigating evidence because [she] did not think [the jury] would find" future dangerousness—*not* that counsel would not address mitigation. ROA.9965.

And counsel in fact presented "mitigating evidence showing Holberg was a person who once possessed tremendous potential, a bright, energetic, popular student, who had her potential taken away by the violent murder of her aunt Karen, which traumatized her and her parents." *Holberg*, 2021 WL 3603347, at *137. For example, "[t]he defense team focused on presenting evidence, through John Schwartz and Dr. Patel, showing Holberg's violent actions toward Towery were an isolated incident in an otherwise non-violent life in which others brutalized Holberg but, until her encounter with Towery, she had not responded in kind." *Id.* And her counsel

"presented testimony from Holberg's aunt Tessa Cobb, who detailed Holberg's re-deeming characteristics, including Holberg's potential as a child." *Id.* Counsel there-after spent nearly half of the closing argument focused specifically on the issue of mitigation. ROA.9964–77. There is no credible argument that her counsel aban-doned mitigation.

*Second*, Holberg argues (at 60–61) that counsel did not "present a thorough mit-igation case" because they "waited too long"—until "during trial"—to investigate. This, too, ignores the state-court record. Trial counsel performed an extensive, thor-ough pre-trial investigation, *see, e.g.*, ROA.98008–15, 90823–24, 90826–28, 90830–32, 90836, 90838–39, 90840, and "pre-trial investigation can provide evidence for both the guilt-innocence and punishment phases; facts gathered before or during trial can be used in both phases," ROA.98004. Indeed, "in 1997, there was no dis-tinction or particular differentiation made between 'fact' and 'mitigation' investiga-tion;" the defense team "was looking for facts that could go to all parts of the trial" and "would seek and discover facts that could be used at both guilt-innocence and punishment." ROA.98006.

*Third*, Holberg faults her trial counsel (at 51–52) because "they did not contact Holberg's father and other paternal relatives who could have shed light on her ge-netic history, birth, and early childhood." But the state habeas court found as a fac-tual matter that Holberg's trial counsel *did* interview Holberg's paternal grandfa-ther, ROA.98024, 98029, which Holberg herself later concedes, Appellant.Br.51. And as for Holberg's biological father, the state habeas court found that he had been incarcerated in prison, difficult to locate, largely absent from her life, and would have

offered testimony that contradicted her self-defense theory. ROA.98024–25, 98029, 98053. Thus, the state court found that "if the trial team did not . . . make locating and interviewing" Holberg's biological father "the top priority, . . . it was a reasonable allocation of limited resources." ROA.98030.

*Fourth*, Holberg argues (at 52–53) that her trial counsel "discounted evidence of Holberg's sexual victimization," including by failing to corroborate her account of being molested when she was 12 or 13 and gang raped shortly before the murder. But the jury *did* hear testimony that Holberg was molested when she was four or five, ROA.8888–89, "molested" at "different times" during her "formative years," ROA.9552, and "gang raped," ROA.9546. To the extent Holberg argues that her counsel should have presented more such evidence at the punishment phase, it was reasonable for counsel to take a more "subtle approach," *King v. Davis*, 883 F.3d 577, 588 (5th Cir. 2018)—harkening back to Holberg's testimony about her troubled upbringing, *supra* at 15–17, but also focusing on Holberg's promising childhood potential. After all, counsel knew that the "same jury" had already heard, and were unmoved by, such evidence at the guilt-innocence stage, *see Nelson v. Lumpkin*, 72 F.4th 649, 662 (5th Cir. 2023), and that, in their professional judgment, a Randall County jury was more likely to reject the death penalty if they could show "Holberg's crime [was] an aberration for a girl who was basically and intrinsically good," ROA.98016.

