

## KEN PAXTON
### ATTORNEY GENERAL OF TEXAS

WILLIAM F. COLE
Principal Deputy Solicitor General

(512) 936-2725
William.Cole@oag.texas.gov

January 29, 2026

**Via CM/ECF**

Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit
600 Maestri Place
New Orleans, LA 70130

    **Re:   No. 21-70010, *Holberg v. Guerrero***

Dear Mr. Cayce:

    I write regarding the Supreme Court's recent decision in *Klein v. Martin*, No. 25-51 (U.S. Jan. 26, 2026) (per curiam), in which an eight-Justice majority summarily reversed the Fourth Circuit for misapplying AEDPA's relitigation bar in the context of the materiality element of a *Brady* claim as applied to undisclosed impeachment evidence of a prosecution witness.

    The Court reiterated that the relitigation bar's unreasonable-application prong requires a habeas petitioner to "'show far more' than 'clear error'"; a petitioner must "instead establish that the state court 'blunder[ed] so badly that every fairminded jurist would disagree' with the decision." Slip op. at 7-8 (citations omitted).

    The Fourth Circuit "contravened these well-settled principles" when it held that the state habeas court unreasonably applied *Kyles v. Whitley*, 514 U.S. 434 (1995), by finding immaterial under *Brady* undisclosed impeachment evidence of a prosecution witness who implicated the defendant in attempted murder. Slip op. at 8. The Court explained that "even if undisclosed evidence 'entirely discredit[s]' a prosecution witness, the failure to turn over the evidence is not material if 'considerable' other evidence 'link[s]' the defendant to the crime and the record provides 'strong support' that the defendant would have been convicted anyway." Slip op. at 9 (quoting *Strickler v. Greene*, 527 U.S. 263, 292-94 (1999)). Because a fairminded

jurist could have found such evidence was present, the Fourth Circuit "went astray" in finding an unreasonable application of *Kyles*. Slip op. at 10.

Application of these principles similarly forecloses relitigation of Holberg's *Brady* claim. As the Director explained in his supplemental brief (at 36-37), the state habeas court did not unreasonably apply *Banks* because fairminded jurists could debate whether a witness's status as a paid informant in different, *unrelated* cases was material. *Cf. Dennes v. Davis*, 797 F. App'x 835, 842 (5th Cir. 2020). Moreover, the record strongly supports the conclusion that Holberg would have been convicted and sentenced to death even if Kirkpatrick's testimony was impeached by evidence that she was paid by the police to buy drugs so they could obtain search warrants in other cases. *See* Appellee's Supp. En Banc Br. 39-44.

Respectfully submitted.

/s/William F. Cole

William F. Cole
Principal Deputy Solicitor General

cc: all counsel of record (via CM/ECF)

# SUPREME COURT OF THE UNITED STATES

## CHRISTOPHER KLEIN, SUPERINTENDENT, DEPARTMENT OF DETENTION FACILITIES FOR ANNE ARUNDEL COUNTY, ET AL. *v.* CHARLES BRANDON MARTIN

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 25–51.    Decided January 26, 2026

PER CURIAM.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), strict standards govern the grant of federal habeas relief to prisoners convicted in state court. Faithful application of those standards sometimes puts federal district courts and courts of appeals in the disagreeable position of having to deny relief in cases they would have analyzed differently if they had been in the shoes of the relevant state court. But federal courts are dutybound to comply with AEDPA, and we have granted summary relief when the lower courts have departed from the role AEDPA assigns. See, *e.g.*, *Clark* v. *Sweeney*, 607 U. S. ___ (2025) (*per curiam*); *Dunn* v. *Reeves*, 594 U. S. 731 (2021) (*per curiam*); *Mays* v. *Hines*, 592 U. S. 385 (2021) (*per curiam*); *Virginia* v. *LeBlanc*, 582 U. S. 91 (2017) (*per curiam*); *White* v. *Wheeler*, 577 U. S. 73 (2015) (*per curiam*).

This is such a case. Respondent Charles Brandon Martin was convicted in a Maryland court for the attempted murder of one of his girlfriends, Jodi Torok. The evidence against him was strong, his conviction was affirmed on appeal, and an appellate court held in a state postconviction proceeding that the State's failure to disclose certain impeachment evidence that was favorable under *Brady* v. *Maryland*, 373 U. S. 83 (1963), did not warrant a new trial because there was no "reasonable probability that the result of [the] trial would have been different" had the

evidence been turned over. App. to Pet. for Cert. 115a (App.); see *Kyles* v. *Whitley*, 514 U. S. 419, 434 (1995) (the "touchstone of materiality is a 'reasonable probability' of a different result"). Because that decision neither was "contrary to" nor "involved an unreasonable application" of "clearly established Federal law," AEDPA required the denial of Martin's federal habeas petition. 28 U. S. C. §2254(d)(1). Yet the Court of Appeals for the Fourth Circuit affirmed the award of a new trial based on reasoning that departed from what AEDPA prescribes. We therefore grant the State's petition for a writ of certiorari and reverse.

