# United States Court of Appeals for the Fifth Circuit

---

No. 21-70010

---

United States Court of Appeals
Fifth Circuit

**FILED**

March 7, 2025

Lyle W. Cayce
Clerk

Brittany Marlowe Holberg,

*Petitioner—Appellant,*

*versus*

Eric Guerrero, *Director, Texas Department of Criminal Justice, Correctional Institutions Division,*

*Respondent—Appellee.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 2:15-CV-285

---

Before Higginbotham, Higginson, and Duncan, *Circuit Judges.*

Patrick E. Higginbotham, *Circuit Judge*:

Brittany Marlowe Holberg was 23 years old when she was sentenced to death for capital murder by a jury in Amarillo, Texas. Holberg has spent the last 27 years of her life on death row, contending that the State of Texas violated her right to due process when it chose to disobey the commands of *Brady v. Maryland*, 373 U.S. 83 (1963), and failed to disclose impeachment evidence that its critical trial witness was a paid informant. Under *Brady* and its progeny, we REVERSE and VACATE Holberg's conviction, and

No. 21-70010

REMAND the case to the district court for further proceedings consistent with this opinion.

We pause only to acknowledge that 27 years on death row is a reality dimming the light that ought to attend proceedings where a life is at stake, a stark reminder that the jurisprudence of capital punishment remains a work in progress. The death penalty itself has traversed a torturous path in this country, dragging Ms. Holberg along with it. From the return of capital punishment in the Seventies—paired with a veritable flood of habeas petitions—came attendant efforts to temper the flow.[1] In the service of federalism and management, Congress enlisted the aid of the lower federal courts by routing review of state decisions to the district courts through the gates of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Yet capital punishment cannot survive without adherence to the fundamental constitutional girds securing the right to trial by jury. Ms. Holberg's 27 years on death row is a showcase of the State's failure to abide by a core structure of prosecution: the *Brady* doctrine.

## I.

## A.

This is the story of Brittany Marlowe Holberg, a bright young woman who—after a childhood and adolescence marked by repeated sexual abuse and trauma—fell into the iron grip of crack cocaine and turned to prostitution to support her addiction.[2]

---

[1] This included a brief flirtation with prospective-only rulings that would confine prisoners to the law in place when their cases are final. *See generally Teague v. Lane*, 489 U.S. 288 (1989).

[2] The district court below issued an appendix to its decision outlining the severe and pervasive sexual trauma and substance abuse of Holberg's young life and urging Texas to consider clemency. *See* Appendix, *Holberg v. Davis*, No. 2:15-CV-285-Z, 2021 WL

No. 21-70010

On November 13, 1996, after ten consecutive days of a high on crack cocaine, Holberg had a minor traffic accident and sought refuge in the apartment of a former customer, A.B. Towery, Sr. A heated argument followed that quickly turned violent, leaving Towery dead with stab wounds and part of a lamp in his throat, and with Holberg leaving the apartment cut and bruised, bleeding from the head where Towery struck her and tore out clumps of her hair. A crime scene investigation was performed on November 14 and an autopsy report completed on November 15.

Holberg was arrested in Memphis, Tennessee in February 1997 and was extradited to Amarillo, Texas, where she was held in the Randall County Jail. There, the local District Attorney's Office unsuccessfully approached multiple inmates, including Holberg's cellmates, to question them about Holberg and offered them deals in exchange for their testimony against her.[3] The prosecution also attempted to feed them false narratives. One of Holberg's cellmates, Lynette Tucker, stated that she "never heard [Holberg] boast about the death of A.B. Towery[,]" but that the prosecution told her

---

3603347, at *151-52 (N.D. Tex. Aug. 13, 2021). As the district court noted, "[a]lmost every man in Holberg's life prior to her arrest treated her as a sexual object[,]" and Holberg was exposed to "rampant abuse of prescription medication and illicit drugs" by her family at a young age. *Id.*

[3] Ella Gibbs, who ran weekly Bible study at Randall County Jail, stated in an affidavit that prior to trial, "several of the ladies in the Bible study were upset because they were being pulled out of their cell to be questioned about Brittany. I learned that the inmates were being asked if they were afraid of Brittany; and they were being offered 'deals' if they could help the prosecution. Many of the inmates told me that they told the prosecutor they thought highly of Brittany and could give favorable testimony for Brittany." Furthermore, Lynette Tucker, a cellmate of Holberg's while Holberg was waiting to go to trial for capital murder, stated in her affidavit: "I was approached twice by the people from the District Attorney's Office to give testimony against Brittany. . . . I know there were other girls in jail that were getting approached by the prosecution also."

that "it would be in [her] best interest" "to say [she] knew [Holberg] longer than [she] did, and that [Holberg] bragged about the killing."

About three months after Holberg's arrest, in May 1997, Vickie Marie Kirkpatrick was arrested for felony burglary. At the time, Kirkpatrick was working as a confidential informant for Corporal Eddie Stallings of the City of Amarillo police and was placed in the same cell as Holberg. Just two days later, Kirkpatrick produced her statement to the Amarillo police detailing Holberg's alleged admission. Crucial details in Kirkpatrick's affidavit corroborated findings from the autopsy report and the crime scene investigation, which had been with law enforcement for six months.[4]

That same day, Corporal Stallings secured a dismissal of a criminal trespass charge against Kirkpatrick and helped her gain release on bond. But Corporal Stallings left the felony burglary charge pending until after Kirkpatrick testified against Holberg at trial.

## B.

At trial, Holberg stated that she had an ongoing relationship with Towery in which "sexual favors [were] exchanged for money[,]"and that there were times when "he got angry" and frightened her. According to Holberg, Towery would get angry if he "had a hard time performing" or if he thought she was on drugs when with him.

Regarding the encounter, Holberg asserted that she acted in self-defense when Towery attacked her, testifying to the following sequence of events. High on crack cocaine, Holberg wrecked her car and sought refuge in Towery's apartment, meeting him by the gate as he was coming back with

---

[4] Such details included the fact that a fork and a lamp were used as weapons in the struggle, and the fact that some blood-soaked bills were found at the crime scene.

groceries. Towery invited her into his home, and began unpacking his groceries. When he later saw her crack pipe in his kitchen, he became angry, screaming: "You stupid bitch, whore. What do you want? You want money? Is that what you want to do so you can smoke the rest of the day away?"

Holberg then heard Towery approaching her from behind and the next thing she knew, he struck her on the back of her head, then shoved her to the floor. At some point during the struggle, Towery pulled money out from his wallet and threw it at her. When Towery pulled Holberg by her hair and refused to stop—even after Holberg had asked him to let her go—Holberg stabbed him to protect herself, fearing for her life. Holberg denied that she killed Towery for his money and drugs, but testified that she took the money thrown at her. The evidence is that high on crack cocaine, Holberg gained the edge and in the frenzy of the fight, repeatedly struck Towery, and in her own words: "I lost it."

To challenge Holberg's account of self-defense and to advance its robbery theory, the prosecution called Kirkpatrick to the stand. Kirkpatrick testified that Holberg admitted to killing Towery; that she stabbed him with a fork; that she had stuck the lamp down Towery's throat because she got tired of hearing him make "gurgling" or "gagging" noises; that she initiated the altercation with Towery in order to get money for a "fix"; that Holberg thought the "fountain" of blood was "pretty," "fun," and "amazing"; and that Holberg would do it all over again for more drugs, a remarkable draw upon the autopsy report as read by the prosecution.

Holberg, however, testified that she never spoke with Kirkpatrick while in jail; that Towery initiated the violent struggle; and that instead of the euphoria Kirkpatrick depicted, she was "afraid," "terrified," and could not breathe throughout her violent struggle with Towery. Melissa Wisemen, a cellmate of Holberg and Kirkpatrick's at the Randall County Jail, also

No. 21-70010

testified and supported Holberg's assertion, stating that the cellmates "were all in [the cell] at the same time" and that she did not "ever hear a conversation between Ms. Holberg and Ms. Kirkpatrick where Ms. Holberg was describing committing acts against Mr. Towery[.]"