*Fifth*, Holberg argues (at 53–54) that her counsel "failed to collect and present evidence of [her stepfather's] sexually predatory behavior toward Holberg." But the state habeas court found no evidence to support that claim, which, before trial,

Holberg had "expressly denied" to her counsel and psychiatrist. ROA.98007, 98052, 90827, 98027; *see generally* ROA.90851–53. The state habeas court found that Holberg, even 16 years after trial, had never submitted sworn testimony accusing her stepfather of sexual abuse. ROA.98027. And as far as the Director is aware, she still has not done so. The state habeas court credited trial counsel's conclusion that pressing "unsubstantiated" evidence of other sexual assaults "would have been dangerous" and likely would have resulted in the jury deliberating for "'maybe 11 minutes instead of 11 hours.'" ROA.98040. Thus, the court found it was reasonable for the trial team not to make that claim to the jury. ROA.98053.

*Sixth*, Holberg repeatedly argues (at 51–52, 54–55) that her counsel's investigation was ineffective because it failed to uncover Holberg's "cognitive impairments" that later testing supposedly revealed. But the state court found that Holberg's medical records "did not indicate any mental health issues of potential genetic origin" and instead "seemed to confirm the overwhelming role of drug addiction." ROA.98030. Further, "Holberg did not present to the attorneys as having any mental health issues," but instead "appeared intelligent, able to understand questions and appropriately respond, participated at trial and was oriented to time, person and place." ROA.98041.

Nevertheless, her counsel "thought her records indicated possible brain damage or mental illness" from drug abuse and addiction, so they "sought funding for a mental health expert." ROA.98041; *see* ROA.98030. That expert, Dr. Patel, "conducted two clinical interviews of Holberg and at the end, did not find that Holberg suffered from any mental illness or brain damage" and "did not advise trial counsel to

conduct additional testing or neuroimaging." ROA.98032; *see* ROA.90844–45. The state habeas court found it a "reasonable strategic decision," ROA.90846, for trial counsel to rely on Dr. Patel's "professional expertise," ROA.90833. Dr. Patel did report, however, "that Holberg suffered from Post-Traumatic Stress Disorder (PTSD) and Battered Women's Syndrome (BWS) and that those conditions could have played a role in Towery's death." ROA.90833; *see* ROA.90844–45. "Trial counsel therefore presented th[at] evidence to the jury at punishment." ROA.90833.

*Seventh*, Holberg argues (at 63–65) that her counsel insufficiently prepared Dr. Patel for trial by "not providing" him "with critical information," including medical and psychiatric records, that would have allowed him to "give[] markedly stronger testimony." But the state court found this "allegation unpersuasive," given that "Holberg executed releases" of her records, Dr. Patel stated that he relied on those records, and he spent "seven hours" reviewing them, "which is inconsistent with the suggestion . . . that only a few medical records were provided to" him. ROA.90844. Further, the state court credited trial counsel's testimony that they collected, reviewed, and provided Holberg's medical records to Dr. Patel, ROA.90831–32, 90840–42, including a "file box [that] was full and . . . very heavy," ROA.98043. Furthermore, the jury heard—from Dr. Patel—much of the evidence Holberg now argues he could have testified about more persuasively had he been better prepared. Thus, the jury heard from Dr. Patel that Holberg had a "very dysfunctional family," was "disinhibited," had impaired memory, had a history of abuse that made her "numb," and had PTSD and BWS. ROA.9668, 9680–81, 9685.

*Eighth*, Holberg characterizes all of the foregoing (at 56–63) as improper "post hoc rationalizations" for a failure to adequately investigate. Holberg claims that this is evident from the fact that, while evidence of Holberg's troubled childhood, replete with sexual and drug abuse, was presented at the guilt-innocence stage, trial counsel did not "corroborate" or "bolster" it during the punishment phase.