## I

## A

Torok, the victim of the attempted murder, had been dating Martin for about a year when she told him she was pregnant with a baby she thought was his. Angered by this news, Martin demanded that Torok have an abortion. She refused and informed him that she intended to go to court to compel him to provide child support. She also threatened to tell his "wife or baby mama" about the child. App. 254a.

A few weeks later, Martin sent Torok a text message asking: "'What time do u work[?]'" *Martin* v. *State*, 218 Md. App. 1, 14, 96 A. 3d 765, 773 (2014) (alteration in original). Torok replied, "'I'm off [today],'" thus verifying that she would likely be home. *Ibid.* Later that day, just before 3 p.m., Torok was alone in her apartment in Crofton, Maryland, speaking on the phone with a close friend, Blair Wolfe, who lived in Pittsburgh. During their call, a man purporting to be a salesman knocked on Torok's front door. Torok hung up to speak to the man but promised to call Wolfe back. When she did not, Wolfe called her several times, but no one answered. Growing increasingly concerned, Wolfe called Torok's housemate, Jessica Higgs, and asked her to return home to see if Torok was safe. Higgs found Torok unconscious on the floor, bleeding from a gunshot wound to

her head.  Torok survived, but her unborn baby did not, and
Torok suffered serious permanent injuries.

When the police examined the scene of the shooting, they
found no sign of forced entry and recovered several items of
evidentiary value from the floor near where Torok lay: a
shell casing and bullet from a .380-caliber cartridge and a
peculiarly modified Gatorade bottle.  (Photos of this bottle
appear in the appendix to this opinion.)  The upper part of
the bottle was covered with two layers of tape, white medi-
cal tape underneath and silver duct tape on top.  There was
a rectangular hole in the tape over the mouth of the bottle
and a jagged hole at the bottom of the bottle.

Circumstantial evidence strongly suggested that this ob-
ject was likely brought to the apartment and left there by
Torok's assailant.  Higgs testified that the bottle was not on
the floor when she left for work that morning.  Both Torok
and Higgs testified that they did not drink Gatorade or keep
it at home, and both said that they would not have left a
bottle on the floor.

The three items found at the crime scene played a part in
the State's case.  Federal firearms records showed that
Martin owned a .380-caliber semiautomatic handgun that
could have fired the bullet and ejected the casing.  One of
Martin's girlfriends testified that she had seen him with a
"small" "semiautomatic" gun in the weeks before the shoot-
ing.  App. 379a.  Michael Bradley, the brother of still an-
other of Martin's girlfriends, Maggie McFadden, added that
on several occasions he had seen Martin with a "small"
"semi-automatic gun."  *Id.*, at 331a–333a, 371a.

As for the bottle, the State offered evidence suggesting
that it was a homemade silencer.  A police sergeant said
that the tape on the mouth of the bottle bore a "rectangular
impression" that likely resulted from something being
"stuck in there."  *Id.*, at 292a.  The bottle was available for
examination by the jury, and the State argued that the
opening in the tape was shaped like the muzzle of a

semiautomatic handgun. The State also noted that the edges of the hole at the bottom of the bottle were bent outward, suggesting that the hole had been created by a force emanating from inside the bottle. The police sergeant testified that the bottle resembled homemade silencing devices he had seen in a film and in online videos. A detective testified that he found "black soot" inside the bottle, *id.*, at 310a–311a, but that he did not smell burnt or burning marijuana in the bottle, *id.*, at 314a–315a, and another witness testified that he found no "signs or evidence of controlled dangerous substances" in the bottle, *id.*, at 309. Based on this evidence and the fact that none of Torok's neighbors had heard a gunshot at the apartment on the afternoon of the shooting, the State argued that the bottle had been used as a silencer.

Testing of the bottle revealed DNA evidence that strongly implicated Martin. A hair was found on the tape on the bottle, and one of the State's expert witnesses, a forensic scientist, determined that although the hair could not have come from 99.94 percent of the population of North America, she could not rule out Martin as the source of hair.