Besides Holberg's own description of the events, Kirkpatrick provided the sole testimony of what happened inside Towery's apartment. The prosecution pointed to additional circumstantial evidence—such as the amount of money on Holberg's person after exiting Towery's apartment, prescriptions missing from Towery's apartment, and the rifled contents of Towery's wallet—to argue Holberg killed Towery while robbing him. The jury convicted her of murder and sentenced her to death.[5]

## C.

Holberg, her counsel, and hence the Amarillo jury had no knowledge that Kirkpatrick was a confidential informant for Corporal Stallings; that in the months leading up to Holberg's alleged confession, Kirkpatrick had almost daily contact with Corporal Stallings, who paid her $100 for each drug buy; that he paid her thousands of dollars to make drug buys; and that Kirkpatrick helped the Amarillo police run approximately 40 search warrants and secure multiple convictions.

Indeed, during a trial of Kirkpatrick's after Holberg was sentenced to death, Robert Love, one of the prosecutors in Holberg's case, repeatedly referred to Kirkpatrick as a "confidential informant," and Corporal Stallings admitted that Kirkpatrick "helped [the department]" on "many, many things." Before testifying against Holberg, Kirkpatrick wrote to the judge

---

[5] *See State v. Holberg*, 38 S.W.3d 137 (Tex. Crim. App. 2000) (published in part), *cert. denied*, 534 U.S. 972 (2001).

No. 21-70010

handling her burglary charge, touting her informant work as a reason why the judge should give her probation.

At the time of Holberg's trial, the State knew about Kirkpatrick's confidential informant work for the Amarillo police but presented her to the Amarillo jury as a disinterested individual who "wanted to do the right thing" and was attempting to be "as truthful . . . and complete as [she] could be[.]" The State did not disclose Kirkpatrick's work as a paid informant until after Holberg was sentenced to death. Holberg's counsel's cross-examination of Kirkpatrick spanned only six pages of the trial transcript, a reality that speaks volumes.

Then, during Holberg's post-conviction state habeas proceedings, Kirkpatrick—in a 2011 deposition—recanted her testimony at Holberg's trial, asserting that the State used her pending burglary charge as leverage to ensure her testimony at Holberg's trial. Specifically, Kirkpatrick stated that then-District Attorney James Farren coached her statements at Holberg's trial, and that Farren both "threatened to send Kirkpatrick to jail if she did not give him what he wanted but also offered her a deal if she cooperated." Kirkpatrick also stated that "Holberg seemed remorseful and sad about [Towery's] death", and that Holberg never used the descriptors "fountain," "pretty," "fun," or "amazing" when discussing the murder.

This narrative, which the jury did not hear, razes Kirkpatrick's credibility: either her testimony at trial was supplied by the State, or her recantation was a lie. Against this context, the State's intentional nondisclosure of Kirkpatrick's informant status strikes at the heart of the jury's conviction, and most assuredly its sentence of death.

## II.

Consistent with AEDPA, Holberg has challenged her conviction and

sentence on multiple grounds in the proper state and federal forums.[6] After each denied all of Holberg's claims, we granted a Certificate of Appealability for two of her claims.[7]

First, Holberg asserts that as the State suppressed evidence that its most critical witness, Kirkpatrick, worked as a paid informant for law enforcement, she is entitled to relief under *Brady v. Maryland*[8] and related cases. Second, Holberg argues that her trial counsel failed to investigate and present compelling mitigation evidence at the sentencing phase, entitling her to relief under *Strickland v. Washington*[9] and its progeny. Finding the *Brady* claim dispositive, we focus on that issue.

In affirming Holberg's conviction on direct appeal, the Texas Court of Criminal Appeals recognized that Kirkpatrick was "a key prosecution witness," adopting crucial parts of her testimony in its final order.[10] Incorporating the state trial judge's determinations, however, the Texas Court of Criminal Appeals denied Holberg's *Brady* claim, finding that "Holberg's allegations regarding Kirkpatrick have no merit." Specifically, the state court emphasized the absence of a plea agreement between the State and Holberg, the prosecutor's testimony that Kirkpatrick "did not ask for any kind of deal" for testifying against Holberg, that "the State did not refer to Kirkpatrick's testimony in its closing argument at the punishment

---

[6] *See* 28 U.S.C. § 2254(b).

[7] *Holberg v. Lumpkin*, No. 21-70010, 2023 WL 2474213 (5th Cir. Mar. 13, 2023) (per curiam).

[8] 373 U.S. 83 (1963).

[9] 466 U.S. 668, 691 (1984).

[10] *Holberg*, 38 S.W.3d at 139.

No. 21-70010

phase[,]"and Kirkpatrick's testimony that she "did not testify at Holberg's trial thinking that it would help her get a better deal on her own charges[.]"[11]

In the federal habeas proceedings, the able district court concluded that although Holberg had properly exhausted her *Brady* claim as required by AEDPA, she was not entitled to relief. Specifically, the federal district court found that Holberg's *Brady* claim "would have backfired because trial counsel knew there was no deal" between Kirkpatrick and the prosecution at the time of Kirkpatrick's testimony, and that disclosing Kirkpatrick's confidential informant status would have merely allowed the prosecution to further bolster Kirkpatrick's testimony. The prosecution would have emphasized to the jury that Kirkpatrick was only testifying for altruistic reasons—not pursuant to some deal—and that she was a "trusted" informant with a reputation in the community for truth. Ultimately, the district court held that, under *Brady*, the state habeas court could reasonably conclude Holberg failed to demonstrate that Kirkpatrick's informant status was favorable or material in a way that would undermine confidence in the verdict.

On appeal, Holberg reasserts her constitutional challenge, arguing that the State violated her due process rights under *Brady* when it failed to disclose Kirkpatrick's status as a confidential informant.

---

[11] Looking at the state habeas court's reasoning, we note that the state court's analysis regarding Kirkpatrick's testimony conflates Holberg's *Brady* violation claim with Holberg's claim that the State intentionally elicited misleading testimony from Kirkpatrick, and uses the same factual findings to conclude that Holberg's *Brady* claim regarding Kirkpatrick had no merit. While the state habeas court identified the standard for establishing a *Brady* violation, it did not apply the legal framework to explain why "Holberg has failed to show that the State violated its obligation under *Brady v. Maryland*."

No. 21-70010

## III.

### A.

After exhausting their claims in state court, prisoners turning to federal court must overcome the relitigation bar of AEDPA.[12] That is, this court must show "AEDPA deference". Under this congressionally-mandated standard, we defer to a state court decision unless it "[1] was contrary to, or [2] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"[13]

While the first exception—the "contrary to" prong—is narrower in its reach, the second exception is still quite demanding.[14] Under the second exception, it is not enough that a federal court disagreed with the state court as a matter of its independent judgment. Rather, the second exception asks whether the state court's determination was unreasonable, beyond any possibility of fair-minded disagreement.[15]

### B.

Assuming a prisoner overcomes AEDPA's relitigation bar, successful *Brady* violations provide grounds for habeas relief. In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence

---

[12] *See* 28 U.S.C. § 2254(b); *Langley v. Prince*, 926 F.3d 145, 155 (5th Cir. 2019) (en banc).

[13] "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

[14] *Langley*, 926 F.3d at 155–56.

[15] *See id.* at 156; *see also Shoop v. Hill*, 586 U.S. 45, 48 (2019) (per curiam).

No. 21-70010

favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[16]  The purpose of *Brady* and its progeny is to ensure that "criminal trials are fair[,]"[17] and "that a miscarriage of justice does not occur."[18] Placing the burden on prosecutors to disclose information "illustrate[s] the special role played by the American prosecutor in the search for truth in criminal trials": a prosecutor must disclose evidence to the defense because its interest "is not that it shall win a case, but that justice shall be done."[19]

To succeed on a *Brady* claim then, a petitioner must establish that (1) favorable evidence, (2) was suppressed and was relevant, and (3) that the suppression was material or prejudicial to their case.[20] As the State rightfully concedes that evidence of Kirkpatrick's status as a confidential informant was suppressed, we will consider only whether this evidence was favorable and material to Holberg's case.