But Holberg overlooks that the "same jury" that convicted her during the guilt-innocence phase had been unmoved by Holberg's account of childhood trauma. *Nelson*, 72 F.4th at 662. So while trial counsel wanted to ensure "the punishment case should not be inconsistent with the evidence presented at the guilt-innocence stage," ROA.98037—and therefore built on Holberg's guilt-stage testimony regarding her troubled childhood with the testimony of her stepfather and aunt—trial counsel's primary goal was not to focus on the depravity of Holberg's childhood (which the jury had already heard). Instead, it was to show "Holberg's violent actions toward Towery were an isolated incident in an otherwise non-violent life in which others brutalized Holberg but, until her encounter with Towery, she had not responded in kind." *Holberg*, 2021 WL 3603347, at *137. This "subtle approach," *King*, 883 F.3d at 588, to addressing Holberg's difficult childhood was in no sense a "*post hoc* rationalization[]," Appellant.Br.56. And as the state court found, it was a reasonable strategic choice. *See* ROA.98030, 98034, 98038, 98068

**3.** Holberg does not try to show how any of the detailed findings of fact described above constitute "unreasonable determination[s]" of the facts, 28 U.S.C. § 2254(d)(2)—let alone supply "clear and convincing evidence" that they should not be presumed correct, *id.* § 2254(e)(1). She instead sprinkles her brief (at 48, 51,

54, 58, 66) with an argument that the state habeas court "unreasonably applied *Strickland*, *Williams*, *Wiggins*, *Rompilla*, and *Porter*." But each case, is "materially []distinguishable," *Langley*, 926 F.3d at 155, so Holberg cannot overcome AEDPA's relitigation bar, 28 U.S.C. § 2254(d)(1).

In *Porter v. McCollum*, for example, trial counsel was deficient because "[h]e did not obtain any of Porter's school, medical, or military service records," and therefore "did not even take the first step of interviewing witnesses or requesting records." 558 U.S. 30, 39–40 (2009) (per curiam). That investigatory failure meant that the jury and judge "heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability" at sentencing. *Id.* at 41. But here, trial counsel undertook extensive investigatory efforts and formulated their whole mitigation strategy around an attempt to humanize Holberg. *See supra* at 48–50.

In *Rompilla v. Beard*, defense counsel failed entirely to examine the defendant's "prior conviction file," which contained evidence depicting the defendant's "childhood and mental health very differently from anything defense counsel had seen or heard." 545 U.S. 374, 383, 390 (2005). Because defense counsel knew that the prosecution (1) possessed the file and (2) would rely on it at trial, it was objectively unreasonable for defense counsel not to review it. *Id.* at 387. Here, Holberg does not argue that trial counsel failed to examine a file that they knew the State possessed and would rely on. In fact, "Holberg's state habeas counsel were unable to identify any potentially mitigating aspects of Holberg's background with which Holberg's defense team were unfamiliar." *Holberg*, 2021 WL 3603347, at *141. Further, in *Rompilla* the file contained mitigating evidence that "would have destroyed the

benign conception" of the defendant's "upbringing and mental capacity." 545 U.S. at 391. Here, the jury heard plenty of evidence—including most of the evidence Holberg claims it did not hear—that Holberg experienced abuse and neglect as a child. *Supra* at 15–17.

In *Wiggins*, counsel rendered deficient performance because they "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. Further, the record demonstrated that counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment." *Id.* at 526. Yet here, counsel undertook an extensive investigation and acquired detailed knowledge about Holberg's background and upbringing before deciding upon a strategy. *See supra* at 48–49.

Lastly, in *Williams*, defense counsel was deficient because "[t]hey failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records." 529 U.S. at 395. Again, trial counsel's substantial investigation here looks nothing like the woefully inadequate one in *Williams*. *See supra* at 48–50.

## B. The state court did not unreasonably apply *Strickland* in determining that trial counsel's mitigation strategy was not prejudicial.

The state habeas court did not unreasonably apply *Strickland*'s prejudice prong either. "With respect to prejudice, a challenger must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

Here, the state habeas court found that "even taken at face value," Holberg's post-conviction mitigation evidence was "not so remarkable that it would have offset the brutality and depravity of her crime." ROA.997. It also found that most of that evidence "*was* actually presented" to the jury. ROA.997. Those findings were correct, and Holberg offers no clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1).