Besides the DNA taken from the hair, trace DNA from at least three persons, including at least one male, was found on the mouth of the bottle. A forensic chemist testified that she could rule out 96 percent of the black population as potential sources of this DNA but could not rule out Martin (who is black).*

This DNA evidence linking Martin to the bottle was bolstered by the testimony of Michael Bradley. Bradley testified that on the afternoon of the shooting, he, his brother Frank, Martin, and an acquaintance named Jerry Burks smoked marijuana at McFadden's home. At one point, according to Michael, Frank went upstairs and came back with white "medical tape." *Id.*, at 337a. Martin and Frank

---

*Nor could she rule out Torok.

then went upstairs together. Frank came downstairs, grabbed a Gatorade bottle, and headed back up the stairs with it.

Based on this testimony, the State suggested that Martin helped to make the bottle into the silencing device that the shooter used. This theory was supported by the discovery in the McFadden home of the same kind of white medical tape that was affixed to the bottle.

Michael Bradley further testified that Martin acted suspiciously at the time of and shortly after the shooting. According to his testimony, Martin and Burks left the house together before 2 p.m. and were still out when he returned from picking up his niece at around 3 p.m. Martin and Burks eventually reappeared together some time before 6:30 p.m. Martin then handed Frank Bradley a "brown paper bag" and told him to "get rid of this." *Id.*, at 353a. The State suggested that this bag contained the hit weapon, which was never found. Neither did police ever find the .380-caliber pistol that, according to federal firearms records and witness testimony, Martin owned.

In addition to all this evidence, Sheri Carter, another of Martin's girlfriends, testified for the State. Carter said that Martin had kept at her home a laptop that he said he had obtained from a former employer. She testified that she had seen Martin "looking up gun silencers" on this laptop not long before the shooting. *Id.*, at 377a. Martin, she asserted, took the laptop from her apartment after the shooting and "got rid of it" "in case [the] apartment got searched," because he "didn't want it found there." *Id.*, at 378a–379a.

The trial judge instructed the jury that Martin could be found guilty if he had "'aided'" or "'encouraged'" the attempted murder and assault with the intent that the crime succeed. *Id.*, at 79a. The jury found him guilty as an accessory before the fact. The court sentenced him to life in prison, and his conviction and sentence were affirmed on direct appeal. *Martin*, 218 Md. App. 1, 96 A. 3d 765.

### B

Martin then sought postconviction relief in state court. He argued that the State had violated his right to due process by failing to disclose a forensic report that had analyzed five computers found at his home. One of these machines, a laptop, had been issued to Martin by a former employer. The report found no evidence that this laptop had been used since 2005, and it noted that a keyword search for words such as "'Handgun,'" "'Gatorade,'" "'silencer,'" and "'Homemade silencer'" had yielded no hits. App. 103a–104a.

Martin argued that this computer was the one to which Carter had referred in her testimony and that the report tended to discredit her claim that he had used the laptop at her home to research silencers. The postconviction court agreed and ordered a new trial, but a unanimous panel of the Maryland Court of Special Appeals reversed on the ground that the report was not material. Based on its review of the whole record, the court concluded that even if the report had "totally discredit[ed]" Carter, the other evidence linking Martin to the crime was so "strong" that there was no "reasonable probability that the result of his trial would have been different." *Id.*, at 112a, 115a. The State's high court denied review, *Martin* v. *State*, 466 Md. 554, 222 A. 3d 1075 (2020) (table), as did this Court, see *Martin* v. *Maryland*, 590 U. S. 973 (2020).

### C

Martin sought habeas relief in federal court, and the District Court granted his petition based on the State's failure to disclose the forensic report. A sharply divided panel of the Fourth Circuit affirmed. The majority acknowledged that the state appellate court had correctly stated the rule on materiality set out in our decisions and had claimed to apply that rule. Yet the majority concluded that the state court had not actually done what it said it did—had not held

that there was no "reasonable probability" that the disclosure of the forensic report would have changed the verdict—but instead had applied the sufficiency-of-the-evidence rule that we condemned in *Kyles.* App. 21a–22a; see 514 U. S., at 434–435 (a *Brady* claimant need not show that, "after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict"). According to the majority, the state court "never engaged" with some evidence, "disregarded or misconstrued" other evidence, and failed to assess in a "nuanced" way the evidence it did discuss. App. 24a–26a. The majority then ruled that no fairminded jurist could agree with the state court's decision. *Id.*, at 27a.

Judge Niemeyer dissented, contending that the majority had defied AEDPA's standard of review.