Favorable evidence is "evidence tending to strengthen a defense[.]"[21] "[T]he character of a piece of evidence as favorable will often turn on the

---

[16] *Brady*, 373 U.S. at 87.

[17] *Id.*

[18] *United States v. Bagley*, 473 U.S. 667, 675 (1985).

[19] *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

[20] *See id.* at 281–82 ("The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.").

[21] *Floyd v. Vannoy*, 894 F.3d 143, 163 (5th Cir. 2018) (citing *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

context of the existing or potential evidentiary record."[22] Over a decade before Holberg's trial, the Supreme Court held in *United States v. Bagley* that favorable evidence includes impeachment evidence.[23] Because impeachment evidence is "evidence favorable to the accused," for many years now it has been well-established federal law that impeachment evidence "falls within the *Brady* rule."[24] The Supreme Court has emphatically "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes[.]"[25]

As to the materiality element, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."[26] The touchstone of the materiality analysis is "a reasonable probability of a different result," such that "the government's evidentiary suppression undermines confidence in the outcome of the trial."[27] The *Brady* materiality analysis is "*not* considered in the light of the probability of acquittal"[28] and instead simply asks whether there is a reasonable probability

---

[22] *Kyles v. Whitley*, 514 U.S. 419, 439 (1995).

[23] 473 U.S. at 676 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule. . . . Such evidence is 'evidence favorable to an accused[.]'" (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady*, 373 U.S. at 87)).

[24] *Id.*

[25] *Kyles*, 514 U.S. at 433.

[26] *Bagley*, 473 U.S. at 682.

[27] *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678) (cleaned up).

[28] *Floyd,* 894 F.3d at 166 (citing *Bagley*, 473 U.S. at 680; *Wearry v. Cain*, 577 U.S. 385, 392 (2016)) (emphasis in original).

No. 21-70010

that the resulting proceeding "would have been different."[29] Materiality "is not a sufficiency of evidence test."[30]

## IV.

Holberg contends she is entitled to relief under *Brady* because the evidence of Kirkpatrick's informant status was favorable to Holberg, suppressed by the State, and material to her conviction and sentence. We find that Holberg is entitled to relief under *Brady*—and in doing so—find that the state habeas court's decision to the contrary was an unreasonable application of clearly established Supreme Court law.

### A.

Holberg argues that Kirkpatrick's status as a confidential informant for the City of Amarillo police is favorable evidence, a reality the State properly conceded. Counsel for the State, when questioned about whether Kirkpatrick's status as a confidential informant would have been favorable bias evidence to cross-examine and impeach Kirkpatrick, said that "in fairness, Your Honor, I think it would be favorable."[31] We agree.

This evidence would have strengthened Holberg's defense at trial.[32] Specifically, Holberg's counsel could have pointed to a trove of suppressed evidence to impeach Kirkpatrick. Holberg's counsel could have introduced

---

[29] *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (per curiam) (quoting *Strickler*, 527 U.S. at 280).

[30] *Kyles*, 514 U.S. at 434.

[31] Oral Argument at 40:30–42:00. https://www.ca5.uscourts.gov/OralArgRecordings/21/21-70010_6-5-2024.mp3.

[32] *See Floyd*, 894 F.3d at 163 (holding that evidence of impeachment was favorable); *see also id.* ("[T]he Court has held evidence impeaching a prosecution witness is favorable *Brady* evidence.") (citing *Bagley*, 473 U.S. at 676).

the evidence of Kirkpatrick's work for the City of Amarillo, including the approximately 40 search warrants and multiple convictions secured; the thousands of dollars she received as cash payments for her information; her daily communications with the Amarillo police department during the months leading up to Holberg's alleged confession; and the legal benefits Corporal Stallings secured for Kirkpatrick *on the same day* she shared Holberg's alleged confession, which included a dismissal of a criminal trespass charge and a release on bond. Instead of the six-page cross-examination, Holberg's counsel could have effectively cross-examined Kirkpatrick and undermined the State's *only* testimonial account of the violent encounter.

The State emphasizes that Kirkpatrick was a paid informant in "unrelated matters". Because Kirkpatrick was only formally paid cash for her assistance in unrelated cases, the State argues that Holberg's facts are distinct from those considered in *Brady* and *Banks v. Dretke*.[33] But the State's argument has no purchase. For decades, it has been established federal law that impeachment evidence is favorable evidence under *Brady*'s protections.[34] And as the Supreme Court recently stated, "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt."[35] Indeed, Kirkpatrick's confidential informant status is classic favorable impeachment evidence, and the state court unreasonably applied *Brady* and its progeny in concluding otherwise. "Any reason to support a conclusion the evidence was

---

[33] 540 U.S. 668 (2004).

[34] *See Bagley*, 473 U.S. at 676.

[35] *Andrew v. White*, 145 S. Ct. 75, 82 (2025) (cleaned up).

No. 21-70010

not favorable to [Holberg] is contrary to Court precedent, and, therefore, an unreasonable application of clearly-established federal law."[36]

**B.**

Finally, we consider whether any reasonable theory supported the state court's conclusion that the withheld evidence was collectively immaterial.[37] After a careful and deferential review of the record and the findings below, we find that if the State had disclosed Kirkpatrick's status as a confidential informant, there is a reasonable probability that the result of Holberg's proceedings would have been different.

**1.**

Holberg was convicted and sentenced to death for capital murder in the course of committing or attempting to commit robbery. Kirkpatrick's testimony was critical to the State's case, providing the supporting evidence for the robbery, undercutting Holberg's account of self-defense, and painting her as an unremorseful addict who posed a continued threat to society. In fact, the State represented, on direct appeal, that Kirkpatrick's testimony was "direct evidence" that "*alone*" proved Holberg committed the murder in order to "get [Towery's] money and to get drugs."

Furthermore, Kirkpatrick's testimony was the State's *only* evidence to assert that Holberg took pleasure in the gruesome act. These details include Holberg's statements to Kirkpatrick that "she'd do anything to get her drug money[,]" that "if she had to do it all over again . . . she would," that Towery's blood "looked real pretty like a fountain," and that Holberg shoved the lamp down Towery's throat to stop his gagging noises.

---

[36] *Floyd*, 894 F.3d at 163.

[37] *Id.* at 165 (citing *Kyles*, 514 U.S. at 436).

No. 21-70010

**2.**

Despite the dissent's assertion that the State disavowed such statements as "jailhouse talk," [38] the prosecution relied on the "talk" throughout both the guilt and punishment phases of the trial.

During the guilt phase of Holberg's trial, the lead prosecutor explicitly drew on Kirkpatrick's testimony in his opening statement and used Kirkpatrick's version of the murder to describe the violent struggle, comment on Holberg's *mens rea*, and challenge Holberg's credibility as a witness. Specifically, the prosecutor cited Kirkpatrick's testimony that Holberg used the lamp to stop Towery's gagging noises, that Holberg was "amazed" by the "fountain" of blood, that Holberg would do "anything to get her drug money," and that Holberg had lied to Kirkpatrick about her sexual relationship with Towery. The prosecutor ended his opening by telling the jury that they would "hear [Towery's] gagging noises, not in this courtroom, but in [their] thoughts, [their] sleep and in [their] dreams maybe for the rest of [their] lives."

While cross-examining Holberg, the prosecution used Kirkpatrick's testimony to challenge her testimony that she did not plan to use the lamp to kill Towery and to undercut Holberg's denial that she would do "anything" to get her drug money.[39] At closing, the prosecution again leveraged Kirkpatrick's testimony to maintain that Holberg admitted to killing Towery for a fix and showed no remorse. And during the State's rebuttal, the

---

[38] *Post*, at 36.

[39] Holberg testified that she would not do "anything" for drugs. She stated: "No, I would not hurt somebody for my addiction, I hurt myself. I never beat any of those pimps, I never beat any of those people. I ran from people. I was scared".