Holberg argues that the jurors who sentenced her "did not know her true story," Appellant.Br.45, because trial counsel "never learned of Holberg's horrifying childhood," Appellant.Br.25. But again, the jury heard that Holberg was molested by a babysitter when she was four or five, ROA.8888–89, and "molested" at "different times" during her "formative years," ROA.9552. It heard that she was "beaten" five or six times, injured with a knife, and "gang raped." ROA.9546. It heard that her parents used drugs heavily and ignored her, ROA.8892, that her parents provided her with marijuana and alcohol beginning when she was ten, ROA.8893–94, that she was assaulted by adult men on multiple occasions, ROA.8894, 8906–09, and that she was beaten "three or four times—one time severely . . . with a tire iron by a black man that was a pimp," ROA.8987. It heard that these experiences had a significant mental impact on Holberg. ROA.9547. And it heard that she had PTSD, BWS, and chemical dependency and was "disinhibit[ed]" as a result. ROA.9668, 9673–74, 9685.

To the extent Holberg is now arguing that that she was prejudiced by the State's arguments that she had a good childhood, her own statements were the cause. Her pre-trial statements indicated that "she had a good childhood" and had "everything that she ever wanted." ROA.9456. She said neither parent ever abused her and that she was never abused by "a biological, step or adoptive parent." ROA.9458. She was a "very good" child before she was a teenager, and her childhood was "happy." ROA.9458. She "did as [she] pleased" as a teenager and felt responsible for the problems experienced by her stepfather, who she could "melt." ROA.9459, 9469, 9471. She said that her ex-husband was a "good friend" and did not indicate that he was abusive. ROA.9460. She indicated that she "dominated" her relationships with men, ROA.9462–63, and that she felt responsible for her parents' problems because "she used them against each other to get what she wanted," ROA.9473.

The jury heard that Holberg told her lifelong friend, Kristi Samperi, that she had a "good background[]," a loving family, and a "spoiled and sheltered life" before deciding to "walk on the dark side." ROA.9646, 9652. Holberg indicated surprise that other women in drug treatment were also "from good backgrounds," ROA.9646–47, and she "couldn't believe she'd done some of the things she did, especially with a family as loving as she had," ROA.9648. Given this evidence, had trial counsel focused more heavily on Holberg's childhood as an excuse for her conduct, it likely would have backfired.

The only evidence Holberg points to that the jury did not hear is that she was "addicted at birth to drugs," Appellant.Br.45, that her stepfather "sexualized" her, Appellant.Br.18, that her family had a "history of psychiatric illness,"

Appellant.Br.52, that her experiences caused "cognitive impairments," Appellant.Br.25, and that Holberg overdosed on cocaine and manifested psychotic symptoms and delirium, Appellant.Br.60. As discussed above, those claims are either unsubstantiated, inconsistent with the evidence, or based on evidence that Holberg's trial counsel reasonably determined would have done more harm than good with the jury. ROA.98068.

Finally, Holberg argues that the "sentencing verdict was close" because the "jury deliberated 11 hours." Appellant.Br.73 (emphasis omitted). But the verdict was not close—it was unanimous, even on mitigation, which required less than unanimity. ROA.21451, 21457. Holberg cites nothing for the proposition that a verdict is "close" because the jury's deliberation takes several hours, particularly after a long and complicated trial, the transcript alone of which is nearly 2,500 pages. In fact, a lengthy deliberation "indicates care, not that the case ultimately was a close one." *United States v. Martinez*, 159 F.3d 1357 (5th Cir. 1998) (per curiam). And as Holberg's trial counsel explained in an affidavit found credible by the state habeas court, if they had taken Holberg's approach to mitigation, the jury would have deliberated for "11 minutes instead of 11 hours." ROA.98040.

## Conclusion

The Court should affirm the district court's denial of habeas relief.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

William R. Peterson
Solicitor General

Brent Webster
First Assistant Attorney General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Cameron Fraser
Assistant Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Mohmed I. Patel
Assistant Attorney General

Counsel for Appellee

61

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 15,917 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William F. Cole
WILLIAM F. COLE