## II

### A

As we have noted many times, AEDPA sharply limits federal review of habeas claims raised by state prisoners. A federal court may grant habeas relief on a claim that a state court resolved on the merits only when the state court's "decision" was "contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U. S. C. §2254(d). These standards require federal courts to give the "benefit of the doubt" to merits decisions issued by the courts of the sovereign States. *Woodford* v. *Visciotti*, 537 U. S. 19, 24 (2002) (*per curiam*). AEDPA review provides an important but limited safeguard: It protects against "'extreme malfunctions'" in the state courts' adjudication of constitutional claims. *Harrington* v. *Richter*, 562 U. S. 86, 102 (2011). So in order to obtain federal habeas relief, a state prisoner must "show far more" than "'clear error.'" *Shinn* v. *Kayer*, 592 U. S. 111, 118 (2020) (*per curiam*) (quoting *LeBlanc*,

582 U. S., at 94). The habeas claimant must instead estab-
lish that the state court "blunder[ed] so badly that every
fairminded jurist would disagree" with the decision. *Mays*,
592 U. S., at 392. Only then is a decision "so lacking in jus-
tification" that its error precludes even the "possibility for
fairminded" dispute. *Richter*, 562 U. S., at 103.

"If this rule means anything," we have said, it means that
a federal court must "carefully consider all the reasons and
evidence supporting the state court's decision." *Mays*, 592
U. S., at 391. That requirement is pivotal because federal
courts have "no authority to impose mandatory opinion-
writing standards on state courts." *Johnson* v. *Williams*,
568 U. S. 289, 300 (2013). And a state court "need not make
detailed findings addressing all the evidence before it." *Mil-
ler-El* v. *Cockrell*, 537 U. S. 322, 347 (2003). Indeed,
AEDPA requires deference even if the state court does not
discuss the evidence at all. *Richter*, 562 U. S., at 99. What
matters under §2254(d)(1)—the standard relevant here—is
whether a decision is contrary to, or involves an unreason-
able application of, this Court's holdings, not whether the
state court's opinion satisfies the federal court's opinion-
writing standards.

## B

The panel majority contravened these well-settled princi-
ples in two ways. First, it grounded its holding that the
state appellate court applied the wrong legal rule on its con-
clusion that the state court had not actually applied the ma-
teriality test that it clearly invoked. Second, it erred in
holding that no fairminded jurist could find the forensic re-
port on the computer to be immaterial.

### 1

The panel majority first erred in holding that the state
appellate court failed to apply the right rule for *Brady* ma-
teriality. Undisclosed evidence is material if it could

reasonably have "'put the whole case in such a different light as to undermine confidence in the verdict.'" *Strickler* v. *Greene*, 527 U. S. 263, 290 (1999). But when the evidence could not have reasonably had such an effect, it is not material, and its erroneous nondisclosure does not justify relief. Under this rule, even if undisclosed evidence "entirely discredit[s]" a prosecution witness, the failure to turn over the evidence is not material if "considerable" other evidence "link[s]" the defendant to the crime and the record provides "strong support" that the defendant would have been convicted anyway. *Id.*, at 292–294.

The state appellate court applied these rules instead of a sufficiency-of-the-evidence test. The state court accurately summarized our *Brady* precedents, correctly stated the governing rule on materiality, and stated unequivocally that its decision was based on that rule. It recounted salient trial evidence, acknowledged where the State's theory of the case was "attenuated," and said that the disclosure of the forensic report would likely have eliminated any adverse inference based on the concealment of evidence. App. 114a–115a, and n. 14. It also assumed that the jury would have "totally discredit[ed]" Carter's testimony had the State disclosed the report. *Id.*, at 112a. Yet based on its review of the "'entire record,'" the court found that the evidence "linking" Martin to the crime was so "strong" that there was no "reasonable probability that the result of his trial would have been different." *Id.*, at 109a–110a, 112a, 115a. That standard was legally correct. And except when it was quoting our precedent, the state court did not use words like "sufficient," "insufficient," "adequate," or "inadequate" in analyzing the *Brady* claim.

The panel majority nonetheless held that the state appellate court applied the wrong rule because that court failed to discuss certain evidence that tended to undermine the State's case and because its analysis was not sufficiently "nuanced." App. 24a–26a. That holding was a basic

misapplication of AEDPA, which bars federal courts from imposing opinion-writing standards on state courts and demands that the relevant state-court decision be given the "benefit of the doubt." *Woodford*, 537 U. S., at 24. The majority's "readiness to attribute error" to the state appellate court despite that court's correct citation and synthesis of our precedent was both "inconsistent with the presumption that state courts know and follow the law" and "incompatible with §2254(d)'s 'highly deferential standard for evaluating state-court rulings.'" *Ibid.* (quoting *Lindh* v. *Murphy*, 521 U. S. 320, 333, n. 7 (1997)).