No. 21-70010

prosecution asserted "Kirkpatrick is telling the truth" and that Holberg "really did talk to Ms. Kirkpatrick and she really did tell her these things."

**3.**

The State continued to rely on Kirkpatrick's testimony during the punishment phase of Holberg's trial. "In Texas, capital cases require bifurcated proceedings—a guilt phase and a penalty phase. If the defendant is found guilty, a separate proceeding before the same jury is held to fix the punishment."[40] During the penalty phase, the jury answered the following two questions:

(1) Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant, BRITTANY MARLOWE HOLBERG aka BRITTANY MARLOWE JOHNSON, would commit criminal acts of violence that would constitute a continuing threat to society?

(2) Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence is imposed?[41]

If the jury returns a unanimous finding on the first question and a unanimous negative finding on the second question, then "the court shall sentence the defendant to death."[42] If at least one juror disagrees as to either question, then the death sentence is precluded.

---

[40] *Estelle v. Smith*, 451 U.S. 454, 457 (1981).

[41] *See also* TEX. CODE CRIM. PROC. ANN. art. 37.071 (West); 1991 Tex. Sess. Law Serv. 2898-99 (West).

[42] *Id.*

No. 21-70010

While Holberg's trial was conducted in two phases, the State re-offered all the admitted evidence in the guilt phase at the beginning of the sentencing phase. Kirkpatrick's testimony—again, the State's *only* evidence that Holberg enjoyed the violent encounter—was critical to the jury's unanimous affirmative finding on the first question in the punishment phase of Holberg's trial: whether Holberg "would commit criminal acts of violence that would constitute a continuing threat to society".

The force of Kirkpatrick's testimony was demonstrated by its use in the hypothetical posed to the State's expert psychiatrist, Dr. Coons. The prosecution referred to Kirkpatrick's statements when it laid the foundation for Dr. Coons, stating:

> And that finally at some point while [Towery] was probably still alive, I want you to assume that an eleven and a half inch lamp stand, a pole-like object with a round plate was jammed down his throat with what the pathologist described as significant force, some five inches down his throat. I want you to assume that the Defendant, Ms. Holberg, in some five or six different versions of what occurred, told at least one person that [Towery] was making some kind of a gagging sound and that she shoved the lamp down his throat to stop the noise.

Dr. Coons, in turn, used such statements to conclude that there was a probability that Holberg "would commit criminal acts of violence in the future which could constitute a continuing threat to society[,]" stating that "the gratuitous lamp down the throat" spoke of "intensity, anger, [and]

No. 21-70010

violence[,]"[43] and was "unnecessary" and "overkill."[44] Relying on the State's hypothetical, Dr. Coons concluded that although there appeared to be "an easy opportunity to get away[,]" the violence was "carried on to a conclusion." The State, in its closing arguments of the punishment phase, emphasized Dr. Coons's testimony in imploring the jury to find that Holberg would continue to commit criminal acts of violence. And the jury ultimately did.

### 4.

Kirkpatrick's testimony was material because defense counsel was effectively deprived of the opportunity to impeach her during trial. The Supreme Court has recognized that witnesses who are compensated for their testimony have acute incentive to lie.[45] Despite this incentive, the Court has concluded this testimony may be presented to the jury because the jury can weigh a witness's credibility when their status as a paid informant is disclosed, that status is subject to rigorous cross examination, and the jury receives a clear instruction to be cautious when weighing such testimony.[46]

---

[43] "The opinion based on that hypothetical is that there is a probability that that person would commit criminal acts of violence in the future which would constitute a continuing threat to society. . . . And then, the gratuitous lamp down the throat, that just speaks intensity, anger, violence with defensive wounds, and so forth, where, if the hypothetical is correct, an easy opportunity to get away as opposed to going through all of that. Instead, it's carried on to a conclusion."

[44] "Well, there shouldn't be any question about violence. . . . I would say there is more there than is necessary. . . . I suspect that the lamp stand was unnecessary. At least that."

[45] *See Hoffa v. United States*, 385 U.S. 293, 311 (1966).

[46] *Id.* ("The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury."); *On Lee v. United States*, 343 U.S. 747, 757-58 (1952) ("The use of informers, accessories, accomplices, false friends, or any of the

No. 21-70010

Kirkpatrick's testimony—and what Holberg allegedly told her in the jail cell—turned on her credibility. Though Kirkpatrick asserted at trial that Holberg was the source of her information, the jury was not presented with the possibility that her statements were cultivated by the prosecution. The jury's ability to weigh Kirkpatrick's credibility against the information elicited by defense counsel was only as effective as the information provided to them. As such, we are persuaded that had Kirkpatrick's informant status been disclosed, defense counsel could have challenged Kirkpatrick's credibility and the true source of her statements so as to raise "a reasonable probability that at least one juror would have struck a different balance." [47]

In light of Kirkpatrick's role as a key prosecution witness, one that supplied the State's only testimonial account of the violent encounter and the "direct evidence" of the alleged robbery, "there is no sound theory, considering the record as a whole, to support the conclusion that the evidence" of Kirkpatrick's suppressed status as a confidential informant did not reasonably affect Holberg's trial.[48] The state court's finding of

---

other betrayals which are 'dirty business' may raise serious questions of credibility. To the extent that they do, a defendant is entitled to broad latitude to probe credibility by cross-examination and to have the issues submitted to the jury with careful instructions."); *Banks*, 540 U.S. at 702 ("Jurors suspect [informants'] motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable . . . . ") (quoting Stephen Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 HASTINGS L.J. 1381, 1385 (1996))); *cf. United States v. Cervantes-Pacheco*, 826 F.2d 310, 315-316 (5th Cir. 1987) (en banc) (stressing that guardrails are in place to protect criminal defendants in context like these).

[47] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). *See also* TEX. CODE. CRIM. PROC. ANN., art. 37.071, § 2(b)(1); 1991 Tex. Sess. Law Serv. 2899 (West).

[48] *Floyd*, 894 F.3d at 167.

No. 21-70010

immateriality is an unreasonable application of clearly established Supreme Court law.[49]

## 5.

The federal district court, however, found that the suppression of the evidence did not prejudice Holberg because there was no formal deal for this case in place at the time of trial, and Kirkpatrick's impeachment would have only empowered the State to bolster Kirkpatrick as a reliable confidential informant. This analysis misses the mark on materiality.

First, the federal district court's potential bolstering reasoning is dubious in light of the State's own view of Kirkpatrick. In the immediate aftermath of Holberg's trial, the State did not vouch for Kirkpatrick's credibility but savaged it. Mr. Love, who prosecuted both Holberg and Kirkpatrick, argued in Kirkpatrick's burglary case, barely a month after Holberg was sentenced to death, that "Ms. Kirkpatrick has lied throughout her entire testimony, and in fact, was caught in a lie before she got up on the witness stand today until I pointed it out to her and her attorney that she had had a previous[] felony conviction."

Second, and more importantly, materiality simply requires showing there is a reasonable probability that the result of Holberg's proceedings would have been different.[50] We ask only whether it is reasonably probable

---

[49] We acknowledge the recent Supreme Court case, *Andrew v. White*, which vacated the lower court's judgment regarding the possibility of unduly prejudicial evidence that violates the Due Process Clause of the Fourteenth Amendment. 145 S. Ct. 75 (2025). Here, the non-admission of evidence at trial is *itself* a violation of the Constitution. Furthermore, this is not a case of a court's self-judgment of evidence. Instead, this is a case of withheld evidence, and the ability of defense counsel—armed with this evidence—to effectively argue its case to the jury.

[50] *Kyles*, 514 U.S. at 434–35.

No. 21-70010

that denying defense counsel the undisputed fact that Kirkpatrick was a paid informant and that the State held the future sentence of her burglary charge over her head for the trial would have impacted the trial outcome.