### 2

### a

The panel majority also went astray in holding that every fairminded jurist would find that the undisclosed forensic report about Martin's laptop was material. On the contrary, the record contains "strong support" for the state court's conclusion that Martin "would have been convicted" even if the forensic report "severely impeached" Carter. *Strickler*, 527 U. S., at 294.

DNA evidence tied Martin tightly to the modified Gatorade bottled that resembled a homemade silencer and that had apparently been used in the shooting. Evidence also suggested that Martin was present when the bottle was modified. Michael Bradley testified that shortly before the shooting Martin was in the room to which Frank Bradley brought both a Gatorade bottle and tape that matched the white medical tape on the mouth of the bottle found at the crime scene.

Martin had a strong motive for aiding the attempted murder of Torok: She had refused to get an abortion, had expressed her intent to take him to court to obtain child support, and had threatened to tell his wife about the baby. On the day of the shooting, Martin had texted Torok in

what a reasonable jury could think was an effort to find a time when she would be home.

Martin owned the kind of gun that seemed to have been used to shoot Torok, and multiple witnesses testified that they had seen him with such a weapon. Michael Bradley also testified that Martin left McFadden's house not long before the hit and that, upon returning, Martin told Frank Bradley to get rid of a brown paper bag that Martin had been holding. Because the police never found Martin's handgun or the weapon used in the shooting, a reasonable jury might well have concluded that Martin allowed his gun to be used and then ensured its disposal.

In light of all this evidence, a fairminded jurist could easily conclude that the disclosure of the forensic report on the computer would not have "undercut" the relevance or force of these "item[s] of the State's case," *Kyles*, 514 U. S., at 451, or "'put the whole case in such a different light as to undermine confidence in the verdict,'" *Strickler*, 527 U. S., at 290.

### b

The panel majority's reasons for concluding otherwise were not consistent with the deference that AEDPA requires. First, the majority argued that the disclosure of the report would have bolstered the defense's primary theory of the case: that the bottle was a device used to smoke marijuana, not a silencer. But a fairminded jurist could find that theory farfetched. Among other things, the mouth of the bottle was covered in tape that looked like it had nestled the muzzle of a semiautomatic firearm. The bottle did not smell like burnt marijuana and bore no trace of controlled substances. The outward-punched puncture at the bottom of the bottle also looked like a bullet hole, and the defense never explained why anyone wanting to construct a bong would have poked a hole in the bottom of the bottle.

The panel majority ventured that Carter's testimony was the "only evidence connecting Martin to his potential

construction of the Gatorade bottle for use as a silencer."
App. 21a. A fairminded jurist could easily disagree based
on both the bottle itself and Michael Bradley's eyewitness
testimony about what had occurred upstairs in the McFad-
den house shortly before the shooting.

The panel majority discounted the strength of the evi-
dence against Martin because it thought that strong evi-
dence linked McFadden to the commission of the crime. Yet
that theory was inconsistent with the undisputed testimony
that Torok ended her phone call with Wolfe to speak with a
man who was at the door. Nor did any evidence tie McFad-
den to the Gatorade bottle or the disposal of the firearm.
And even if McFadden were somehow involved in the crime,
Martin could have been an accessory anyway. After all, a
fairminded jurist could decide that no evidence suggests
that McFadden knew about Torok, or had any reason to
want her killed, except through and because of Martin. See
*id.*, at 439a.

Last, the panel majority voiced serious doubt about Mi-
chael Bradley's credibility, and the defense certainly had
material to use in its effort to convince the jury that he
should not be believed. But his testimony about Martin's
role in the creation of the makeshift silencer was supported
by the DNA evidence, and the jury was able to assess his
credibility firsthand.

Based on all the evidence, a fairminded jurist could easily
conclude that disclosure of the forensic report on the laptop
would not have made a difference.

*       *       *

We grant the State's petition for a writ of certiorari, re-
verse the judgment of the Fourth Circuit, and remand the
case for further proceedings consistent with this opinion.

*It is so ordered.*

Per Curiam

JUSTICE JACKSON would deny the petition for a writ of certiorari.

Appendix to Per Curiam Opinion

## APPENDIX



App. 442a

Appendix to Per Curiam Opinion



App. 445a

Appendix to Per Curiam Opinion



App. 444a