The State also points to Holberg's own "damaging" testimony to argue that withholding Kirkpatrick's status as a confidential informant was not prejudicial. The State's observation, alas, fails to account for the real possibility that Holberg *may have never testified* were it not for Kirkpatrick's testimony. More importantly, as this Circuit has previously held, even if the state court could have concluded that the jury could still have convicted Holberg based on her own testimony, "that, too, would be an unreasonable application of Supreme Court law. Materiality is not a sufficiency of evidence test."[51] Again, *Brady* is not a sufficiency of evidence analysis; it instead requires asking whether there is a reasonable probability that the outcome would have been different. We find that it is reasonably probable that defense counsel's impeachment of Kirkpatrick during trial would have undermined the jury's confidence in the State's argument. Had the suppressed information been disclosed, defense counsel could have mounted a more fulsome argument that the jury should discredit Kirkpatrick's testimony.

## V.

With all due respect, our able colleague steps past the salient issue in his dissent: the prosecution's reliance upon the credibility of Kirkpatrick's testimony while withholding from defense counsel that she was a paid informant placed in Holberg's cell on her arrest, taking only two days to report Holberg's confession to the killing and embellishing details of Holberg's delight in the "fountain" of blood her blows produced. The dissent argues that the State's failure to disclose had no salience as the State

---

[51] *Floyd*, 894 F.3d at 167 (quoting *Kyles*, 514 U.S. at 434) (cleaned up).

produced a "mountain of evidence" of the brutality of the killing for which Kirkpatrick was not the source.[52] With respect, the prosecution thought otherwise, electing to disobey a fundamental tenet of criminal prosecution. But the prosecution's failure to disclose was no oversight. It was rather a tactical decision in service of its reliance upon the credibility of Kirkpatrick throughout the trial.

Both *Brady* and *Giglio*[53] respond to the real-world effects of handicapping counsel in preparing the defense of the case. Did Holberg tell Kirkpatrick that she enjoyed the fountain of blood, or was Kirkpatrick simply enhancing her bargaining power in her then-ongoing negotiations of her pending charges of burglary?

It bears emphasis that Kirkpatrick did not create her testimony on her own. Unbeknownst to the jury, Kirkpatrick's statements were compensated by the State, and it intentionally withheld the information. The prosecution went to great lengths to obtain Kirkpatrick's testimony: six months passed between the State's initial investigation into Towery's death and Kirkpatrick's involvement in this case. The prosecution made multiple attempts to secure testimony against Holberg from her cellmates, offering them deals in exchange for false statements, to no avail.[54] But within two days of placing Kirkpatrick in Holberg's cell, the State received Holberg's alleged admission. The State compensated Kirkpatrick by dismissing her criminal trespass charge and releasing her on bond. Critically, however, the State held Kirkpatrick's felony burglary charge over her head until after she had testified against Holberg.

---

[52] *Post*, at 32.

[53] 405 U.S. 150 (1972).

[54] *Supra* n.3.

No. 21-70010

The dissent—in a footnote—dismisses Kirkpatrick's 2011 recantation, stating that the state habeas court ruled that Kirkpatrick's recantation was not credible.[55] With deference to the state court, its determination of Kirkpatrick's veracity in the distinct environment of a separate proceeding is, at best, further evidence that Kirkpatrick's testimony turned on its benefits to herself. In the words of the federal district court, "Kirkpatrick is a liar." It is undisputed that Kirkpatrick cut deals with the State in exchange for protection from prosecution, and that the State relied upon the testimony Kirkpatrick later recanted to bolster its case. Defense counsel, however, was never given the opportunity to cross-examine Kirkpatrick effectively and to develop the relationship between Kirkpatrick and the State.

The dissent also argues that Kirkpatrick's testimony was immaterial as to Holberg's sentencing, asserting that her testimony "played virtually no role in the punishment phase."[56] The dissent's analysis of the trial transcript, however, disregards the mechanics of the bifurcated trial in capital punishment. The dissent cannot take a siloed view of the punishment phase, especially as the State reintroduced all its guilt-innocence phase evidence—including Kirkpatrick's testimony—before the *very same jury.*

---

[55] *Post*, at 32 n.4.

[56] *Id*. at 39-40. The dissent states that the only mention of Kirkpatrick made during the prosecution's punishment-phase was during the testimony of Katina Dixon (also spelled "Katina Dickson" in the state habeas court's opinion), a cellmate of Holberg and Kirkpatrick who testified that Holberg asked Dixon to "shut [Kirkpatrick] up[.]" *Id*. The dissent, however, overlooks that Dixon also stated that she did not believe Holberg "mean[t] any harm," asserting that Holberg "was just blowing off some steam" and that "we all say things that we don't mean to say[.]" Furthermore, as with Kirkpatrick, Dixon—in her 2011 affidavit—later asserted that "Holberg never told her to shut [Kirkpatrick] up," and asserted that the State "told her to say that [Holberg] told her, 'I wish you would shut [Kirkpatrick] up.'"

No. 21-70010

Furthermore, common experience supported by empirical studies demonstrate that "evidence and arguments presented during the guilt phase of a capital trial will often have a significant effect on the jurors' choice of sentence."[57] As the State's *only* testimonial account of the violent encounter, Kirkpatrick's testimony presented a gripping story.[58] Though Kirkpatrick testified only in the guilt phase, the narrative force of her words had a lasting impact on the jury, as it was Kirkpatrick alone who stated that Holberg relished the violent act against Towery. The prosecution recognized this, telling the jury that they would remember Kirkpatrick's statements in their "thoughts, [their] sleep and in [their] dreams maybe for the rest of [their] lives."

Our colleague in dissent underestimates the power of an advocate armed with the evidence here illegally withheld and its impact on the trial. That fatality is the driving force of the *Brady* doctrine itself. We highlight here *Glossip v. Oklahoma*, the recent decision of the Supreme Court, reversing and remanding the Oklahoma Court of Criminal Appeals' judgment and ordering a new trial for defendant Richard Glossip.[59] The Court found the jury's credibility assessment of the prosecution's star witness "necessarily determinative" and the prosecution's *Napue v. Illinois*, 360 U.S. 264 (1959), violation material—even though the jury was aware that the witness in question was untrustworthy.[60] Here, the State succeeded in

---

[57] Strickler, 527 U.S. at 305 (Souter, J., concurring). See also Bowers, Sandys, & Steiner, Foreclosed Impartiality in Capital Sentencing: Jurors' Predispositions, Guilt-Trial Experience, and Premature Decision Making, 83 CORNELL L. REV. 1476, 1486-1496 (1998).

[58] *Strickler*, 527 U.S. at 307 (Souter, J., concurring). *See also* E. Loftus & J. Doyle, *Eyewitness Testimony: Civil and Criminal* 5 (3d ed. 1997) ("[R]esearch re[s]oundingly proves that the story format is a powerful key to juror decision making").

[59] No. 22-7466, 2025 WL 594736, at *3 (Feb. 25, 2025).

[60] *Id.*, at *11-12.

No. 21-70010

blocking evidence undermining Kirkpatrick's credibility. Given the prosecution's knowledge and nondisclosure of Kirkpatrick's government informant status, and the deal it struck with her including a ticket to avoid jail, the prosecution had to know that there was—at best—a high risk of presenting false testimony. We do not conflate *Brady* and *Napue* but only note that this recent ruling reinforces that the ultimate decisions in capital cases lie with the jury; practices that take that power from the jury to the prosecution are forbidden. *Brady* and *Napue* hold hands in their efforts to protect the jury in their decision-making and to preserve the fundamentals of a fair trial.

The critical question here is whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[61] And because Holberg's conviction required a unanimous jury recommendation,[62] materiality here requires only "a reasonable probability that at least one juror" would have decided differently.[63] Looking at these facts through the lens of a jury who was deprived of this information, we find that at least one juror would have done so.[64]

## VI.

There is a reason Brittany Marlowe Holberg has been on death row for over 27 years. The State denied her right to due process by keeping from

---

[61] *Bagley*, 473 U.S. at 682.

[62] TEX. CODE. CRIM. PROC. ANN., art. 37.071; 1991 Tex. Sess. Law Serv. 2898-99 (West).

[63] *Wiggins*, 539 U.S. at 537.

[64] We pause to note here that even if one assumes that the *Brady* violations were not material as to Holberg's conviction, they were as to her sentencing, a reality requiring that Holberg's death sentence be vacated and her case returned for further proceedings.

No. 21-70010

the jury evidence favorable to the Defendant, and this suppression prejudiced her case.

By the metric of AEDPA, fair-minded jurists could not disagree that the state court's denial of relief involved an unreasonable application of clearly established Supreme Court law. For these reasons, we REVERSE and VACATE Holberg's conviction, and REMAND the case to the district court for further proceedings consistent with this opinion.

No. 21-70010

Stuart Kyle Duncan, *Circuit Judge*, dissenting:

The majority grants habeas to Brittany Holberg, who admitted over a quarter century ago to butchering a sickly 80-year-old man named A.B. Towery. Holberg claimed self-defense, but the jury didn't buy it. No wonder why. No jury in its right mind would believe that a 23-year-old cocaine-addled prostitute "defended" herself against a frail old man by (1) stabbing him 58 times, (2) bludgeoning him with various objects including a steam iron, and (3) ramming a lamp base down his throat while he was still alive. I will spare you the crime scene photos of Towery's ghastly injuries. But the jury saw them. It also heard Holberg admit to inflicting each and every one of the blows that turned Towery's face into unrecognizable red pulp. So, it is not hard to understand why the jury rejected Holberg's self-defense theory as—in the prosecutor's words—"a lot of BS." Nor is it hard to understand why the jury sentenced Holberg to die.

Yet my colleagues now award Holberg a new trial on both guilt and punishment. Why? Because the prosecution failed to disclose that one of its witnesses, Vickie Kirkpatrick, previously acted as a police informant in unrelated drug cases. Kirkpatrick testified that, when they were cell-mates, Holberg admitted killing Towery for drugs, not in self-defense, and that she enjoyed doing it. According to the majority, Holberg could have impeached Kirkpatrick with the suppressed information, which could have led the jury to credit her self-defense theory or, at least, spare her the death penalty.

The majority is mistaken. A defendant gets a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963), only if undisclosed evidence is "material." The Kirkpatrick evidence was not. Contrary to the majority's insistence, Kirkpatrick was by no means the prosecution's "critical trial witness," Op. 1, either as to guilt or punishment. To the contrary, a wealth of other powerful evidence—evidence entirely unconnected to Kirkpatrick—obliterated

No. 21-70010

Holberg's self-defense claim and proved she robbed Towery after killing him. And Kirkpatrick's testimony played virtually no role at the punishment phase. So, even had Kirkpatrick been impeached, there's zero chance that a jury would have credited Holberg's laughable claim of self-defense or spared her the death penalty for slaughtering a sick old man.

## I.

The majority proceeds on the following assumptions: (1) Holberg exhausted a *Brady* claim based on the prosecution's failure to disclose that Kirkpatrick acted as a police informant in unrelated drug cases, *see* Op. 10; (2) the state habeas court denied this *Brady* claim on the merits, *ibid.*; (3) AEDPA deference applies to the state habeas court's decision, *ibid.*; (4) the prosecution failed to disclose Kirkpatrick's informant activities, *id.* at 6–8; (5) that evidence was favorable because Holberg's attorneys could have impeached Kirkpatrick with it, *id.* at 13–15.

I accept all those assumptions for present purposes.[1] Still, I disagree with the majority's conclusion that this undisclosed evidence was material under *Brady*, either as to Holberg's guilt or her eligibility for the death

---

[1] There is a strong argument, however, that this *Brady* claim was never raised on state habeas and is now procedurally barred. *See Davila v. Davis*, 582 U.S. 521, 527 (2017) ("[A] state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court."). Holberg points to two state habeas claims as exhausting this claim, but both are different—one claimed the prosecution knowingly presented false testimony from Kirkpatrick under *Giglio v. United States*, 405 U.S. 150 (1972), and the other was a *Brady* claim concerning another witness, not Kirkpatrick. That said, procedural bar is no longer an issue because in supplemental briefing the State expressly waived the defense. *See Carty v. Thaler*, 583 F.3d 244, 256 (5th Cir. 2009) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." (quoting 28 U.S.C. § 2254(b)(3))). Accordingly, I proceed on the assumption—shared by both parties and the majority—that the Kirkpatrick-related *Brady* claim was exhausted in state proceedings and ruled on by the state habeas court.

penalty. *A fortiori*, I cannot accept the majority's bottom-line holding that the state habeas court's rejection of this claim was an "unreasonable application" of *Brady* under AEDPA. *See* 28 U.S.C. § 2254(d)(1).

## II.

The core of the majority's ruling is that the Kirkpatrick impeachment evidence was material as to both guilt and punishment. As to guilt, Kirkpatrick's testimony went to (1) whether Holberg killed Towery in self-defense and (2) whether Holberg robbed Towery during the killing. Op. 15. As to punishment, Kirkpatrick's testimony spoke to Holberg's remorse (or lack thereof) and future dangerousness. *Id.* at 17–19. In the majority's view, if Holberg could have exposed Kirkpatrick as a police informant in other cases, it's reasonable to think she would have been acquitted or at least spared capital punishment. That is wrong.

*Brady*'s materiality standard is well-settled. "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 582 U.S. 313, 324 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).[2] A defendant need not show the jury would have reached a different verdict had the evidence been disclosed. *Wearry v. Cain*, 577 U.S. 385, 392 (2016). Rather, she must show the undisclosed evidence "undermines confidence in the outcome of the trial." *Turner*, 582 U.S. at 324 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "[W]ithheld evidence is more likely material when the State presents a weaker case for guilt." *Floyd v. Vannoy*, 894 F.3d 143, 166 (5th Cir. 2018) (citing *Smith v. Cain*, 565 U.S. 73, 76 (2012); *United States v. Agurs*, 427 U.S.

---

[2] *See also Youngblood v. West Va.*, 547 U.S. 867, 870 (2006); *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Bagley*, 473 U.S. 667, 682 (1985).

No. 21-70010

97, 113 (1976)). Conversely, such evidence is *less* likely material when "a substantial body of evidence establishing . . . guilt . . . is left unscathed by the suppressed evidence." *United States v. Miller*, 520 F.3d 504, 515 (5th Cir. 2008).[3] In other words, "[i]n assessing the materiality of undisclosed impeachment evidence, 'we must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony.'" *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994) (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)).

Under these standards, the state habeas court correctly ruled that the Kirkpatrick impeachment evidence was immaterial as to guilt or punishment. By definition, then, that court did not "unreasonably" apply *Brady*.

## A. Materiality as to guilt

### 1. Self-defense

Holberg admitted to killing Towery, a frail and sickly 80-year-old man, by stabbing him 58 times, bludgeoning him with various objects, and shoving a lamp down his throat. She claimed she did all this in self-defense, however, after Towery attacked her for smoking crack in his apartment. Kirkpatrick's testimony undermined this story. Kirkpatrick testified Holberg said she killed Towery for drugs and would do it again. She also testified that Holberg thought Towery's blood was "pretty like a fountain," that the killing was

---

[3] *See also Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004) (suppressed evidence was not material "in light of the overwhelming evidence establishing his guilt"); *United States v. Cessa*, 872 F.3d 267, 272 (5th Cir. 2017) ("[W]hen the testimony of a witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict, the undisclosed evidence is generally not found to be material.") (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996)); *United States v. Brumfield*, 89 F.4th 506, 515 (5th Cir. 2023) (same).

No. 21-70010

"fun and amazing," and that she shoved the lamp down Towery's throat to stop his "gurgling noises." Impeaching Kirkpatrick, according to the majority, could have "undercut[] Holberg's account of self-defense." Op. 17.[4]

That is wrong for a simple reason: Holberg's self-defense theory was ludicrous. It was obliterated by a mountain of evidence, none of which had any connection to Kirkpatrick. So, undermining Kirkpatrick couldn't have made any difference to the outcome.

Holberg stabbed Towery in the head, face, neck, chest, back, abdomen, hands, and wrists—a total of 58 times. Towery also suffered blunt force wounds to his head, face, neck, and trunk. To inflict these injuries, Holberg used a claw hammer, a butcher knife, a cast iron skillet, a steam iron, forks, and a paring knife (the last was found sticking out of Towery's abdomen). Holberg also pushed an 11.5 inch lamp base down Towery's throat—so far that it nicked his carotid artery. None of these injuries was instantly fatal. Given evidence of hemorrhaging in his mouth, Towery was likely alive when Holberg forced the lamp down his windpipe.

When he was killed, Towery was 80 years old and weighed about 160 pounds. He had several health problems—gout, stomach ulcers, prostate

---

[4] It bears mentioning that, in a 2011 deposition, Kirkpatrick tried to recant most of her testimony at Holberg's trial, asserting instead that the district attorney had offered her a deal for her cooperation and coached her testimony. Holberg introduced this evidence to support her state habeas claim that the prosecution knowingly elicited false testimony from Kirkpatrick. The state habeas court rejected that claim, however. In doing so, the court ruled that Kirkpatrick's recantation was "not credible," that her trial testimony was "credible," that the district attorney's affidavit rebutting Kirkpatrick's recantation was "credible," and that Kirkpatrick's testimony at Holberg's trial was "not misleading." My colleagues in the majority state that my "dissent ... dismisses Kirkpatrick's 2011 recantation." Op. at 24. Not so. It was the *state habeas court* that "dismissed" Kirkpatrick's recantation as a lie.

No. 21-70010

issues, and bad knees—and took numerous prescription medications including painkillers. He had had a tumor removed on one ankle and surgery on one knee. One of his sons testified Towery walked "very slow," "shuffled when he walked," and "didn't take very big steps." His children had taken away his car keys.

Not one iota of this evidence had anything to do with Kirkpatrick. It came from the police, the medical examiner, and Towery's adult children. It was supported by crime scene videos and autopsy photos.

Let's suppose that, armed with the withheld evidence, Holberg's attorneys discredited Kirkpatrick. *Brady* asks this materiality question: with Kirkpatrick impeached, was there a "reasonable probability" that the jury would credit Holberg's self-defense theory? The answer is no. The jury was presented with graphic physical evidence that Holberg sadistically butchered a sick old man—with a lamp rammed down his throat as the *coup de grâce*. Holberg admitted to striking each and every one of those blows. That evidence doomed Holberg's self-defense theory and there is no chance that impeaching Kirkpatrick would have resurrected it.

In other words, the state habeas court correctly ruled the withheld evidence was immaterial to self-defense. "[W]hen the testimony of a witness who might have been impeached is *strongly corroborated by additional evidence supporting a guilty verdict*, the undisclosed evidence is generally not found to be material." *Cessa*, 872 F.3d at 272 (quoting *Spence*, 80 F.3d at 995) (emphasis added).[5] That principle ends this appeal. Kirkpatrick's testimony

---

[5] *See also Brumfield*, 89 F.4th at 515 (same); *United States v. Brown*, 650 F.3d 581, 592 (5th Cir. 2011) (same); *Miller*, 520 F.3d at 515 n.26 (same); *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004) ("'The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state.'" (quoting *Smith v. Black*, 904 F.2d 950, 967 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992))); *Rocha v. Thaler*, 619 F.3d 387, 396–97 (5th Cir. 2010) (same); *Medellin v. Dretke*,

No. 21-70010

that Holberg did not kill Towery in self-defense was strongly—overwhelmingly—corroborated by the uncontradicted physical evidence of the ghastly brutality Holberg visited on Towery. Even with Kirkpatrick impeached, there is no reasonable probability of the jury's coming out differently. Or, to ask the question another way: if Kirkpatrick was impeached, might the jury have accepted the theory that Holberg defended herself by stabbing an ailing 80-year-old man 58 times, bludgeoning him with blunt objects, and shoving a lamp down his throat? To ask is to answer.[6]

The majority fails to place Kirkpatrick's testimony within the overall context of the trial evidence. *Cf. Porretto v. Stalder*, 834 F.2d 461, 464 (5th Cir. 1987) ("*Brady* requires that materiality be determined in light of all the evidence at trial, not just that portion sought to be introduced by the defendant."). It says Kirkpatrick's testimony was "critical" because it "undercut[] Holberg's account of self-defense." Op. 15. But this ignores that the self-defense theory was demolished by a flood of *other* evidence unconnected to Kirkpatrick.

The majority claims the prosecution "relied" on Kirkpatrick's testimony "throughout both the guilt and punishment phases of the trial." Op. 16. When unpacked, though, that statement means much less than meets the eye. In the course of an opening argument spanning 19 transcript pages,

_____

371 F.3d 270, 281 (5th Cir. 2004) (suppressed evidence was not material "in light of the overwhelming evidence establishing his guilt").

[6] The majority suggests this reasoning is out of place because materiality under *Brady* "is not a sufficiency of evidence analysis." Op. 22; *see Kyles*, 514 U.S. at 434. That argument fails. My point is not that, subtracting Kirkpatrick's testimony, enough evidence still supported the verdict. Instead, it is that, given the *independent* evidence demolishing Holberg's self-defense theory, impeaching Kirkpatrick couldn't have made any difference to the verdict. The same is true of the evidence independently proving that Holberg robbed Towery. *See infra.*

No. 21-70010

the prosecutor referenced Kirkpatrick only four times. His focus was not on Kirkpatrick, but rather on the shocking barbarism of Towery's injuries—something Holberg did not and could not contest. ("You will learn that she beat A. B. Towery with a hammer, a claw hammer. She beat him with a heavy cast iron skillet. You will learn she stabbed him 58 times."). The prosecutor also focused on the plethora of evidence that Holberg robbed Towery (more on that below).

As for the prosecution's closing, it *did not mention Kirkpatrick at all*. Instead it focused, like its opening, on the strong evidence of robbery and on the savagery of Towery's killing. The prosecutor used the latter point to argue that Holberg's "self-defense claim [wa]s a lot of BS." Here's a key passage:

> Well, I want you to think about this: If that story is true, this is an 80-year-old man who has been stabbed 57 times. Stab wounds puncturing his lung, liver, he's been beaten with a claw hammer causing chips to his skull. He has a pulverized nose, he's just – he just keeps coming at her. Just keeps coming at her.
>
> [***]
>
> And you have heard the number 57 and 58. I say 57 because the pathologist said there were 57 – I'm sorry, 58 sharp force stab wounds to Mr. Towery. His back, his torso, his neck, his face, his hands. He said 58, I say 57 because she says that in the course of that last series of events, she shoves the lamp down his throat by accident and then he moves and she has to stab him one last time.
>
> [***]
>
> And we talk about 57 and it's just a number, but it's not. Fifty-seven is not just a number as it relates to this case. I want you to think about 57 stab wounds to an 80-year-old man. This is how many it was.

No. 21-70010

(Whereupon Assistant State's Attorney Blount hit the jury counter with his hand 57 times.)

It was not the prosecution but the defense that brought up Kirkpatrick in its closing, arguing she lied about Holberg's saying the blood was "pretty like a fountain." In rebuttal, the State addressed this by *disavowing* those comments. The prosecutor said he didn't believe that Holberg was "so callous and uncaring that she actually really did enjoy stabbing [Towery]" or that she thought his blood was "pretty." He dismissed this as "jailhouse talk." The prosecutor argued only that Kirkpatrick testified about "details" (specifically, Towery's repeated stabbing) she otherwise couldn't have known about.

Finally, it bears emphasizing that Kirkpatrick was the *eighteenth* of twenty witnesses for the State. Besides Kirkpatrick, the prosecution relied on a litany of testimony concerning: (1) the bloody crime scene; (2) Holberg's cocaine-addled state on arriving at Towery's apartment; (3) Towery's age and frail health; (4) the $1,200–$1,400 missing from Towery's wallet; (5) the prescription bottles missing from Towery's apartment; (6) Holberg's washing up and dressing in Towery's clothes before leaving; (7) Holberg's paying someone $200 in bloodstained bills to drive her away from the scene; (8) Holberg's partying with hundreds of dollars' worth of cocaine she bought the same day as the killing; (9) Holberg's strange comments to her mother about the killing; (10) Holberg's unprompted remark to the arresting officer denying she stole "$1,400" from Towery; and (11) the grisly details from Towery's autopsy. The climax of the State's case was not Kirkpatrick but rather the chief medical examiner's description of Towery's horrific injuries.

This context is important. Although the majority is superficially correct that Kirkpatrick provided "the State's only testimonial account of the violent encounter," Op. 16, the evidence bearing on Holberg's *self-defense theory* is massive. And, as discussed, that evidence is (1) entirely separate

No. 21-70010

from Kirkpatrick's testimony and (2) devastating to the notion that Holberg slaughtered Towery in self-defense.

Finally, let's suppose that—contrary to the foregoing discussion—the state habeas court's materiality analysis was wrong. That still wouldn't entitle Holberg to habeas relief, though, because her petition is governed by AEDPA. "The question under AEDPA is . . . not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable—'a substantially higher threshold' for a prisoner to meet." *Shoop v. Twyford*, 596 U.S. 811, 819 (2022) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). The majority has not shown how that daunting standard is met here. *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The majority seems to believe this is not a close case, given the "critical" role it assigns to Kirkpatrick. Op. 1. As shown, though, the majority overestimates Kirkpatrick's role in the trial. While her testimony was damaging to Holberg's claim of self-defense, Kirkpatrick was not the lynchpin witness the majority imagines. Rather, wholly apart from Kirkpatrick's testimony, a flood of vivid and gruesome evidence independently showed that Holberg's self-defense theory was—as the prosecutor argued in closing—"a lot of BS." Would impeaching Kirkpatrick have made the slightest bit of difference? Not a chance.

### 2. Robbery

The majority also claims Kirkpatrick's testimony was material because it "provid[ed] the supporting evidence for the robbery." Op. 15. That is also mistaken.

No. 21-70010

Kirkpatrick testified that Holberg said she killed Towery for money and drugs. But there is a plethora of evidence—entirely unconnected to Kirkpatrick—showing Holberg robbed Towery of over $1,000 in cash and several bottles of prescription medication.

Start with the money. A wallet containing a $1 bill was found *on Towery's corpse* (near the handle of the paring knife protruding from his abdomen). But two of Towery's children and his daughter-in-law testified Towery had recently been carrying over $1,000 in cash, in $100 bills, folded in a particular way, and kept in his wallet. They had seen the cash with their own eyes. Towery was saving up to buy an old pick-up truck, evidently in defiance of his children's taking his car keys away.

When Holberg arrived at the scene, she stiffed a cab driver for the fare. She had money when she left, though. According to Cody Mayo and his girlfriend, Misty Votaw, Holberg offered them $200 for a ride. One of the bills was bloodstained. Both saw Holberg pull out a wad of cash. Cody watched her "count[] out at least ten $100 bills." Misty testified Holberg "pulled out ten to twenty $100 bills" from her right pocket and had "approximately ten $100 bills" left after she paid them $200. Finally, later that evening Holberg "partied" with a drug dealer named Dimitris Pettus. She testified that Holberg "had a lot of money" and bought "five or six hundred" dollars of "dope," paying for it "in $100 bills and some twenties."

Next, the drugs. Multiple witnesses testified that Towery kept numerous bottles of prescription medication—as many as ten—around his apartment in plain sight. Yet only two bottles were found at the crime scene, one in a bedroom drawer. Holberg was an admitted drug abuser. The cab driver testified that, on the way to Towery's place, Holberg tried unsuccessfully to get pills from a pharmacy. The jury easily could have found she stole Towery's medication.

No. 21-70010

None of this evidence had anything to do with Kirkpatrick. And it is much more specific than Kirkpatrick's generic testimony. The evidence about the bloodstained wad of $100 bills Holberg was carrying immediately after the killing is particularly damning. In light of that, there's no reasonable probability that impeaching Kirkpatrick would have made the tiniest bit of difference. *See Porretto*, 834 F.2d at 464 ("*Brady* requires that materiality be determined in light of all the evidence at trial . . . ."). And by no stretch of the imagination was the state habeas court's decision "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.[7]

## B. Materiality as to punishment

The majority also claims that Kirkpatrick's testimony played a "critical" role in Holberg's capital sentence because it "paint[ed] her as an unremorseful addict who posed a continued threat to society," Op. 15, and was therefore material to punishment as well as guilt. This is again mistaken.

Kirkpatrick's guilt-phase testimony played virtually no role in the punishment phase. Multiple witnesses testified on both sides about Holberg's violent propensities (or lack thereof) and mitigating factors (or lack thereof). Kirkpatrick's guilt-phase testimony did not figure into any of

---

[7] Quoting the State's brief on direct appeal, the majority implies the State itself argued that "Kirkpatrick's testimony was 'direct evidence' that '*alone*' proved that Holberg committed the murder in order to 'get [Towery's] money and to get drugs.'" Op. 15. That is misleading, though. The State was arguing only that Kirkpatrick's testimony was sufficient *by itself* to prove the aggravating robbery factor. Immediately after that, however, the State spent a dozen pages recounting a litany of other evidence—totally independent of Kirkpatrick's testimony—supporting the jury's capital verdict.

No. 21-70010

that,[8] and Kirkpatrick herself did not testify. Ironically, the only mention made of Kirkpatrick during the prosecution's punishment-phase case came during the testimony of Katina (or Katrina) Dixon, a cell-mate of Holberg and Kirkpatrick. Dixon testified that Holberg asked Dixon to "shut [Kirkpatrick] up"—*i.e.*, kill her—to prevent Kirkpatrick's testifying. The prosecution mentioned this threat against Kirkpatrick during its closing.

For its part, the defense mentioned Kirkpatrick's guilt-phase testimony once during its closing, again arguing Kirkpatrick was lying. The defense said the same thing about Dixon's testimony that Holberg asked her to "shut up" Kirkpatrick.

That was it. The lengthy punishment phase—which goes on for nearly 500 transcript pages—barely mentioned Kirkpatrick. The prosecution presented testimony from Towery's daughter, from two of Holberg's *other* cell-mates (Dixon and Mary Burnett), from a woman in a drug treatment facility with Holberg, from Holberg's probation officer, and from a psychiatrist who reviewed Holberg's files. The defense side was the mirror image, presenting testimony from Holberg's family and friends, from a psychiatrist, from various prison officials, from a chaplain, and from yet another cell-mate. The punishment phase was about many things, but it was assuredly not about Kirkpatrick's guilt-phase testimony.

---

[8] The majority tries to link the testimony of the State's psychiatrist, Dr. Richard Coons, to Kirkpatrick's statements about the lamp being shoved down Towery's throat. Op. 18–19. But the majority refers to something the prosecutor said to Coons, not to what Coons himself testified. *Ibid.* Coons testified only that "the gratuitous lamp down the throat" showed the "intensity, anger, [and] violence" of the crime. Moreover, as discussed throughout this opinion, the extent of Towery's injuries (including the lamp shoved down his throat) was powerfully shown by forensic evidence entirely independent of Kirkpatrick's testimony.

No. 21-70010

In light of that, I fail to see how the withheld evidence regarding Kirkpatrick could have influenced the punishment phase—much less created a "reasonable probability" of a different outcome. And, once again, that doesn't really matter because this is an AEDPA case. The question is not whether the state habeas court *correctly* ruled on this point but whether it *unreasonably* applied *Brady*. *See Harrington*, 562 U.S. at 103. The majority somehow finds such an unreasonable application with respect to punishment as well as guilt. I cannot agree.

***

I would affirm the district court's denial of habeas relief as to Holberg's *Brady* claim.